# 14-3091-cv

## United States Court of Appeals
## for the Second Circuit

——— ◦❙◦ ———

WELLS FARGO BANK, N.A., Trustee for the Registered
Holders of Salomon Bro Mortgage Securities VII Inc,
Mortgage Pass-Through Certificates, Series 2000 C-2, by
Orix Capital Markets LLC, its Attorney in Fact,

*Plaintiff-Appellee,*

— v. —

KONOVER DEVELOPMENT CORPORATION, KONOVER
CONSTRUCTION CORPORATION, KONOVER &
ASSOCIATES, INC., BLACKBOARD LLC, RIPPLE LLC,
*Defendants,*

MICHAEL KONOVER,

*Defendant-Appellant.*

———————————

ON APPEAL FROM THE UNITED STATES DISTRICT
COURT FOR THE DISTRICT OF CONNECTICUT

## PAGE PROOF BRIEF OF DEFENDANT-APPELLANT
## (REDACTED)

WILLIAM J. MURPHY
CONOR B. O'CROININ
ZUCKERMAN SPAEDER LLP
100 East Pratt Street, Ste. 2440
Baltimore, Maryland 21202
(410) 332-0444

JAMES T. SHEARIN
PULLMAN & COMLEY LLC
850 Main Street
Bridgeport, Connecticut 06601
(203) 330-2240

*Attorneys for Defendant-Appellant*

## CORPORATE DISCLOSURE STATEMENT

In conformance with Rule 26.1 of the Federal Rules of Appellate Procedure, Defendants Konover Development Corporation, Konover Construction Corporation, Konover & Associates, Inc., Blackboard LLC, and Ripple LLC state that each has no parent corporation and that no publicly held corporation owns any of their stock or membership interests.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT...........................................C

TABLE OF CITATIONS ...................................................v

STATEMENT OF JURISDICTION..........................................1

ISSUES PRESENTED .................................................2

STATEMENT OF THE CASE ..........................................4

I.    The Konover Companies. ................................................5

    A.    Konover Management Corporation ("KMC")..........................5

    B.    Konover Development Corporation ("KDC").........................6

    C.    Michael Konover. ................................................7

    D.    Konover & Associates and Corporate Allocation Payments. ...................................................8

    E.    Mr. Goman's Decision to Transfer Leasing from KMC to KDC. ................................................8

II.    The Diamond Point Loan Refinancing. .........................................10

    A.    The Sam's Club Information.................................................11

    B.    Mr. Konover's Refusal to Personally Guarantee the Loan. ................................................14

    C.    The KMC Guaranty. ................................................14

    D.    The Loan Closing and Subsequent Securitization. ..............17

    E.    ORIX Capital Markets, LLC ("ORIX"). ...............................19

    F.    The Diamond Point Default.................................................21

III.    The 2002-2003 Portfolio Sale.........................................23

A.    Mr. Konover's Decision to Sell the Shopping Center
      Portfolio. ...............................................................23

B.    The Portfolio Sale Commissions. ...........................25

      1.    Future Lease Renewal Option Commissions...............26
      2.    Sales Commissions.......................................27
      3.    The Return of Mr. Konover's Capital.........................28

C.    The Effects of the Portfolio Sale. ..........................29

IV.   The Underlying Maryland Action....................................30

A.    The Complaints in the Maryland Action. ............30

B.    Disclosure of the Leasing Division Transfer and
      Portfolio Sale in the Maryland Action................................32

C.    The Bench Trial in Baltimore County.................................33

D.    Post-Judgment Proceedings and the 2005 Transfers............35

E.    The Attorneys' Fees Hearing in the Maryland Action. ........38

V.    Plaintiff's Connecticut Action and Request for a Veil-
      Piercing Remedy..............................................................39

A.    Plaintiff's Complaints. .........................................39

B.    Relevant Pretrial Rulings. ....................................40

      1.    Motion to Dismiss for Lack of Subject Matter
            Jurisdiction. ...............................................40
      2.    Defendants' Motions for Summary Judgment. ..........41
      3.    The District Court's Rulings on Motions in Limine....43

VI.   The Trial in the District Court. ...................................47

A.    The Witnesses and Subject Areas of Examination...............47

      1.    The DPPLP Certificates. ..............................48
      2.    Fraudulent Inducement by KMC...............................49
      3.    KMC's Alleged Breaches of the KMC Guaranty. ........51

ii

B.    Mr. Konover's Motion for Judgment. ....................53

C.    The District Court's Jury Instructions...................54

D.    The Jury's Verdict. ................................................56

VII.   Plaintiff's Request For $10.6 Million in Attorneys' Fees..............56

SUMMARY OF ARGUMENT ...................................................57

ARGUMENT .................................................................................63

I.     Because the Parties are not Diverse, there is No Subject
       Matter Jurisdiction. ........................................................63

II.    The District Court Erred by Granting Plaintiff a License to
       Present Volumes of Irrelevant and Unfairly Prejudicial
       Evidence, and then Refusing to Instruct the Jury on the
       Relevant Transactions and Veil-Piercing Principles...................69

       A.    Without Explanation, Judge Thompson Removed All
             Limitations from Plaintiff's Veil-Piercing Claims..............71

       B.    The District Court Erred by Ignoring the *State Five*
             Decision. ................................................................77

       C.    The District Court Erred by Not Instructing the Jury
             that Veil-Piercing is Permissible Only if Plaintiff
             Could Not be Compensated Through Money Damages........83

III.   The District Court Erred by Refusing to Grant Mr. Konover's
       Motion for Judgment.......................................................85

       A.    The Portfolio Sale Transactions Could Not Have
             Impaired Plaintiff's Nonexistent Judgment Rights. ...........88

       B.    Only the 2005 Transfers Could Have Violated
             Plaintiff's Judgment Rights, But They Could Not
             Have Caused Plaintiff's Loss.......................................90

iii

IV.    Plaintiff's Claims that Mr. Konover Caused KMC to
       Fraudulently Induce the Diamond Point Loan were Barred
       by Res Judicata. ............................................................... 91

V.     The District Court Erred by Taking Judicial Notice of
       Plaintiff's "Tailored Presentation" of the Maryland Findings. ..... 94

VI.    There was No Cause of Action to Support an Award of
       Punitive Damages. ........................................................ 101

VII.   The Loan Documents Merged Into the Maryland Judgment...... 105

CONCLUSION ...................................................................... 109

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF CITATIONS

## CASES

*AccuBid Excav., Inc.*, v. *Kennedy Contractors, Inc.*,
981 A.2d 727 (Md. App. 2009) ........................................................... 105

*Advantage Health Plan, Inc.* v. *Knight*,
139 F. Supp. 2d 108 (D.D.C. 2001) ..................................................... 94

*Anderson* v. *Bessemer City*,
470 U.S. 564 (1985) ............................................................................. 99

*Angelo Tomasso, Inc.* v. *Armor Construction & Paving, Inc.*,
447 A.2d 406 (Conn. 1982) .................................................. 41, 46, 72, 83

*Barlow* v. *Liberty Mar. Corp.*,
746 F.3d 518 (2d Cir. 2014) ................................................................ 69

*Barry* v. *Posi-Seal Int'l, Inc.*,
672 A.2d 514 (Conn. App. 1996) ....................................................... 102

*Bear, Stearns & Co.* v. *1109580 Ontario, Inc.*,
409 F.3d 87 (2d Cir. 2005) .................................................................. 97

*Belle View Apts.* v. *Realty ReFund Trust*,
602 F.2d 668 (4th Cir. 1979) .............................................................. 64

*Berry* v. *Loiseau*,
614 A.2d 414 (Conn. 1992) ................................................................. 57

*BKJB Partnership* v. *Moseman*,
644 S.E.2d 874 (Ga. App. 2007) ........................................................ 93

*Bouchat* v. *Champion Prods., Inc.*,
327 F. Supp. 2d 537 (D. Md. 2003) ..................................................... 94

*Brunswick Corp.* v. *Waxman*,
599 F.2d 34 (2d Cir. 1979) ............................................................ 87, 88

*Campisano* v. *Nardi*,
562 A.2d 1 (Conn. 1989) ....................................................................... 88

*Carden* v. *Arkoma Assocs.*,
494 U.S. 185 (1990) ...................................................................... 63, 65

*Cole* v. *Aetna Life & Cas.*,
70 F. Supp. 2d 106 (D. Conn. 1999) ..................................................... 102

*Comm'r of Envtl. Prot.* v. *State Five Indus. Park, Inc.*,
37 A.3d 724 (Conn. 2012) ............................................................. passim

*Creaciones Con Idea, S.A. de C.V.* v. *Mashreqbank PSC*,
232 F.3d 79 (2d Cir. 2000) .................................................................. 63

*CSX Transp., Inc.* v. *Blakeslee*,
2012 WL 3985169 (D. Conn., Sept. 11, 2012) ...................................... 76

*CWCapital Asset Mgmt., LLC* v. *Chicago Props., LLC*,
610 F.3d 497 (7th Cir. 2010) ............................................................... 20

*DPPLP* v. *Wells Fargo Bank, N.A.*,
929 A.2d 932 (Md. 2007). ............................................................. passim

*Duane Reade, Inc.* v. *St. Paul Fire & Marine Ins. Co.*,
600 F.3d 190 (2d Cir. 2010) ................................................................ 91

*E.R. Squibb & Sons, Inc.* v. *Accident & Cas. Ins. Co.*,
160 F.3d 925 (2d Cir. 1998) ................................................................ 65

*Emerald Investors Trust* v. *Guant Parsippany Partners*,
492 F.3d 192 (3d Cir. 2007) ................................................................ 66

*Evergreens* v. *Nunan*,
141 F.2d 927 (2d Cir. 1944) ................................................................ 98

*Everspeed Enterprises Ltd.* v. *Skaarup Shipping International*,
754 F. Supp. 2d 395 (D. Conn. 2010) ................................................. 103

*Girden* v. *Sandals Int'l*,
262 F.3d 195 (2d Cir. 2001) ................................................................ 69

*Hale* v. *Firestone Tire & Rubber Co.*,
756 F.2d 1322 (8th Cir. 1985) ............................................................ 70

*Hall* v. *St. Mary's Seminary & University*,
378 F. App'x 326 (4th Cir. 2010) ....................................................... 92

*Hall* v. *St. Mary's Seminary & Univ*ersity,
608 F. Supp. 2d 679 (D. Md. 2009) .................................................. 92

*Handelsman* v. *Bedford Village Assocs. L.P.*,
213 F.3d 48 (2d Cir. 2000) ................................................................. 64

*Hyundai-Wia Mach. Am. Corp.* v. *Rouette*,
2013 WL 395474 (D. Conn., Jan. 31, 2013) .................................... 83

*In re Microsoft Corp. Antitrust Litig.*,
355 F.3d 322 (4th Cir. 2004) .............................................................. 99

*Izzarelli* v. *R.J. Reynolds Tobacco Co.*,
731 F.3d 164 (2d Cir. 2013) ............................................................... 85

*McCarthy* v. *State Five Indus. Park*,
2009 WL 104287 (Conn. Super., Jan. 5, 2009) ............................... 43

*McNutt* v. *Bland*,
2 How. 9 (1844) .................................................................................. 65

*Monarc Constr., Inc.* v. *Aris Corp.*,
981 A.2d 822 (Md. App. 2009) ........................................................ 105

*Morris* v. *N.Y. State Dept. of Taxation & Fin.*,
603 N.Y.S.2d 807 (1993) ................................................................. 104

*Naples* v. *Keystone Bldg. & Dev. Corp.*,
990 A.2d 326 (Conn. 2010) ................................................... 55, 76, 83

*Nat'l R.R. Passenger Corp.* v. *One 25,900 S.F. Parcel*,
766 F.2d 685 (2d Cir. 1985) ............................................................... 69

*Navarro Savings Ass'n.* v. *Lee*,
446 U.S. 458 (1980) ............................................................... 64, 65, 67

*Parklane Hosiery Co.* v. *Shore,*
439 U.S. 322 (1979) ............................................................... 99

*Parsons Steel, Inc.* v. *First Alabama Bank,*
474 U.S. 518 (1986) ............................................................... 92

*Pat Perusse Realty Co.* v. *Lingo,*
238 A.2d 100 (Md. 1968) ....................................................... 92

*Pompa Constr. Corp.* v. *Saratoga Springs,*
706 F.2d 418 (2d Cir. 1983) ................................................... 99

*RBC Bearings, Inc.* v. *Thin Section Bearings, Inc.,*
2007 WL 2727160 (D. Conn., Sept. 18, 2007) .................... 76

*Reeves* v. *St. Mary's Cnty. Comm'rs,*
268 F. Supp. 2d 576 (D. Md. 2003) ...................................... 92

*Remington Rand Corp.* v. *Amsterdam-Rotterdam Bank, N.V.,*
68 F.3d 1478 (2d Cir. 1995) ............................................ 97, 98

*Riley* v. *Merrill Lynch, Pierce, Fenner & Smith, Inc.,*
292 F.3d 1334 (11th Cir. 2002) ............................................ 65

*Rocque* v. *Farricielli,*
848 A.2d 1206 (Conn. 2004) ................................................. 77

*SCM Corp.* v. *Xerox Corp.,*
507 F.2d 358 (2d Cir. 1974) .................................................. 83

*Secon Serv. Sys., Inc.* v. *St. Joseph Bank & Trust Co.,*
855 F.2d 406 (7th Cir. 1988) .......................................... 87, 88

*SunTrust Bank* v. *Goldman,*
29 A.3d 724 (Md. App. 2011) ............................... 105, 106, 107

*Thales Alenia Space France* v. *Thermo Funding Co., LLC,*
989 F. Supp. 2d 287 (S.D.N.Y. 2013) ............................. 64, 66

*U.S. Bank N.A.* v. *Cooperative Dist.,*
2011 WL 4499309 (S.D. Ala., Sept. 29, 2011) ..................... 66

*U.S. Bank N.A.* v. *Nesbitt Bellevue Prop., LLC*,
   859 F. Supp. 2d 602 (S.D.N.Y 2012) ...................................................66

*United States* v. *Demosthene*,
   334 F. Supp. 2d 378 (S.D.N.Y. 2004) ..................................................100

*United States* v. *El Paso Natural Gas Co.*,
   376 U.S. 651 (1964) .............................................................................99

*United States* v. *Rivera*,
   61 F.3d 131 (2d Cir. 1995)...................................................................100

*United States* v. *Washington*,
   592 F.2d 680 (2d Cir. 1979)...................................................................69

*Wells Fargo Bank, N.A.* v. *DPPLP*,
   971 A.2d 360 (Md. App. 2009)...............................................................38

## STATUTES

15 U.S.C. § 80a-26(a) .................................................................................68

26 U.S.C. § 860..........................................................................................18

28 U.S.C. § 1291........................................................................................1

28 U.S.C. § 1332.................................................................................1, 63

## RULES

Federal Rule of Evidence 105 ...................................................................69

Federal Rule of Evidence 106 .................................................................100

## TREATISES

Restatement (Second) of Judgments § 29(3) ...........................................99

## OTHER

Fletcher Encyclopedia of the Law of Corporations § 41
   (September 2011)................................................................................104

Fletcher Encyclopedia of the Law of Corporations § 41.25
      (September 2011)..................................................................... 83

# STATEMENT OF JURISDICTION

Plaintiff filed this case in federal court, invoking the District Court's diversity jurisdiction under 28 U.S.C. § 1332. Appellant maintains that the parties are not diverse, and that the Court lacked subject matter jurisdiction.

The District Court entered final judgment on August 19, 2014. (Doc. 1159). Appellant timely filed his notice of appeal on August 22, 2014. (Doc. 1161). This Court has jurisdiction over the appeal pursuant to 28 U.S.C. § 1291.

# ISSUES PRESENTED

1. Whether the District Court erred in determining diversity jurisdiction by disregarding the citizenship of the investors in the Plaintiff business trust, and by considering only the citizenship of a passive trustee, Wells Fargo Bank.

2. Whether the District Court erred by refusing to limit the conduct and transactions on which Plaintiff could base its request that the jury impose the equitable remedy of piercing the corporate veil—in contravention of an earlier summary judgment ruling and Connecticut veil-piercing principles.

3. Whether the District Court erred by denying Defendant's motion for judgment as a matter of law based on the veil-piercing principles announced in *Comm'r of Envtl. Prot.* v. *State Five Indus. Park, Inc.*, 37 A.3d 724 (Conn. 2012).

4. Whether Plaintiff was barred by res judicata from arguing to the jury that it should pierce the corporate veil based on fraudulent inducement theories that Plaintiff either failed to prove, or could have presented, during the 2005 trial of the underlying action in Maryland.

5. Whether the District Court erred by taking judicial notice of

selective findings of fact from the underlying Maryland action, which precluded Defendant from receiving a fair trial on issues the Connecticut jury was charged with deciding.

6.   Whether under Connecticut law a plaintiff who successfully invokes the remedy of piercing the corporate veil may also receive an ancillary remedy of punitive damages, without having asserted any supporting independent cause of action.

7.   Whether the District Court erred by ruling in the alternative that Plaintiff could recover $10.6 million in attorneys' fees—equivalent to its punitive damages remedy—based on fee-shifting provisions contained in the underlying loan documents, when those loan documents had merged into the Maryland Judgment.

## STATEMENT OF THE CASE

This is a veil-piercing action based on a $22.8 million judgment that Plaintiff obtained in Maryland in 2005 against Konover Management Corporation ("KMC"). That judgment arose from KMC's guaranty of a defaulted commercial loan made five years earlier. Defendant Michael Konover appeals following a six-week trial in which the jury elected to pierce the corporate veil of KMC (a company the lenders knew was never worth more than $4.4 million) to impose liability for the Maryland Judgment on Mr. Konover individually. Based on that verdict, and the jury's imposition of punitive damages, Mr. Konover now faces a Final Judgment entered by the District Court (Thompson, *J*.) that imposes $32 million of liability—all of which stems from a $5 million deficiency on a commercial loan that Mr. Konover refused to guarantee personally.

Plaintiff filed this case in the District Court on December 15, 2005. But the dispute long predates this case. Indeed, despite the fact that Plaintiff's alleged harm was its inability to collect from KMC the judgment entered in August 2005, Plaintiff's principal focus in the Connecticut trial was on the time frame between 1999 (before the loan was made) and 2002 (before Plaintiff filed the litigation giving rise to the

4

Maryland Judgment).

Accordingly, while Mr. Konover has attempted to set forth a concise statement of the case, because of the length of the dispute—and the breadth of the veil-piercing theories Plaintiff pursued during the trial below—this statement is longer than most.

## I. The Konover Companies.

### A. Konover Management Corporation ("KMC").

KMC, the veil-piercing target in this action, was not a typical candidate for such relief. KMC was organized under Connecticut law in 1984. (3229:12-14); (DX2108). The parties never disputed that KMC was formed for proper purposes. (Doc. 829-1 at 40). Defendant Michael Konover was the sole shareholder of KMC and served as its Board Chairman. *Id.* at 37. Until 2002, Richard Cohen also served on KMC's board. (123:25-124:1).

At its height, KMC managed more than 80 shopping centers located primarily in New England, and employed approximately 75 employees. (4199:14-16); (4224:24-4225:6); (706:10-14); (DX2350). By 1998, KMC also served as the general partner or managing member (typically owning only a 1% interest) of approximately 40 property-owning entities. (115:13-117:19). As is commonplace in the industry, each property within

the Konover portfolio was owned by a separate entity. (705:24-706:14).

Throughout its existence, KMC strictly observed corporate formalities. It had by-laws, (753:25-754:2); (765:10-20), maintained an agent for service of process, (755:17-21), and filed annual reports with the Connecticut Secretary of State, (756:12-757:16). It executed shareholder and director consents to approve corporate actions. (758:7-759:20). KMC filed federal tax returns, and returns in every State in which it held interests. (761:1-764:13). KMC paid its payroll taxes and filed all unemployment compensation returns. (765:7-9). And with the exception of the $22.8 million Maryland Judgment at issue here, KMC always paid its bills. (822:22-823:1).

**B.      Konover Development Corporation ("KDC").**

Like KMC, former Defendant KDC also was organized under Connecticut law in 1984. (704:9-15). KDC's function was to develop shopping centers principally by working with anchor tenants to find new locations for their stores. *Id.* These tenants included large retailers such as Wal-Mart and Home Depot, and smaller stores such as CVS and Walgreen's. *Id.* KDC typically employed 16 to 18 individuals, including several senior executives with years of development experience. (1423:7-

1427:15).

### C. Michael Konover.

Michael Konover joined his father's real estate business in 1976. (3222:6-9). After devoting the next twenty years to commercial development, and establishing his own portfolio of shopping centers, Mr. Konover decided to reduce his day-to-day business involvement. (2977:5-12). In September 1996, he hired R. Michael Goman to manage his companies. (3238:5-3239:7); (1123:2-4). With the exception of Konover Construction Corporation ("KCC"), a commercial builder, Mr. Goman ran Mr. Konover's companies. (252:14-20). In addition to KMC and KDC, these entities included Konover & Associates, Inc. ("K&A"), which provided administrative support for the other companies; and Konover Capital Advisors ("KCA"), a mortgage broker. (123:2-11); (751:8-11); (1130:9-19). Mr. Goman made all hiring and firing decisions until his departure in 2008. (1392:11-21).

By 1999, Mr. Konover had ceded complete operational control to Mr. Goman. (4182:18-24). Mr. Konover pared back his trips to the office. (1118:5-18); (1163:8-20). Following this transition, Mr. Goman sometimes went weeks without speaking to Mr. Konover, and viewed him

7

as a "passive investor." (1164:10-18); (568:7-9).

### D. Konover & Associates and Corporate Allocation Payments.

K&A's function was to provide centralized administrative services for the other companies, including KMC. (4179:3-19); (709:12-19). In exchange, the operating companies made regular corporate allocation payments to K&A. (191:7-12). In addition to human resource functions, these services included management of a common cash account, and shared expenses for health plans, IT, payroll, telephones, computers, and rent. (193:10-12); (208:1-5); (610:1-25).[1] Despite these shared services, employees of KMC, KCC, K&A, and KDC viewed their companies as separate businesses. (812:12-24).

### E. Mr. Goman's Decision to Transfer Leasing from KMC to KDC.

One of the principal transactions that Plaintiff attacked at trial was a decision that Mr. Goman made in 1999 to have KMC transfer its leasing division to KDC. (343-353); (1168-1169); (1215-1222); (1279-1282); (1315-1319); (1625-1630); (1661-1663); (1689-1691); (1699-1700); (2127-2128);

---

[1] In 2005, as a result of the Portfolio Sale (explained below), KDC assumed responsibility for allocating shared services. (458:20-23).

(2132-2134); (2385-2388); (2391-2393); (2463-2475); (2509-2516); (3048-3051). Between 1984 and 1999, KMC was organized in two main divisions: leasing and property management. Because many of the properties KMC managed were old, and commanded low rents, the leasing division was a drag on KMC's profitability. (2999:10-25).

By 1997, KMC was responsible for managing and leasing over 7 million square feet of commercial space. (3297:15-3298:9). But over 20% of that space was vacant. *Id.* To fix this, Mr. Goman brought in a leasing specialist named John Anderson. (3293:11-18). Within two years, the leasing division achieved its goal of 95% occupancy, yet continued to be unprofitable. (4171:6-20); (PX220).

Once KMC achieved a "full occupancy" rate of 95%, there was little work left for KMC's leasing personnel. (3298:10-17); (4171:15-20). Mr. Goman believed that KMC's leasing representatives would be put to better use assisting KDC to lease space for new projects. (3305:6-22); (3006:10-18). In the fall of 1999, Mr. Goman decided to transfer KMC's leasing employees to KDC effective January 1, 2000. (3248:24-3249:9); (1168:14-18); (PX46).

Because the leasing division was not profitable, no one within KMC

9

objected. (3302:25-3303:5); (1220:13-17). In particular, Lisa Whitney, the senior executive in charge of KMC, agreed. (4176:7-19); (3309:16-24). Mr. Anderson also concurred. (3305:23-25). Both Ms. Whitney and Mr. Anderson expected the transfer to improve KMC's bottom line. (4188:9-23). At trial, Ms. Whitney rejected Plaintiff's contention that KDC should have paid KMC for taking on the leasing division (an argument Plaintiff pursued even though the transfer occurred before the loan transaction that led to the Maryland Judgment). (4189:5-17); (347:15-348:6). After the transfer became effective, all leasing commissions were earned by KDC, and KDC became responsible for the salaries and other expenses associated with the leasing division. (3325:10-13).

## II. The Diamond Point Loan Refinancing.

During the late 1980s, Mr. Konover developed a shopping center in Maryland located just outside of Baltimore. (3234:18-3235:18). The center became known as "Diamond Point Plaza." *Id.* It was owned by a single-purpose entity called Diamond Point Plaza Limited Partnership ("DPPLP"). DPPLP obtained permanent financing for the shopping center from Principal Mutual Life Insurance Company ("Principal Mutual") in the amount of $16.25 million. (Doc. 829-1 at 8). The Principal

10

Mutual loan was non-recourse and had no guarantor. (3254:7-13; 3256:3-7). It had an original maturity date of January 1, 2000. (Doc. 829-1 at 8). Beginning in July 1999, KCA (an affiliated mortgage broker) began the process of seeking to refinance the Principal Mutual loan on behalf of DPPLP. *Id.* at 9. Mr. Konover played no part in the refinancing negotiations. (3256:8-3258:21). They were handled by two employees of KCA: Rick Liljedahl and Susan Larkin. (2020:10-16).

### A. The Sam's Club Information.

Diamond Point Plaza had two anchor tenants: an Ames store and a Sam's Club store. (3236:22-3237:1). Early on, Ms. Larkin applied for refinancing from Lehman Brothers. (2166:7-15). By visiting Sam's Club's web site, a Lehman representative learned that Sam's Club was advertising its Diamond Point store as available for sublease. (2166:12-2167:9); (PX25). The Lehman representative informed Ms. Larkin about the web site, and a follow-up conversation in which Sam's Club confirmed its interest in vacating the space. *Id.* Ms. Larkin had not visited the web site, and this was the first indication she had received that Sam's Club was considering leaving Diamond Point. (PX25).

Under a "go dark" clause in its lease, Sam's Club had the right to

vacate its space, so long as it continued to pay rent for the ten years then remaining on its lease. (2177:7-2178:12); (2175:14-25); (2178:9-17); (4198:10-21). Ms. Larkin reported to Principal Mutual that Sam's Club was looking for alternate locations. (2036:4-10). She also discussed this information with senior executives of KDC, K&A, and KMC. (2169:23-2170:12). Ms. Larkin and the other executives were embarrassed that a potential new lender had learned about Sam's Club's plans before they did. (2170:20-2171:7). They wanted to avoid further embarrassment if another potential lender were to learn those plans by visiting the web site (rather than hearing it first from KCA). *Id*. These senior managers viewed strong relationships with lenders as their "life blood for doing business." (1348:12-15). As a result, they agreed to inform potential lenders about the Sam's Club information. (2169:23-2170:12).

In the fall of 1999, Ms. Larkin began discussions with a new lender, Pinnacle Capital Group, L.P. ("Pinnacle"), which ultimately agreed to refinance Diamond Point. (2058:9-13). Ms. Larkin dealt with three individuals at Pinnacle: two executives in Philadelphia; and "Chick" Chamberlin, a Connecticut-based vice president. (2058:14-25). After Pinnacle closed the loan in June 2000, it immediately sold the loan to

Paine Webber (now known as UBS Warburg Securities). (2595:8-14).

Chick Chamberlin had not previously done business with KCA, KMC, or any of their affiliates. (4281:15-17). Mr. Chamberlin dealt primarily with Ms. Larkin; he never communicated with Mr. Konover. (4288:12-25). And it was undisputed that Mr. Konover had no communication with anyone at Pinnacle or Paine Webber. (1509:1-4).

Ms. Larkin told Mr. Chamberlin that Sam's Club occupied the majority of space at the shopping center. (4292:16-23). Sam's Club wrote to Pinnacle on May 6, 2000 to affirm, among other things, that its lease was still in effect. (DX2028-admitted for limited purposes-2312:25-2316:6).[2]

---

[2] In its estoppel letter, Sam's Club cautioned that "[n]othing in this letter shall be construed or relied upon directly or indirectly as a representation of any future operational plans at this site." (DX2028). Further, Ms. Larkin confirmed during her trial testimony that she told Pinnacle that Sam's Club was contemplating leaving Diamond Point Plaza, testimony that was confirmed by a typed document in Pinnacle's files. (2340:12-19); (DX2037-excluded). But as addressed below in Part V, the District Court sustained all of Plaintiff's objections to this evidence as contrary to factual findings made by the Maryland court in 2005 and judicially noticed by the District Court. (2340:12-2341:5). Mr. Chamberlin's handwritten notes also confirmed the accuracy of Ms. Larkin's recollection. (2204); (2220); (DX2040-excluded). Moreover, Plaintiff's own expert witness had concluded that Ms. Larkin had so informed Mr. Chamberlin in a report prepared in support of Plaintiff's

### B. Mr. Konover's Refusal to Personally Guarantee the Loan.

Initially, Pinnacle did not insist on any guarantor for the $15.3 million Diamond Point loan. (2062:3-7). But in early 2000, Pinnacle informed Ms. Larkin that it was seeking to sell the loan to a conduit lender, Greenwich Capital, who insisted that the loan be guaranteed by an individual with substantial net worth, referred to as a "warm body guarantor." (2071:18-22); (2233:12-2234:5); (2628:10-19). Because Mr. Konover was the only conceivable "warm body," and because Mr. Konover made it his practice never to guarantee permanent financing, (3259:4-24); (2629:14-22), Ms. Larkin informed Pinnacle that Greenwich Capital's request was a non-starter, *id.*; (2398:18-24); (PX34).

### C. The KMC Guaranty.

In the spring of 2000, Pinnacle turned to Paine Webber to serve as a conduit lender for the Diamond Point loan. (2122:2-12). Paine Webber agreed to forego a warm-body guarantor and settled instead for a corporate guarantor "who had some connection to the borrower." (2076:17-2077:1); (4396:17-4397:5).

_____

claims against Paine Webber in separate Texas litigation. (2223). None of this evidence was admitted.

KCA offered KMC as a potential guarantor, even though KMC had recently posted negative net income and had less than $1.3 million in liquid assets. (PX32); (3269:9-16). Paine Webber insisted initially that Pinnacle obtain financial covenants from KMC. (4395:3-10). Paine Webber proposed that KMC be required to maintain a minimum net worth of $3.75 million and that KMC be prohibited from taking on more than $100,000 in debt. (2112:10-23).

KCA refused to agree to these covenants. (2112:4-2115:13). KCA took the position that as a limited guarantor on a non-recourse loan, KMC should not be required to maintain any particular level of net worth. (3260:9-22). Ms. Larkin also explained to the lenders that KMC's net worth fluctuated with trends in real estate values. Thus, Ms. Larkin cautioned Paine Webber that in the future, KMC's net worth could be "minimal." (PX39). Ms. Larkin explained all this in a written memorandum to Pinnacle. *Id.* The "Larkin Memo" became the centerpiece of Plaintiff's claims in the Connecticut veil-piercing trial.

The Larkin Memo described the business activities of KMC, but correctly did not list "leasing" among them. (PX39). Nor did it suggest that KMC had the potential to earn future leasing income. (2293:24-

2294:7). Mr. Konover did not review the Larkin Memo. (3022:24-3023:1). In fact, although Mr. Konover later initialed an internal summary term sheet authorizing KCA to proceed with the Diamond Point refinancing, he never participated in the loan negotiations or signed any loan documents. (2599:25-2560:7); (2601:4-18); (PX29).

Ms. Larkin also provided Pinnacle with unaudited financial statements for KMC, for years 1997 and 1998, labeled "for internal use." (PX32). K&A's accountants had prepared these statements in June 1999 for purposes unrelated to financing. (2248:4-14); (2251:10-16). The unaudited financial statements did not include in KMC's net worth calculation future earnings from either leasing fees or management fees. (2241:17-21). In footnotes, K&A's accountants explained that KMC did not charge market rates for managing properties owned solely by Konover affiliates, and explained that KMC was not a stand-alone company, in that it made corporate allocation payments to cover shared overhead expenses. (PX32); (208:1-7); (209:16-23).

Pinnacle and Paine Webber agreed to eliminate the financial covenants they had initially requested. As a result, the KMC Guaranty contained no financial covenants and did not impose any restrictions on

16

KMC's ability to make distributions to its shareholder, Mr. Konover. (3067:11-13).

In addition to transmitting KMC's financial statements to Paine Webber, Pinnacle provided Paine Webber with a credit report on KMC. (2280:19-2281:17). The credit report confirmed that KMC was a separate corporation from its affiliates. (2291:24-2292:1).[3] The lenders asked no questions about the Larkin Memo, KMC's financial statements, or the credit report, and accepted KMC as the *sole* guarantor of the Diamond Point loan. (2089:11-14).

### D.   The Loan Closing and Subsequent Securitization.

Pinnacle closed the $15.3 million Diamond Point refinancing on June 2, 2000. (2160:11-13). DPPLP signed a mortgage note, mortgage agreement, assignment of rents, and two borrowers' certificates. (Doc. 829-1 at 26). KMC signed only a guaranty of the borrower's limited recourse obligations ("KMC Guaranty"). *Id.*

---

[3] The report also indicated that KMC was at "[h]igher risk than other companies in the same region [industry, employee size range, and with a comparable number of years in business.]" (DX2039 at WFB-MK-559165-not admitted); (2320:24-2321:21); (2406:15-21). It also showed that some of KMC's officers were active in other affiliated companies. *Id.* at WFB-MK-559171. As addressed in Part III, this evidence was relevant to Plaintiff's knowledge of KMC's limited net worth.

17

The Diamond Point loan was a non-recourse loan with certain recourse liability "carve-outs." (PX12). DPPLP's liability in the event of default was limited to the value of the mortgaged Diamond Point property, unless its conduct triggered liability under these carve-outs. *Id.* KMC's liability as a guarantor was likewise limited. (PX14).

As planned, Pinnacle assigned the Diamond Point loan to Paine Webber. A few weeks later, Paine Webber assigned the loan to a real estate mortgage investment conduit ("REMIC") that was being formed by Salomon Brothers. (4284:16-4285:3). A REMIC is a mortgage investment vehicle created by the Tax Reform Act of 1986. *See* 26 U.S.C. §§ 860A-G. REMICs are "conduits" that hold commercial or residential mortgages in a pool, and that issue securities (or "certificates") representing undivided interests in those pools. The certificates usually are split into multiple classes with different seniority rights and interest rates and sold to financial institutions and other sophisticated investors. *See id.* at § 860D(a)(3).

The investors in the pool that purchased the Diamond Point loan are "the Registered Holders of Salomon Brothers Mortgage Securities VII, Inc., Mortgage Pass-Through Certificates, Series 2000 C-2." Salomon

18

Brothers finalized this $750 million pool of commercial mortgages—the "SBMS VII pool"—in August 2000. (4352:24-4353:2). The Diamond Point loan was among the riskiest loans included in the pool.[4] And that risk fell disproportionately on the servicer of the SBMS VII pool, and the driving force behind this lawsuit, ORIX Capital Markets, LLC.

### E. ORIX Capital Markets, LLC ("ORIX").

ORIX invests in "b-pieces" and operates as a servicing company for securitized loans. (4301:1-10). A "b-piece" investor bets on the "first loss piece" of a securitized loan pool. (4314:2-9). Such an investor is "at the bottom of the credit stack." (4303:4-10). "B-pieces" are either unrated or non-investment grade securities within a commercial mortgage-backed securities ("CMBS") offering. (4353:21-24). ORIX purchased at a steep discount the five lowest classes of "b-piece" certificates within the SBMS



1365213, Page 32 of 124

VII pool. (4354:7-17); (4329:2-5).

The role of special servicer is defined in the Pooling and Servicing Agreement ("PSA"), governing the SBMS VII pool. (Doc. 465-7, 465-8). The PSA gives the holder of the "b-piece" certificates (ORIX) the right to appoint the servicer (ORIX). (4303:15-24). And it is the servicer who, under a PSA, "has the whip hand." *CWCapital Asset Mgmt., LLC* v. *Chicago Props., LLC*, 610 F.3d 497, 501 (7th Cir. 2010); (4303:4-10). As the special servicer for this pool, ORIX earned enhanced fees for litigating against DPPLP, KMC, Mr. Konover, and the other defendants. (4343:4-8). ORIX also shares in any recovery. *Id.*

Before the securitization closed, ORIX performed its own due diligence on the loans in the pool. (4308:5-11). ORIX viewed KMC as a "weak" guarantor because it had only $1.2 million of cash on its balance sheet. (4385:21-25). ORIX also was aware that during the prior year, KMC had as little as $95,000 cash on hand. (4385:9-11); (4387:1-4). ORIX recognized that KMC's minimal (and fluctuating) liquidity was a "tremendous weakness." *Id.* ORIX nonetheless invested in the riskiest classes of certificates issued by the SBMS VII pool.

20

[5] ORIX, as special servicer, functions as the attorney-in-fact for Wells Fargo. The creators of the pool selected Wells Fargo because it is a well-known banking brand that would help them market their product—the CMBS investment certificates. (Doc. 866-3 at 6). In exchange for serving as a passive trustee, and lending its name to the $750 million SBMS VII pool, Wells Fargo received monthly fees of approximately $1,200. (Doc. 866-3 at 5).

## F. The Diamond Point Default.

In June 2002, Sam's Club vacated its space at Diamond Point Plaza. (DX1315). At that time, Ames was in bankruptcy, but had not yet rejected its lease. (4377:12-24). Mr. Liljedahl contacted ORIX to explain the situation and offered a partial prepayment of the Diamond Point loan. (DX1315). ORIX rejected the offer and transferred the loan from general servicing to special servicing. (DX1315); (4353:3-6). After Ames rejected its lease in bankruptcy in October 2002, it was no longer required to pay rent. (4201:22-25). The loss of Ames' rent resulted in negative cash flow

---

[5] Wells Fargo also refers to itself as a "nominal trustee." (Doc. 866-3 at 3).

for DPPLP, even though Sam's Club still was paying full rent on the anchor space it had vacated (and would continue to do so for the next eight years). (4202:1-8).

After consulting with his senior managers, Mr. Konover decided against contributing additional capital to DPPLP, and to permit the loan to go into default with the recognized risk of losing the property through foreclosure. (Doc. 829-1 at 32). As Maryland's highest court later observed, Mr. Konover made "a business decision to have [DPPLP] default on the mortgage, obviously believing it to be a non-recourse loan that would engender no liability to himself or any of his companies." *DPPLP* v. *Wells Fargo Bank, N.A.*, 929 A.2d 932, 947 (Md. 2007). Indeed, Mr. Goman, Mr. Konover, Chief Financial Officer James Ainsworth, and KMC's attorney advisors did not believe there was any risk of recourse liability for DPPLP or KMC, let alone Mr. Konover personally. (342:16-343:4).

In October 2002, DPPLP notified ORIX that it would not be making its November 2002 mortgage payment. (4380:8-15). On November 21, 2002, Plaintiff petitioned the Circuit Court for Baltimore County to appoint a receiver for the property. (DX1326).

22

**III.    The 2002-2003 Portfolio Sale.**

   **A.    Mr. Konover's Decision to Sell the Shopping Center Portfolio.**

In the Connecticut trial, Plaintiff argued that Mr. Konover caused KMC to mislead the Diamond Point lenders by not revealing that he had allegedly begun the process of selling off his shopping center portfolio *before* the loan was made on June 2, 2000. (5211:5-5212:9).

But the evidence showed that it was not until spring of 2001—a year *after* the loan was made and 18 months *before* the Diamond Point default—that Mr. Konover began to consider selling his shopping center portfolio. (3500:2-21). At that time, the portfolio consisted of about 65 marketable properties. (353:20-25). Capitalization rates, used by real estate investors to calculate expected income from commercial property, had fallen to an all-time low, making it a good time to sell. (2986:21-2987:4). Many of Mr. Konover's partners in the projects also were interested in selling. (2988:22-23). In addition, Mr. Konover wanted to focus more time on his philanthropic activities and his family. (2988:7-9).

Although contested at trial, no one employed by the Konover companies (including Mr. Liljedahl and Ms. Larkin), heard about the planned Portfolio Sale until May 2001, almost a year *after* the Diamond

23

Point refinancing. (2157:6-9); (335:12-17). During a dinner meeting earlier that month, Mr. Konover first told Mr. Goman that he planned to sell all of the property-owning entities as well as KMC and KDC. (1478:7-23). Mr. Goman and others within KDC later convinced Mr. Konover to retain KDC because it had a number of promising projects in the pipeline. (1479:14-24). Mr. Konover, who had been unaware of those projects, agreed to allow Mr. Goman to revamp KDC into a "merchant developer," developing commercial properties for sale to third parties rather than long-term ownership. (1480:8-14).

Soon after the dinner meeting, Mr. Goman announced the intended Portfolio Sale to the entire organization. (1483:8-1484:3). Mr. Goman gathered 300 to 400 employees in the cafeteria and made the announcement. (1483:11-14). The employees, including the senior managers, were shocked. (1483:20-25); (4187:12-16); (883:12-15). The operating companies had recently moved into a brand new building, and they had been in a growth mode. (4186:21-4187:6). KMC, in particular, "was a very busy, productive company." (1823:14-18). In the words of former director Richard Cohen, KMC was "rocking and rolling." *Id*. On May 30, 2001, K&A announced the Portfolio Sale on the newswire of the

24

International Council of Shopping Centers. (2571:10-19); (DX1508).

Under Mr. Konover's original concept for the Portfolio Sale, any potential buyer would purchase KMC, as well as up to 60 separate properties that KMC had been managing. (3017:8-16). The eventual buyer was Samuels Edens & Avant ("SEA"), a joint venture between a Boston developer (Samuel & Associates) and a shopping center REIT (Edens & Avant). (886:25-887:3). SEA purchased 38 of the Portfolio properties, but because SEA already had its own property management business, it did not acquire KMC. *Id.*[6]

### B. The Portfolio Sale Commissions.

SEA conducted due diligence on each property included in the sale. (4190:1-14). That required the Konover companies to compile a "mountain" of information. (890:8-18). KMC's property managers assisted with this effort, while KMC continued to earn management fees during the due diligence period. (4190:1-14). Employees of KCA also contributed efforts to the Portfolio Sale. (4190:15-4191:1). But it was KDC that took on the bulk of the work. (893:6-25); (441:1-3). KDC's senior

---

[6] Several additional properties were sold in "one-off" transactions. (354:1-5). Those separate sales occurred both before and after the sale to SEA. *Id.*

development personnel assisted SEA in evaluating the properties and their revenue streams from hundreds of commercial leases. (1488:4-1489:24). As a result, KDC was required to suspend its own development activities on new projects. (893:6-25); (441:1-3).

During the summer of 2002, Mr. Goman decided that KDC should be paid two types of Portfolio Sale commissions: sales commissions and future lease renewal option commissions. (4191:14-19); (1275:12-20). Plaintiff argued at trial that KMC was the rightful recipient of these commissions, but there was no debate between KMC and KDC professionals in 2002 about which company should receive the commissions. (4192:8-4193:4). In that respect, multiple spreadsheets—which predated the Diamond Point default—showed that KDC would receive these commissions. E.g. (DX1602); (925:21-926:10); (927:8-15); (DX1592).

### 1. Future Lease Renewal Option Commissions.

KDC received approximately $4.3 million in future lease renewal option commissions from the Portfolio sellers. (352:6-11). Many commercial leases include an option for the tenant to renew at the end of the lease term. (394:17-395:12). Leasing representatives are

26

compensated for securing a tenant's exercise of an option to renew. (DX1501). The senior managers of KDC concluded that the right to earn future commissions belonged to KDC, which had employed the leasing representatives since January 1, 2000 (before the Diamond Point loan was made). (349:2-14).

During the Portfolio Sale, John Anderson, KDC's head of leasing, recognized that as a result of the sale, KDC would lose the opportunity to earn commissions from future lease option renewals. (3340:8-24). This affected his compensation and that of his division personnel. *Id.* So Mr. Anderson presented the issue to Mr. Goman, who in turn discussed it with Mr. Konover. (3341:3-8). Mr. Konover agreed that the portfolio sellers should reimburse KDC for its future lost income. (3347:20-3348:4).

2. <u>Sales Commissions.</u>

Mr. Konover also received authorization from his various partners to charge the selling entities a sales commission for all efforts that would be borne by a "Konover affiliate." E.g. (3627:9-20); (3597:12-18); (DX1548). Because KDC handled the lion's share of the burdens of implementing the Portfolio Sale, Mr. Goman (not Mr. Konover) decided

27

that KDC would be that affiliate. (4191:14-19); (1275:12-20). Although KMC had received a 2% sales commission in connection with two early one-off sales, those payments were later reclassified, and the commissions (totaling approximately $130,000) paid to KDC. (3112:24-3114:18); (441:14-19); (442:13-23). That was because Mr. Goman had decided by July of 2002—after those two sales had been completed—that based on its Portfolio Sale workload, KDC was the proper recipient. (1276:1-25). As Mr. Goman explained, "[a]t some point it became apparent to me in the sales process that in fact it was the [KDC] personnel who were doing most of the work related to the [Portfolio] sale." (1285:16-19). Conversely, KMC personnel had little to do with the sales process. (1286:1-2); (1304:5-10).

### 3.    The Return of Mr. Konover's Capital.

In December 2002, after KDC received its sales and leasing commissions from the Portfolio Sale, James Ainsworth—K&A's chief financial officer—returned $7 million of capital that Mr. Konover, as KDC's owner, had invested in the company. (476:22-24); (2965:23-2966:6); (3026:16-23). He did this through a bookkeeping entry without input from Mr. Konover. (674:14-19); (981:1-6); (DX1126B). The funds

were placed with an entity called MCK, Inc., which held invested funds so that K&A's accountants could deploy Mr. Konover's capital to various entities through contributions when needed. (983:21-22). In December 2002, Mr. Ainsworth (again without input from Mr. Konover), made a book entry distributing another $1.1 million to Mr. Konover from KMC. This distribution reflected KMC's 1% share of the proceeds of the first tranche of the Portfolio Sale. (984:8-16).

Between 1997 and 2012, Mr. Konover contributed capital, made loans, and received distributions from KMC. (1015:23-1016:11). In all, Mr. Konover contributed $2 million more to KMC—the veil-piercing target— than the distributions he received. (1016:12-15). Similarly, between 2000 and 2005, Mr. Konover contributed $8 million more to KDC than the distributions he received. (989:19-990:3).

## C.    The Effects of the Portfolio Sale.

The Portfolio Sale closed in two tranches: the first on November 15, 2002 and the second on February 13, 2003. (898:6-11). Only KDC and KCC remained active after the sale. Mr. Goman remained as the head of KDC, developing new projects with a sharply reduced workforce, until 2008. (701:17-702:5); (1443:19-22). Because property financing was no

29

longer needed, KCA wound up its operations in 2003. (700:22-25). By January 1, 2005, K&A no longer had any employees. (700:13-19).

In addition, following the Portfolio Sale, KMC wound up its property management business. (996:5-10). Its employees dwindled from 16 in 2002 to zero in 2004. (1026:9-14). By 2005, KMC continued to earn management income from a few remaining properties—just enough to pay operating expenses. (1023:9-13). Aside from this management fee income, the only assets that KMC held were small, illiquid (typically 1%) partnership interests in various ownership entities that remained following the Portfolio Sale. (1027:6-9). KDC assumed the remaining property management functions in July 2005. (1054:1-6). Despite shrinking in size and functions, KMC continued to honor its corporate formalities. (1038:5-11).

## IV. The Underlying Maryland Action.

### A. The Complaints in the Maryland Action.

On March 7, 2003, Plaintiff filed its original complaint in the Circuit Court for Baltimore County seeking to impose recourse liability against DPPLP and KMC. (Doc. 829-1 at 33). Plaintiff alleged that DPPLP and KMC had breached "carve-outs" contained in the Diamond Point loan documents. (DX1337); (DX1344). Initially, Plaintiff claimed that KMC

30

violated Section 1.2 of the KMC Guaranty on the baseless theory that the Court's appointment of a receiver for Diamond Point Plaza triggered recourse liability. (DX1337). Section 1.2 of its Guaranty only came into play, however, if a receiver was appointed for "the Borrower" or "any guarantor." (PX14). No receiver ever was appointed for DPPLP or KMC.

On February 26, 2004, Plaintiff filed a second amended complaint, alleging for the first time that DPPLP had fraudulently induced Pinnacle and Paine Webber to refinance Diamond Point by failing to inform Pinnacle about the information Ms. Larkin received concerning Sam's Club's intention to vacate.[7] (DX1344). In that respect, Plaintiff argued, and the Maryland courts eventually found, that DPPLP's two borrower's certificates had indicated falsely that: DPPLP had no knowledge of any tenant's intention or notice to vacate the property; DPPLP knew nothing that would cause an institutional investor to regard the loan as an unacceptable investment; and, all financial statements submitted in support of the loan application were accurate. *See DPPLP*, 929 A.2d at

---

[7] In the Maryland Action, Plaintiff amended its complaint three times, and also sued Sam's Club, Wal-Mart, and related entities for conduct surrounding Sam's Club's departure from Diamond Point Plaza, and opening new Sam's Club stores in Baltimore.

940.

Plaintiff alleged further that KMC violated Section 1.2 of the Guaranty because KMC had "actively participated in acts of deceit, fraud[,] and misrepresentation perpetrated by [DPPLP]." (DX1337-Count IV). Plaintiff alleged that KMC had "intentionally . . . misrepresented facts with the intent to create . . . false impressions as to those facts." *Id.*; (3490:24-3491:5). Plaintiff failed to sustain these charges of fraud.

Finally, Plaintiff sued Mr. Konover personally for allegedly directing the transfer of $633,000 in rental income that DPPLP had collected prior to the loan default. (DX1344-Count VI). Plaintiff argued that it was entitled to recover those funds under the assignment of rents that DPPLP had granted the lenders. *Id.*

## B. Disclosure of the Leasing Division Transfer and Portfolio Sale in the Maryland Action.

Plaintiff deposed a number of KMC and KDC executives in the Maryland Action. On February 25, 2004, Plaintiff deposed Alan E. Smith, a former KDC leasing specialist, who worked for KMC until Mr. Goman transferred the leasing division in 2000. (4871:15-20); (4874:8-15). During his deposition, Mr. Smith explained the transfer of the leasing

32

division and described the "Konover organization" both before and after the Portfolio Sale. (4874:18-4877:18). He explained that SEA had purchased "principally all of the existing shopping center portfolio," and described the reasons for the sale, as well as the timing of the two tranches. (4877:12-4880:6).

Plaintiff also deposed Patrick Roche, a former KMC property manager. (4883:2-16). Mr. Roche explained that he had worked for KMC until 2002 when KMC "deemed [his property management] portfolio had been pretty much sold off, [so he] left the company." (4833:17-24).

As part of defendants' document production in the Maryland Action, KCA produced the Larkin Memo and KMC financial statements that Ms. Larkin provided to Pinnacle and Paine Webber. These documents were produced shortly after Plaintiff asserted its fraudulent inducement claim in the Maryland Action. (PX603); (4000:11-18).

## C. The Bench Trial in Baltimore County.

The trial in the Maryland Action lasted for one week in April 2005. (3159:5-8). The trial witnesses included Mr. Konover, Mr. Ainsworth, Ms. Larkin, Mr. Liljedahl, and Ms. Whitney (all of whom later testified in the Connecticut trial). The Larkin Memo was Trial Exhibit No. 104.

33

(DX2023); (3485:16-24). The Maryland trial focused on the Diamond Point refinancing negotiations, and in particular, the actions of Ms. Larkin and Mr. Liljedahl on behalf of DPPLP and KMC. (3158:23-3159:2).

While Plaintiff contended that KMC was an active participant in the alleged fraudulent inducement, Plaintiff failed to prove that KMC committed any fraud. KMC was held liable only for breach of contract. (Doc. 784 at 54). *See DPPLP*, 929 A.2d at 935 ("The judgment against all defendants but KMC was for intentional misrepresentation and gross negligence. The judgment against KMC was based on its status as guarantor of recourse obligations.").

At the conclusion of the evidence, Circuit Court Judge Susan Souder invited both sides to submit proposed findings of fact. (2665:9-21). Plaintiff's counsel submitted 396 proposed findings of fact, on a computer disc, which Judge Souder adopted almost verbatim. (490:5-14). On May 4, 2005, Judge Souder announced to the parties that she intended to enter a $22.8 million judgment for Plaintiff. (571:24-572:3). When the Maryland Judgment was announced, KMC had no remaining employees and no cash on hand. (2753:1-4).

34

On November 21, 2005, three years after initiating foreclosure proceedings, Plaintiff finally auctioned off Diamond Point Plaza for $10.3 million, selling the property to an entity formed by ORIX. (Doc. 829-1 at 34). On December 5, 2005, the Maryland Court entered an Amended Final Judgment in the amount of $22,862,399.66 (including 14% pre-judgment default rate interest calculated from the date of the loan's inception and an erroneous $3.6 million "prepayment premium"), plus post-judgment interest, jointly and severally against DPPLP, KMC, and two related borrower entities.[8] *Id.* at 35. The Court also entered judgment against Mr. Konover in the amount of $633,000. (Doc. 1159-1 at 5).

### D. Post-Judgment Proceedings and the 2005 Transfers.

After Judge Souder announced that she intended to enter a $22.8 million judgment for Plaintiff, Mr. Konover sought to isolate KMC's business activities from its various affiliated entities and liquidate KMC's few remaining assets to make a settlement offer to Plaintiff. (1045:7-17). If that offer was rejected, which it was, he intended to use

---

[8] These were Oriole Commercial Associates Limited Partnership ("Oriole"), the general partner of DPPLP, and Diamond Point Management Corporation ("DPMC"), the general partner of Oriole. (Doc. 829-1 at 3).

the funds for an appeal of the Maryland Judgment. (1031:8-15).

In June 2005, to isolate its activity, KMC left the common cash management account maintained by K&A, and set up its own separate checking account. (1040:20-22). As of November 1, 2005, KMC had $800 in that account. (168:10-16). Later that month, KMC established a zero-balance account to allow Mr. Konover to continue to advance to KMC funds for its legal fees. (2806:10-13); (167:11-13). At the end of each day, any funds in the account were transferred to maintain a zero balance. (168:12-16). This account was linked to one owned by Mr. Konover. (168:20-24).

Starting in June 2005, Mr. Konover, with the assistance of corporate counsel, also undertook to have KMC liquidate its remaining minority general partnership interests. Mr. Konover and his team wanted to avoid any claim that KMC's divestment of these interests constituted fraudulent transfers, so they did their best to ensure that the transfers were completed for more than fair market value. (2801:19-23). To that end, they did not apply any discount for the lack of marketability of these 1% interests. (3812:6-10).

Mr. Konover caused a limited liability company to be formed called

36

Ripple, LLC. (2870:24-2871:12). Mr. Konover asked his outside accountant, Ed Kindelan of Kostin Ruffkess & Company, to establish a fair price for KMC's 1% general partnership interest in the Konover Family Limited Partnership ("KFLP"), which Mr. Konover owned with his two siblings. (2873:14-17). Mr. Konover then directed that KMC's interest in KFLP be sold to Ripple for that price—$187,000. (1048:17-22).

Mr. Konover caused a second entity, Blackboard, LLC, to be formed, and to purchase most of KMC's other general partnership interests, at prices set by Kostin Ruffkess. (710:14-17). These interests were comprised of minority holdings (typically 1%) in about 16 to 17 property-owning entities. *Id.*; (642:20-23). As minority interests in family-owned partnerships, these KMC holdings were not otherwise marketable. (2872:1-10). Mr. Konover himself purchased KMC's remaining interests in a few limited partnerships. (2903:3-10).

The total proceeds from KMC's sales to Ripple, Blackboard, and Mr. Konover ("2005 Transfers") was about $600,000. (640:18-25). After deducting transaction costs, KMC raised $300,000 from the 2005 Transfers. (641:6-9). Mr. Konover made a settlement offer on KMC's behalf in August 2005, which was rejected. (PX150); (2829:19-22). KMC's

37

remaining funds were consumed by legal fees. (2829:22-25). Mr. Konover made a series of contributions and loans to KMC that allowed it to prosecute appeals through two levels of the Maryland courts. (1048:23-1049:12).

In 2007, the Court of Appeals of Maryland affirmed the Circuit Court's judgment. Mr. Konover then paid the $633,000 judgment entered against him personally, with interest. (2668:4-8). That amount, along with payments made by Sam's Club and Wal-Mart Stores, Inc., and the Diamond Point foreclosure proceeds, eventually were credited against the Maryland Judgment. (PX9a).

### E. The Attorneys' Fees Hearing in the Maryland Action.

Plaintiff sought attorneys' fees in the Maryland Action under the Diamond Point loan documents. The Circuit Court initially denied Plaintiff's fee request on the grounds that it had failed to itemize and apportion fees among various defendants and claims, including claims against Sam's Club and Wal-Mart. *Wells Fargo Bank, N.A.* v. *DPPLP*, 971 A.2d 360, 362 (Md. App. 2009). The Court of Appeals reversed that ruling and remanded for an evidentiary hearing on the proper allocation of attorneys' fees. On remand, KMC opposed Plaintiff's fee request on the

basis that any award would be unreasonable because the Circuit Court had erroneously overcompensated Plaintiff in its original judgment by including a $3.6 million prepayment premium, which never was due. *Id.* at 362. The Circuit Court agreed, and held that although Plaintiff had otherwise proved that it was entitled to approximately $1.4 million in attorneys' fees from DPPLP and KMC, any fee award would be unreasonable because of the Court's previous $3.6 million error. *Id.* The intermediate appellate court reversed the Circuit Court, however, and held that the Maryland defendants had raised this issue too late. The appellate court reinstated Plaintiff's award of $1.4 million in attorneys' fees for the Maryland Action. *Id.* at 368.

## V. Plaintiff's Connecticut Action and Request for a Veil-Piercing Remedy.

### A. Plaintiff's Complaints.

Plaintiff filed suit in the District Court on December 15, 2005. (1030:13-19). Plaintiff sued Mr. Konover, along with KDC, KCC, K&A, Blackboard, and Ripple. (1448:8-21). After many years of discovery and motions practice, three amended complaints, and the Court's dismissal of multiple counts and veil-piercing claims on summary judgment, Plaintiff dismissed all remaining Defendants except Mr. Konover, along

39

with all of its independent causes of action. (1448:22-10). The only claims that remained for trial were two veil-piercing counts against Mr. Konover, seeking to hold him liable for the Maryland Judgment against KMC. The Maryland Judgment was calculated by Plaintiff as approximately $20 million by the time of the Connecticut trial.

**B.      Relevant Pretrial Rulings.**

1.      Motion to Dismiss for Lack of Subject Matter Jurisdiction.

In 2008, all Defendants moved to dismiss for lack of subject matter jurisdiction because Plaintiff failed to allege (and could not allege) complete diversity between its "certificate holders" (the beneficiaries of the SBMS VII "trust") and Defendants, all of whom were Connecticut residents. (Doc. 465). Defendants argued that despite the historical rule that when a trustee sues in his own name it is the trustee's citizenship that counts, the SBMS VII pool was a far cry from a traditional trust. Rather, because Wells Fargo was a passive trustee by design, with no control over the "trust's" operations, Defendants argued that Plaintiff's citizenship, like that of other unincorporated business entities, should be determined by the citizenship of all entity participants.

The District Court denied the motion. (Doc. 619). The Court

40

acknowledged that "[h]aving designated ORIX as master servicer, special servicer, and attorney-in-fact, Wells Fargo had essentially no knowledge of the day-to-day operations of the REMIC." (Doc. 619 at 3). But the Court held that Wells Fargo was nevertheless an "active trustee" because it had delegated its power to control the trust assets to ORIX. (Doc. 619 at 8). Thus, the Court determined that only Wells Fargo's citizenship should be considered. *Id.*

### 2. Defendants' Motions for Summary Judgment.

In 2010, Defendants moved for summary judgment on all seven counts of Plaintiff's second amended complaint, with the exception of Count III, Plaintiff's statutory fraudulent transfer claim. (Doc. 699-1 at 3-4). With respect to the veil-piercing claims, Defendants argued that under the leading case of *Angelo Tomasso, Inc.* v. *Armor Construction & Paving, Inc.*, 447 A.2d 406 (Conn. 1982), there was no basis to pierce the corporate veils of either DPPLP or KMC, for fraudulently inducing Pinnacle and Paine Webber into making the Diamond Point loan, or for defaulting on the loan. (Doc. 699-1 at 23).

In his ruling, then-District Judge Christopher F. Droney recognized that Plaintiff's veil-piercing action, properly construed, had to focus on

41

whether Mr. Konover's actions "wrongfully prevented Plaintiff from collecting on the Maryland Judgment." (Doc. 784 at 2). Judge Droney concluded that Plaintiff "ha[d] not shown how [Mr.] Konover or the other defendants used their control of DPPLP, DPMC, or Oriole to abuse the corporate form in an effort to avoid paying the judgment entered in the Maryland Action." (Doc. 784 at 15). In particular, Judge Droney held that "[e]ven though [Mr.] Konover personally instructed DPPLP to default on the Diamond Point loan, there is no causal link between such control and [Plaintiff's] inability to collect the judgment." *Id.* Judge Droney also concluded that "evidence relating to DPPLP and KMC's [alleged] fraudulent misrepresentation of its finances in procuring the Diamond Point loan is not relevant as it does not satisfy *Tomasso's* causation requirement." (Doc. 784 at 14 n.22).

As a result, Judge Droney granted summary judgment to all Defendants with respect to Plaintiff's attempt to pierce the corporate veils of DPPLP, DPMC, and Oriole. But with respect to KMC, Judge Droney held, citing as support the Connecticut Superior Court's decision in *McCarthy* v. *State Five Indus. Park*, 2009 WL 104287 (Conn. Super.,

42

Jan. 5, 2009),[9] that there was a genuine dispute of fact regarding whether transfers that KMC engaged in during the Portfolio Sale—principally the alleged diversion of commission payments from KMC to KDC—and the 2005 Transfers, were the cause of Plaintiff's inability to collect its judgment. (Doc. 784 at 13).

> 3.      The District Court's Rulings on Motions in Limine.

Both sides filed multiple motions in limine. District Judge Thompson's resolution of two of those motions defined the length and tenor of the trial.[10]

First, Plaintiff asked the District Court to take judicial notice of certain findings of fact entered by the Maryland trial court. (Doc. 856 at 2-3). Plaintiff suggested that the Court strike a balance between "honoring the preclusive effect of the Maryland judgment" and allowing Plaintiff to present some evidence of "overlapping matters" between the Maryland Action and Plaintiff's veil-piercing case. *Id.* Plaintiff invited the District Court to direct the jury to accept the truth of Plaintiff's

---

[9] (Doc. 735 at 31). The Superior Court's opinion in *State Five* was later reversed by the Supreme Court. *Comm'r of Envtl. Prot.* v. *State Five Indus. Park, Inc.*, 37 A.3d 724 (Conn. 2012).

[10] After Judge Droney was elevated to this Court, this case was reassigned to Judge Alvin W. Thompson.

"tailored presentation of [Judge Souder's] findings" when considering Plaintiff's veil-piercing claims. *Id.* Plaintiff also signaled that during the trial, it would use adverse credibility determinations that Judge Souder had accepted during the Maryland trial to attack the credibility of the same trial witnesses on "overlapping matters." *Id.* at 6-7 n.2.

Despite Mr. Konover's argument that taking judicial notice of Plaintiff's "tailored presentation" of its own proposed findings of fact would pave the way for Plaintiff to present one-sided evidence from the Maryland Action, and prevent Mr. Konover from contesting that evidence (as well as circumvent rulings made previously by Judge Droney), Judge Thompson accepted Plaintiff's invitation. (Doc. 895).

Second, in anticipation of Plaintiff's reliance on the identical conduct that led to DPPLP's liability for the Maryland Judgment as a basis to pierce KMC's corporate veil, Mr. Konover moved to exclude all such evidence on res judicata grounds and as inconsistent with Judge Droney's prior ruling. (Doc. 834). Judge Thompson denied Mr. Konover's motion. While acknowledging that Judge Droney had in fact "identif[ed] the specific transactions attacked in plaintiff's veil piercing claims," Judge Thompson held that "[t]he fact that only certain transactions constitute

44

the basis for the plaintiff's veil piercing claims . . . does not mean that any other transaction or evidence relating to it is irrelevant." (Doc. 930 at 2). Judge Thompson further reasoned that even though evidence related to these transactions concerned claims "***no longer in [the] case***," this did not prevent Plaintiff from presenting the evidence. *Id.* (emphasis added).

After Mr. Konover filed his motion in limine, the Supreme Court of Connecticut reversed the Superior Court's decision in *State Five*—the opinion cited by Judge Droney to allow Plaintiff to move forward on the Portfolio Sale transactions and 2005 Transfers. Mr. Konover filed supplemental memoranda to address the impact of *State Five* on Plaintiff's remaining claims. (Doc. 906); (Doc. 915). Mr. Konover urged Judge Thompson to recognize that *State Five* foreclosed any findings that KMC's veil could be pierced based on conduct that occurred before the Diamond Point loan was made, before Plaintiff filed its ultimately successful claim against KMC, and before Plaintiff obtained the Maryland Judgment, or on transfers of assets whose value was incommensurate with the $20 million balance of the Maryland Judgment then outstanding.

In denying this motion, Judge Thompson rejected the notion that *State Five* had *any* application to this case. As support, the District Court pointed to a remark that the *State Five* Court made in footnote 13 of its opinion. In that footnote, the Court explained that it was not expressing any opinion about the continued vitality of a prior decision by Connecticut's intermediate appellate court, which had upheld the use of "reverse veil piercing." *State Five*, 37 A.3d at 740 & n.13. The Supreme Court commented that "[t]he circumstances relevant to a veil piercing analysis 'necessarily vary according to the facts of the particular case. Therefore, each case in which the issue is raised should be regarded as *sui generis*, to be decided in accordance with its own underlying facts.'" *Id.* (quoting *Angelo Tomasso,* 447 A.2d at 411 n.7). Citing this dicta, Judge Thompson concluded that in *State Five*, the Supreme Court had not set down any "general legal principle," but had only made factual findings without precedential value. (Doc. 930 at 4).

VI.    The Trial in the District Court.

   A.    The Witnesses and Subject Areas of Examination.

The Connecticut trial began on October 31, 2012 and concluded six weeks later on December 14, 2012. There were 21 days of testimony from twelve live witnesses and six witnesses presented through deposition excerpts. Plaintiff called no witnesses who were not either current or former employees of companies affiliated with Mr. Konover. Over Mr. Konover's objection, Plaintiff opened its case by reading to the jury its "tailored version" of the findings of fact made by Judge Souder in Maryland. (PX6A).[11] Even after reading these findings to the jury, Plaintiff then insisted on parsing through its Judicially Noticed Facts with multiple witnesses. E.g. (484:19-486-4); (1064:21-1067:21); (1538:16-1545:18); (1854:9-1855:5); (2010:10-2011:9); (2665:2-2671:18). When witnesses took issue with the accuracy of a finding made by Judge Souder, Plaintiff would object, and ask Judge Thompson to strike the witness's testimony. (1408:17-1409:20); (2164:15-2165:5); (2191:13-25); (2340:21-2341:23); (2669:4-13); (3715:21-3716:1). In response, the

_____

[11] On October 25, 2012, Mr. Konover filed an additional written objection to Plaintiff's intended use of these "judicially noticed facts." That objection was overruled. (Doc. 949).

47

District Court routinely struck witnesses' testimony. (1408:17-1409:20); (2341:1-16); (2669:4-2670:1). The District Court permitted these tactics over Mr. Konover's objections. E.g. (2165:6-18); (2192:1-3); (2193:21-2199:1); (2341:24-2342:9). Following the improper "impeachment" of one witness who testified that certain of Judge Souder's findings simply were wrong, Mr. Konover moved for a mistrial. (489:14-490:20). That motion was denied. (490:21).

Plaintiff also used trial exhibits from Maryland to recreate the case it put on during the Maryland trial. E.g. (1336:20-24). But when Mr. Konover's lawyers attempted to follow up by explaining the other side of the story, Judge Thompson struck any elicited testimony that he deemed inconsistent with the Judicially Noticed Facts. E.g. (1408:9-1409:20).

Over Mr. Konover's continuing objection that the Connecticut trial reflected a perversion of res judicata principles, Plaintiff devoted its case-in-chief to the following subjects:

        1.    <u>The DPPLP Certificates.</u>

Plaintiff examined multiple witnesses about DPPLP's borrower's certificates, which had formed the basis for the Maryland court's fraud

finding against parties other than KMC. (2470:19-2477:20).[12] Plaintiff argued to the jury that the "transaction we're here on [is] a Konover borrower [DPPLP] and Konover guarantor [KMC] have undertaken obligations to inform lenders of events that happened in the future after the [loan] closing[.]" (2613:16-21). Plaintiff contended that the borrower's certificates imposed such an obligation on DPPLP, despite the fact that Judge Droney had ruled that DPPLP was no longer a veil-piercing target in this case. (2614:17-2615:21). Plaintiff contended—based on its unsupported theory that there was a plan in place to wind KMC down as early as 2000—that because DPPLP did not notify its lender that KMC was getting out of the management business, *DPPLP* had violated the certificate. (2616:14-20).[13]

2.     Fraudulent Inducement by KMC.

Plaintiff devoted much of its trial presentation to its theory that KMC

---

[12] *See also* (1170-1171); (1336-1363); (1536-1545); (1649); (1664-1675); (1696-1700); (2034-2075); (2339-2342); (2381-2384); (2433-2446); (2475-2477); (2657); (2776-2789); (5353:12-17).

[13] *See also* (199-2110); (1101-1109); (1322-1336); (1362-1369); (1548-1551); (1562-1563); (1675-1700); (1849-1853); (1891-1908); (2075-2134); (2345-2348); (2352-2356); (2366-2374); (2390-2400); (2453-2475); (2478-2484); (2516-2523); (2614-2619); (2710-2712); (2745-2746); (2986-3021); (3022-3031); (3041-3048); (3984-3986); (4023-4043).

49

fraudulently induced Pinnacle and Paine Webber to make the Diamond Point loan. Plaintiff centered that theory on KMC's financial statements and the statement in the Larkin Memo that "it was reasonable to expect that KMC would remain viable." (PX39). Through questioning, Plaintiff argued to the jury that "an important issue in this case is when did the idea of restructuring the business and doing the portfolio sale, when did it come up?" (2710:1-5); (3014:10-12); (3026:3-5). Plaintiff argued that Mr. Goman's pre-loan decision to transfer the leasing division from KMC to KDC was "a step away from viability for this company." (3026:11-12). And Plaintiff made it clear to the jury that the focus of its case was "the time frame from 2000 through 2002"—*before* Plaintiff commenced the Maryland Action. (2985:1-2).

Plaintiff grilled witnesses on the accuracy of footnotes contained in KMC's unaudited financial statements. (2961:7-2962:5). For example, Plaintiff examined multiple witnesses about the legitimacy of a 1997/1998 $2.27 million shareholder loan carried on KMC's books, and whether it was a loan or capital contribution. (3054:21-24); (PX214).[14]

---

[14] *See also* (289-298); (331-332); (643-645); (1114-1115); (1368-1369); (1695); (2135-2136); (2390-2391); (2407-2410); (2495-2508); (2516); (2663-2665); (3054-3070); (3992-3995).

Because KMC never paid interest, KMC's accountants considered it to be a capital contribution. (3056:19-22). Plaintiff argued further that Ms. Larkin had "lied" about whether KMC was a "division" of Konover & Associates, rather than a stand-alone corporation as reflected in the credit report obtained by Paine Webber. (3028:1-8). None of this "evidence" supported Plaintiff's claim that Mr. Konover controlled KMC in obtaining the Diamond Point loan. Moreover, Plaintiff did not call any witnesses from either Pinnacle or Paine Webber to testify that they had been deceived by anyone based on the Larkin Memo or the unaudited KMC financial statements. Nor did Plaintiff present evidence that Mr. Konover knew anything about these documents.

### 3. KMC's Alleged Breaches of the KMC Guaranty.

Plaintiff also pursued a theory that KMC, already liable under the Maryland Judgment for breach of the Guaranty, had breached additional provisions in that same Guaranty. (PX14); (2495:3-2537:22). Plaintiff quarreled with witnesses about whether Section 3.4 of the KMC Guaranty obligated KMC to have $15.3 million available to cover the loan principal on the day the loan closed, even though KMC's financial statements provided to the lenders reported a much smaller net worth.

51

(2513:7-21). Plaintiff took the position before the jury that beginning at the loan's inception on June 2, 2000, KMC was required to have assets sufficient to pay the $22.8 million Maryland Judgment—even though the lenders always knew that KMC was never in a position to satisfy a liability of that magnitude. (196:3-9). Plaintiff contended, without support in the Guaranty, that KMC was required to monitor the value of Diamond Point Plaza, and if the value dropped, to "maintain sufficient assets" to retain "equilibrium" between the value of the loan collateral and its own net worth. (196:21-24); (197:24-198:1).[15]

Plaintiff also contended that under Section 3.6, KMC was required to cease making corporate allocation payments to its affiliates the day the loan was made, even though Judge Droney had previously rejected that precise interpretation. (Doc. 784 at 53-54) ("As applied in this case, Section 3.6 did not *prohibit* inter-company transfers as of the date the Guaranty was signed. . . . If the parties' intent was to prohibit KMC's

---

[15] Inexplicably, given Plaintiff's focus on the value of the Diamond Point collateral, the District Court excluded an internal ORIX report that showed that ORIX was willing to pay up to $14 million to acquire Diamond Point Plaza at the foreclosure sale in November 2005–three years after the loan default. (DX1357); (4330:19-23); (Doc. 1175-2 at 4); (Doc. 1000).

corporate allocation payments, irrespective of any obligation arising under the Guaranty, they could have drafted the Guaranty accordingly."); (191:20-21); (2533:5-8). Although Judge Thompson recognized that Judge Droney had "definitively . . . determined the actual meaning [of] Section 3.6," he permitted Plaintiff to maintain this contrary position. (2562:23-2563:10); (3087:9-3088:7); (Doc. 929).

Mr. Konover objected that none of these arguments was supported by language in the KMC Guaranty. (2488:15-18); (2532:1-2533:16). Mr. Konover also objected that Plaintiff's contentions that KMC breached its Guaranty in ways other than those that led to the Maryland Judgment were barred by res judicata and were not relevant to whether Mr. Konover had engaged in conduct that should result in KMC's corporate veil being pierced. (3529:15-3530:10). Despite these objections, all of Plaintiff's "evidence" was admitted.

### B.    Mr. Konover's Motion for Judgment.

At the conclusion of Plaintiff's case, Mr. Konover moved for judgment as a matter of law. (Docs. 991, 992, 994). Mr. Konover argued, among other things, that Judge Thompson had allowed Plaintiff to circumvent the narrowing effect of Judge Droney's summary judgment ruling, that

Plaintiff's fraudulent inducement theory was barred by res judicata, and that under *State Five*, Plaintiff's claims based on events occurring before the Maryland Judgment (and even before Plaintiff initiated litigation in Maryland) could not have violated Plaintiff's judgment creditor rights, and therefore could not have caused Plaintiff's loss. Mr. Konover also argued that under *State Five* the 2005 Transfers could not have caused Plaintiff's injury because the total value of the transferred interests was only $600,000, nowhere near the magnitude of the $22.8 million Maryland Judgment.

The District Court denied the motion, both at the close of Plaintiff's case and when Mr. Konover renewed the motion at the close of all evidence. (Docs. 1011-1013); (5318:3-8).

## C.    The District Court's Jury Instructions.

On December 12, 2012, at the conclusion of the evidence, Judge Thompson gave the parties his draft jury instructions. Judge Thompson intended to instruct the jury that the only specific transactions under attack by Plaintiff were the Portfolio Sale transactions and 2005 Transfers. (5279:15-5290:22). This was consistent with Judge Droney's summary judgment ruling, but sharply at odds with the strategy Plaintiff

54

pursued at trial. Plaintiff objected and explained to the Court that it had been proceeding on the theory that *all* of the evidence Judge Thompson had admitted at trial was fair game for the jury to consider in deciding whether to pierce KMC's veil. (5280:11-17). Judge Thompson interpreted Plaintiff's suggestion that he remove the "specific transactions" instruction from his draft as reflecting Plaintiff's desire that "there be *no limitation at all* in terms of the transactions that plaintiff attacks." (5285:15-18) (emphasis added). Although he recognized the broad implications of Plaintiff's request, Judge Thompson nonetheless acquiesced and eliminated the instruction from the charge—without further explanation. As a result, the jury was given no guidance about what transactions it could consider as a basis for piercing KMC's corporate veil.

The District Court also refused to specify in its instructions that the harm that Plaintiff properly was complaining about was its inability to collect the Maryland Judgment, as opposed to the underlying breach of KMC's Guaranty or any other event that led to that judgment. (5290:6-13). The District Court even refused to provide the jury with a list of non-exhaustive factors that the Connecticut courts use to determine whether

55

an entity has been dominated and controlled. *See Naples* v. *Keystone Bldg. & Dev. Corp.*, 990 A.2d 326, 339-40 (Conn. 2010). The Court rejected this instruction despite the fact that both sides acknowledged that some list of factors was required. (Doc. 1009-1 at 39-41, 60-62). Judge Thompson reiterated his view that every veil-piercing case is "*sui generis*," and it was up to the jury to decide what factors were relevant—without meaningful guidance from the Court. (4900:4-21).

### D.  The Jury's Verdict.

On December 14, 2012, the jury returned a verdict in favor of Plaintiff, granting Plaintiff's request for a veil-piercing remedy. The jury also found that Plaintiff was entitled to the additional remedy of punitive damages. Mr. Konover had filed motions for judgment both at the conclusion of Plaintiff's case-in-chief and at the end of all evidence on Plaintiff's claim for punitive damages, arguing that punitive damages are not available at all as ancillary relief to a Connecticut veil-piercing remedy. *See* (Doc. 992). The District Court denied these motions. (5318:3-8); (Doc. 1112).

## VII.  Plaintiff's Request For $10.6 Million in Attorneys' Fees.

Following the jury's verdict, Plaintiff moved for an award of $10.6 million in attorneys' fees as the measure of punitive damages available

56

under Connecticut law. *See Berry* v. *Loiseau*, 614 A.2d 414, 437 (Conn. 1992). Mr. Konover objected on numerous grounds. Yet the District Court deducted only $32,000 from Plaintiff's $10.6 million fee request. (Doc. 1155 at 44). The District Court refused to deduct fees incurred for work undertaken with respect to five Defendants and five counts that were dismissed from the action either by way of summary judgment ruling or Plaintiff's voluntary stipulation. (*Id.* at 14).

Plaintiff filed its fee request on February 19, 2013. The District Court did not decide that motion until August 8, 2014. During that delay, interest on the Maryland Judgment increased by $1.8 million, thereby bringing Mr. Konover's total potential liability resulting from KMC's guarantee of the Diamond Point loan to an amount in excess of $32 million.

## SUMMARY OF ARGUMENT

Six months before Pinnacle made the $15.3 million Diamond Point loan to DPPLP, KMC held approximately $680,000 in cash, and reported net worth of approximately $4.4 million—facts known by the original lenders. (PX39). After conducting its own due diligence on the Diamond Point loan, ORIX purchased the riskiest "b-piece" certificates in the

57

SBMS VII pool. During discovery in the Maryland Action, ORIX learned that KMC had terminated the employment of many property managers following the Portfolio Sale, because the properties they had managed had been sold. Nevertheless, ORIX spent over three years litigating against KMC in Maryland to obtain a $22.8 million judgment that it *knew* the Maryland defendants could not pay. ORIX then filed this suit on the theory that the cause of its inability to collect the Maryland Judgment was not the fact that the lenders had gambled on a corporate guarantor with insufficient net worth and liquidity (in the event of a decline in the value of the mortgaged shopping center property), but rather alleged wrongful conduct by Michael Konover beginning in 1999, before the Diamond Point loan even was made. After the District Court erred by awarding attorneys' fees on top of the Maryland Judgment, Mr. Konover now stands liable to Plaintiff for an amount in excess of $32 million, increasing at the rate of more than $100,000 per month.[16]

Plaintiff's entire veil-piercing theory defies *State Five's* requirement that a judgment creditor prove that a veil-piercing defendant used his

---

[16] Maryland's statutory rate of post-judgment interest is 10%. Maryland Code, § 11–106 of the Courts and Judicial Proceedings Article.

58

control to divert assets "*that otherwise would have been available to satisfy that judgment,* [and] that these maneuvers were the *proximate cause* of the plaintiffs' inability to collect [the judgment] that it otherwise would have been able to recover." *State Five*, 37 A.3d at 737. The District Court refused to apply this principle, on the theory that *State Five* was "*sui generis*" and devoid of precedential value. This Court should reject the District Court's conclusion as contrary to the common law tradition of *stare decisis* and vacate the judgment. In short, nothing that Plaintiff accused Mr. Konover of doing could possibly have been the proximate cause of Plaintiff's inability to squeeze blood from the KMC stone.

There are additional grounds to reverse. First, there is no subject matter jurisdiction. While the citizenship of an active trustee in a typical trust entity is used to determine diversity, the business reality of the SBMS VII "trust" is that Wells Fargo always was a passive trustee. The certificate holders include Connecticut residents.

Second, by ignoring the substance of Judge Droney's summary judgment ruling and the decision in *State Five*, the District Court gave Plaintiff free rein to present evidence of events and conduct that could not form a legitimate basis to pierce KMC's veil. The District Court

59

compounded this error by refusing, without explanation, Mr. Konover's request that the jury be instructed about the specific transactions that were relevant. The Court's terse open-ended instructions signaled to the jury that any and all evidence was relevant and that it could pierce KMC's corporate veil on any basis it believed appropriate.

Third, the District Court erred by allowing Plaintiff to pursue theories that KMC fraudulently induced the Diamond Point lenders to make a $15.3 million loan to DPPLP, and otherwise breached its loan guaranty. Principles of res judicata should have prohibited Plaintiff from retrying theories on which it failed to prevail in the earlier Maryland litigation—even if based on different facts, different claims, and asserted against different adversaries.

Fourth, the District Court erred by giving collateral estoppel effect to Plaintiff's "tailored version" of Judge Souder's factual findings, and then allowing Plaintiff to bait the witnesses it called into daring to contradict those faulty findings as a form of "impeachment." The District Court also erred by refusing Mr. Konover's request—again without explanation— that additional findings made by Judge Souder from the Maryland Action should be admitted to give proper context to certain of the Judicially

Noticed Facts.

Fifth, the District Court's unprecedented holding under Connecticut law that punitive damages are available as a form of ancillary relief in connection with a veil-piercing remedy was incorrect. Punitive damages are only available as an additional remedy for an underlying independent cause of action. Veil-piercing is itself a remedy, not a cause of action, and the liability of a veil-piercing defendant must be coextensive with that of the veil-piercing target.

Sixth, the District Court erred by holding in the alternative that Plaintiff could recover the same $10.6 million in attorneys' fees (the punitive damages remedy) under the Maryland loan documents. While the District Court acknowledged that the DPPLP mortgage agreement and KMC Guaranty had merged into the Maryland Judgment, it held that language in these agreements was sufficiently specific to avoid the effects of merger. The District Court's ruling is flatly inconsistent with controlling Maryland authority.

Finally, throughout the Connecticut proceedings, Mr. Konover was rebuffed in efforts to persuade the District Court that there is something fundamentally unfair about imposing on him a $20 million judgment,

61

predicated on a $15.3 million non-recourse loan, when the lender foreclosed on the property and recovered $10.3 million from the sale, delayed the Maryland proceedings to allow for the maximum impact of prejudgment default interest at 14%, benefitted from a wrongfully-imposed $3.6 million prepayment premium plus seven years of interest on that amount (when the loan was never prepaid), and when additional delays caused by seven years of Connecticut litigation resulted in post-judgment interest totaling approximately $8.4 million. *See* (PX9a). Equity cannot tolerate a ruling that Mr. Konover should be personally liable for this massively over-inflated judgment simply because he was the owner of KMC, when he refused to personally guarantee the Diamond Point loan, and when the lenders freely accepted KMC as a corporate guarantor with a stated net worth of not more than $4.4 million.

# ARGUMENT

## I. Because the Parties are not Diverse, there is No Subject Matter Jurisdiction.

District courts have diversity jurisdiction over controversies between "citizens of different States." 28 U.S.C. § 1332(a)(1). "When reviewing a district court's determination of its subject matter jurisdiction, [this Court] review[s] factual findings for clear error and legal conclusions *de novo.*" *Creaciones Con Idea, S.A. de C.V.* v. *Mashreqbank PSC*, 232 F.3d 79, 81 (2d Cir. 2000) (internal citation omitted). There was no dispute below that if the citizenship of the certificate-holders of the SBMS VII pool were to be considered, the District Court lacked subject matter jurisdiction.[17] The question for this Court is whether the Connecticut citizenship of the certificate-holders can be disregarded.

In general, the citizenship of an artificial business entity other than a corporation is governed by the citizenship of *all* of the entity's members. *Carden* v. *Arkoma Assocs.*, 494 U.S. 185, 189 (1990); *see also Handelsman*

---

[17] In support of their motion, Defendants submitted evidence that two of the SBMS VII pool investors were Connecticut-based institutions. (Doc. 465-6 at ¶¶ 9–10). Defendants obtained this information through third-party discovery because Wells Fargo and ORIX, its attorney-in-fact, were unable to identify the beneficiaries of the "trust" they purport to manage on the beneficiaries' behalf. *Id.* at ¶ 5.

v. *Bedford Village Assocs. L.P.*, 213 F.3d 48, 52 (2d Cir. 2000). Historically, trusts were not viewed as business entities and a trustee could bring an action in his own name and rely upon his own citizenship for purposes of diversity. Trusts themselves usually took the citizenship of both their trustees and their beneficiaries. *E.g.*, *Belle View Apts.* v. *Realty ReFund Trust*, 602 F.2d 668 (4th Cir. 1979).

In *Navarro Savings Association* v. *Lee*, 446 U.S. 458 (1980), the Supreme Court confronted a Massachusetts business trust, which resembled an unincorporated business association more than a traditional common law trust. *See Thales Alenia Space France* v. *Thermo Funding Co., LLC*, 989 F. Supp. 2d 287, 297 & n.60 (S.D.N.Y. 2013) (explaining the differences). In *Navarro*, the plaintiffs were the trustees themselves, not the trust, and were suing on a note "payable to themselves as trustees." *Navarro*, 446 U.S. at 459. The Court adhered to the historical rule that the trustees' citizenship would control in those circumstances, but based its holding on the determination that the plaintiffs were "***active trustees*** whose control over the assets held in their names is real and substantial." *Id.* at 465 (emphasis added). The Court contrasted the *Navarro* plaintiffs with "'naked trustees' who act as

64

'mere conduits' for a remedy flowing to others." *Id.* at 465 (quoting *McNutt* v. *Bland*, 2 How. 9, 13-14 (1844)).

Under *Navarro*, federal courts in diversity cases involving businesses conducted in trust form should not look to the citizenship of the trustee—even if the action is filed in the trustee's name—unless the trustee exercises real and active control over trust assets. The Supreme Court reaffirmed that principle in *Carden* and observed that the "business reality is taken into account for purposes of determining whether a trustee is the real party to the controversy." *Carden*, 494 U.S. at 192.

This Court has not yet applied *Carden* and *Navarro* to a business trust, or a REMIC operating in trust form. *Cf. E.R. Squibb & Sons, Inc.* v. *Accident & Cas. Ins. Co.*, 160 F.3d 925, 931 (2d Cir. 1998) (citing *Navarro* in dicta for the proposition that the trustees' citizenship is determinative). Two federal appellate courts have concluded that the citizenship of the beneficiaries (or shareholders) counts in diversity cases brought by or against business trusts; one also counted the citizenship of the trustee. *Riley* v. *Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 292 F.3d 1334 (11th Cir. 2002); *Emerald Investors Trust* v. *Guant Parsippany Partners*, 492 F.3d 192 (3d Cir. 2007). District Courts generally have read

*Carden* and *Navarro* to require an analysis of whether the trustee is active and exercises real and substantial control over the assets. *E.g.*, *Thermo Funding*, 989 F. Supp. 2d at 297 & n.60.

Nevertheless, several courts in this Circuit, including the District Court below, have concluded that the citizenship of a REMIC filed in the name of a trustee is governed by the trustee's citizenship rather than the citizenship of the certificate holders. But those courts have looked past the business realities of REMIC trustees, and instead reasoned that the organic documents, usually pooling and servicing agreements ("PSAs"), give the trustees legal title over trust assets, before they cede control to loan servicers. *See* (Doc. 619 at 8); *see also U.S. Bank N.A.* v. *Nesbitt Bellevue Prop., LLC*, 859 F. Supp. 2d 602, 607 (S.D.N.Y 2012) (collecting cases). Other district courts have looked beyond the trustee's status as the holder of *legal* title and concluded that the trustee lacked real and substantial authority to control trust assets. *See U.S. Bank N.A.* v. *Cooperative Dist.*, 2011 WL 4499309 (S.D. Ala., Sept. 29, 2011).

The District Court in this case determined that Wells Fargo was a "real trustee" who had delegated control to ORIX. *See* (Doc. 619 at 8). That conclusion was erroneous for two reasons. First, irrespective of

66

whether Wells Fargo was a "real" trustee, the undisputed evidence contradicted any notion that Wells Fargo was ever an *active* trustee who exercised "real and substantial control" over trust assets, as *Navarro* and *Carden* require. ███████████████████████████████████████

██████████████████████████████████████ A Wells Fargo witness confirmed that Wells Fargo had virtually no knowledge of the Diamond Point loan default and "did nothing" when it did learn. (Doc. 465-10 at 48). As "attorney-in-fact," ORIX did not even consult with Wells Fargo before it filed the Maryland litigation. *Id.* at 50. Wells Fargo earned a meager $1,200 per month from the $750,000,000 SBMS VII pool to do nothing more than lend its name to this investment vehicle. (Doc. 866-3 at 5). Therefore, unlike the active trustees in *Navarro*, Wells Fargo exercised no professional judgment or discretion—and never intended to do so. In short, with respect to the SBMS VII pool, Wells Fargo cannot meet the definition of an "active trustee" with "real and substantial control" over trust assets.

Second, the District Court misperceived Wells Fargo's role in SBMS VII. Wells Fargo did not acquire title to the trust assets *and then* decide to delegate its authority to ORIX. Rather, Wells Fargo had nothing to do

67

with the formation of this trust. The CMBS trust was formed by Salomon Brothers (the sponsor of the vehicle known as SBMS VII) and ORIX (the purchaser of the "b-piece" certificates and the general and special servicer). (Docs. 465-7, 465-8). Those parties obtained Wells Fargo's agreement to act as a ██████████████ because it is a bank that satisfies certain requirements of Section 26(a) of the Investment Company Act, 15 U.S.C. § 80a-26(a). *See* (Doc. 465-8 at § 8.06) (describing the eligibility requirements for a trustee). The PSA grants Wells Fargo only nominal authority sufficient to meet certain requirements of the tax code and Investment Company Act. But Wells Fargo never possessed or exercised, and never intended to possess or exercise, the "real and substantial" control that a bona fide trustee ordinarily assumes. As a result, Plaintiff's citizenship must be measured—not by that of its passive trustee—but by the citizenship of the beneficiaries, including at least two Connecticut certificate holders. Absent complete diversity, the District Court lacked jurisdiction.

## II. The District Court Erred by Granting Plaintiff a License to Present Volumes of Irrelevant and Unfairly Prejudicial Evidence, and then Refusing to Instruct the Jury on the Relevant Transactions and Veil-Piercing Principles.

"The purpose of jury instructions is to give the jury a clear and concise statement of the law applicable to the facts of the case." *Girden* v. *Sandals Int'l*, 262 F.3d 195, 203 (2d Cir. 2001) (internal citations and quotations omitted). This Court "review[s] the district court's instructions *de novo* and will order a new trial if the instruction[s] [misled] the jury as to the correct legal standard or [did] not adequately inform the jury on the law." *Barlow* v. *Liberty Mar. Corp.*, 746 F.3d 518, 524 n.9 (2d Cir. 2014) (internal citations and quotations omitted). "A charge that appears likely to have left the jury 'highly confused' may, on that ground alone, be reversed." *Nat'l R.R. Passenger Corp.* v. *One 25,900 S.F. Parcel*, 766 F.2d 685, 688 (2d Cir. 1985) (citation omitted). Further, when a court admits evidence that is admissible for one purpose but not for another, "the court, on timely request, must restrict the evidence to its proper scope and instruct the jury accordingly." Fed. R. Evid. 105. The failure to give a requested limiting instruction also can constitute reversible error. *United States* v. *Washington*, 592 F.2d 680, 681 (2d Cir. 1979); *Hale* v. *Firestone Tire & Rubber Co.*, 756 F.2d 1322, 1334-35 (8th

69

Cir. 1985).

Over Mr. Konover's objections, the District Court admitted evidence on a range of transactions and conduct that could not form a lawful basis upon which to pierce KMC's veil. (Doc. 958). In addition, the District Court refused all of Mr. Konover's requests to provide the jury with guidance about how to sift through weeks of irrelevant and unfairly prejudicial evidence that the Court admitted. Instead, the Court gave an open-ended instruction suggesting that veil-piercing was a vague concept with no clear rules—in effect, instructing the jury to consider whatever it thought might be relevant. (5541-43).

The District Court set forth three elements of the instrumentality theory (complete domination of the judgment debtor in respect to the transaction attacked, fraud or wrong, and proximate causation). But it did not define or limit which transactions were relevant to veil-piercing, and did not identify any fraud or wrongful acts that the jury could consider. Nor did it describe the injury that Mr. Konover was alleged to have proximately caused. (5542).

Instead, the Court instructed the jury that with respect to both the instrumentality rule and identity rule, "[t]here are no hard and fast rules

70

for determining when the corporate veil should be disregarded. The circumstances necessarily vary according to the facts of a particular case, and there is no exhaustive list of factors that is to be considered or balanced. Therefore, each case in which the issue is raised should be decided in accordance with its own underlying facts." (5542:24-5543:25). This instruction was an erroneous statement of the applicable law.

## A. Without Explanation, Judge Thompson Removed All Limitations from Plaintiff's Veil-Piercing Claims.

Plaintiff devoted its case-in-chief to examining transactions that Judge Droney had ruled could not form a basis for veil-piercing. In fact, any observer of the trial would have concluded that this case was not about Plaintiff's inability to collect the Maryland Judgment entered in 2005, but whether KMC had misrepresented its finances and its reasonably-expected viability as a guarantor in order to help DPPLP procure the Diamond Point loan in the spring of 2000. Over Mr. Konover's objections, Plaintiff hammered witness after witness about the Larkin Memo and KMC's financial statements presented to Pinnacle and Paine Webber in the spring of 2000, even though Plaintiff offered no evidence that Mr. Konover knew anything about these documents. E.g. (643:5-645:2).

71

As Judge Droney made clear in his summary judgment ruling, "the plaintiff must prove that the defendant exercised control or dominance over the business affairs of the corporation 'with respect to the *specific transaction* attacked.'" (Doc. 784 at 13) (quoting *Tomasso*, 447 A.2d at 412). "Thus, to prove causation, the plaintiff must prove control over the fraudulent transactions, not just general control over the dominated entity." (Doc. 784 at 13).

After examining the numerous transactions and events Plaintiff had included in its pleadings, Judge Droney concluded that Plaintiff could premise its veil-piercing claims on its contention that two categories of transactions caused its inability to collect the Maryland Judgment: 1) Mr. Konover's alleged role in what Plaintiff described as a diversion of Portfolio Sale commission payments from KMC to KDC; and 2) the 2005 Transfers. (Doc. 784 at 14 & n.22). Judge Droney concluded that Plaintiff could not reach Mr. Konover by piercing the veils of DPPLP, Oriole, and DPMC—either under the instrumentality rule or Connecticut's "interchangeable" identity rule. (Doc. 784 at 21).

Thus, applying Connecticut veil-piercing principles, Judge Droney set the stage for trial. Plaintiff would be permitted to attack the Portfolio

72

Sale transactions and 2005 Transfers, and to prove that Mr. Konover's alleged role in those transactions caused its inability to collect the Maryland Judgment. But Plaintiff would not be permitted to attack transactions or conduct that might have led to the Maryland Judgment itself. *Id.* As a result, Plaintiff should have been prohibited from arguing that the jury could pierce KMC's veil based on: Mr. Konover's decision to allow DPPLP to default on the Diamond Point loan; misrepresentations found by Judge Souder that were contained in DPPLP's borrower's certificates; and KMC's alleged misrepresentations about its finances and reasonably-expected viability.

Judge Thompson purported to accept Judge Droney's summary judgment rulings in full, but somehow determined that those rulings did not prevent Plaintiff from introducing substantial evidence covering the same claims and transactions that Judge Droney jettisoned at summary judgment. (Doc. 930). With the evidentiary doors wide open, Plaintiff inflated and distorted the case beyond the Portfolio Sale commissions and 2005 Transfers to include conduct, events, and transactions that did not even involve KMC, Mr. Konover, or Plaintiff's inability to collect the Maryland Judgment. In fact, Plaintiff spent days cross-examining

witnesses about whether: (1) DPPLP, the borrower, misrepresented Sam's Club's intention to leave; (2) KMC misrepresented its finances to the lenders by characterizing $2.27 million in two "shareholder loans" from Mr. Konover in 1997 and 1998 as capital contributions; and (3) Ms. Larkin misrepresented KMC's reasonably-expected viability as a guarantor in the spring of 2000 because Mr. Konover (a year later) put the wheels in motion for a substantial reduction of KMC's business when he decided to sell the Portfolio.[18]

Judge Thompson permitted Plaintiff to introduce this evidence and related arguments, over objection, even though Judge Droney had granted summary judgment to Defendants on the identical claims, all of which either were tried or could have been tried in Maryland. Moreover, despite never formally reconsidering Judge Droney's rulings or finding any fault with Judge Droney's reasoning, Judge Thompson refused to give any instructions that would have guided and limited the jury's use of Plaintiff's evidence in forming a legitimate basis for veil-piercing. (Doc.

---

[18] Because Plaintiff called only adverse witnesses at trial, Plaintiff's examinations were direct examinations conducted through leading questions.

1009).[19]

In addition, the District Court allowed the jury to hear volumes of pejorative evidence about KMC, Mr. Konover, other companies owned by Mr. Konover, and about individual conduct other than Mr. Konover's concerning matters that could not have formed a lawful basis for veil-piercing. For example: Plaintiff examined Mr. Konover at length about the limited liability company that in 1987 purchased the land on which four homes, including Mr. Konover's subsequently-built home, are located in Avon, Connecticut, (1929-1935), (2693-2700); whether Mr. Konover had been fair to his partners during the Portfolio Sale, (4622-4626); whether Mr. Konover resides in Florida for tax purposes, (2704:25-2706:10); and facts surrounding two individuals who had embezzled money from one of Mr. Konover's father's companies during the late 1980s and early 1990s, (1088-1089); (1174-1177); (1616-1618); (1751-1754); (2941-2951); (2978-2979); (4016-4018).

---

[19] Judge Thompson stated later that he was "halfway through dictating something" that would explain his reasoning, but the Court never provided any explanation for its rejection of the defense's proposed instruction defining the specific transactions relevant to the jury's veil-piercing determination. (5553).

75

Even if this evidence was admissible for some limited purpose—and Mr. Konover contends that it was not—it was not relevant to a specific fraudulent transaction necessary to support veil-piercing under the instrumentality theory. Nor was it relevant to the "interchangeable" identity theory.[20] As a result of the Court's admission of this evidence and its refusal to provide the jury with any guidance about how to make sense of it all, the jury could have predicated its verdict on any number of improper grounds. For instance, the jury could have acted under the erroneous belief that KMC was the "instrumentality" of Mr. Konover because KMC fraudulently misrepresented its finances or viability in order to procure the Diamond Point loan—an issue that Plaintiff had asserted in the Maryland proceedings and on which it failed to obtain relief. In addition to such evidence being barred by res judicata, Plaintiff produced no evidence that Mr. Konover caused any misrepresentations

---

[20] *See Naples*, 990 A.2d at 342 (holding that the plaintiff's claims failed under both the instrumentality claim and identity claim because the plaintiff could not show that any alleged wrong caused the injury complained of). *See also CSX Transp., Inc.* v. *Blakeslee*, 2012 WL 3985169, \*6 (D. Conn., Sept. 11, 2012) (rejecting claims under both tests because of the lack of a causal connection to loss); *RBC Bearings, Inc.* v. *Thin Section Bearings, Inc.*, 2007 WL 2727160 (D. Conn., Sept. 18, 2007) (same).

76

to be made to the lenders about KMC. Worse yet, the jury could have decided to pierce KMC's veil based only on Mr. Konover's decision to allow DPPLP to default on the Diamond Point loan, on the theory that this was a "wrongful" act that caused Plaintiff's loss.[21]

### B. The District Court Erred by Ignoring the *State Five* Decision.

In *State Five*, the commissioner of environmental protection and other governmental units obtained a judgment against Joseph Farricielli and five corporations that Mr. Farricielli owned or controlled. The plaintiffs obtained their judgment in 2001 as a result of illegal waste disposal activities on land referred to as "parcels A and B." The corporations were all defaulted for failing to appear, and by the time of trial, the corporations were defunct. *See Rocque* v. *Farricielli*, 848 A.2d 1206, 1209 n.1 (Conn. 2004).

On September 21, 2001, the trial court entered judgment in favor of the plaintiffs, awarding approximately $3.8 million in civil penalties. Mr. Farricielli and his defunct companies failed to pay that judgment. The

---

[21] Indeed, in an apparent effort to confuse the jury, Plaintiff referred over and over again to the mundane fact that Mr. Konover approved DPPLP's decision to default. (125-126); (499-500); (1171); (1375); (1518); (2654-2655); (2744); (2789); (2293-2295); (3082); (3088-3096).

plaintiffs then brought a veil-piercing action against Mr. Farricielli's wife, Jean Farricielli, and a company called State Five Industrial Park, Inc. ("State Five"). In that action, the plaintiffs attacked several transactions that preceded their 2001 judgment. For example, in February 1996, Mr. Farricielli conveyed real property to State Five without consideration, including a parcel of land known as "parcel C." In January 2000, during the underlying action, Mr. Farricielli caused one of the judgment debtors to transfer land to State Five for no consideration so that State Five could construct a cell phone tower on parcel C. Following that conveyance, State Five collected the rental income from the cell tower.

Reversing the lower court and directing that judgment be entered in favor of the veil-piercing defendants, the Supreme Court held that the plaintiffs failed to prove that Mr. Farricielli's actions were the proximate cause of the plaintiffs' inability to collect their judgment. The Court held that:

> to justify imposing the entire obligation of the 2001 judgment on State Five, the plaintiffs needed to show that Joseph exercised his control over State Five to divert or secrete assets *that otherwise would have been available to satisfy that judgment,* [and] that these maneuvers were the *proximate*

78

> *cause* of the plaintiffs' inability to collect $3.8 million that it otherwise would have been able to recover.

*State Five*, 37 A.3d at 737.

The Supreme Court concluded that the pre-judgment transfers could *not* have been the proximate cause of the plaintiffs' inability to collect. The Court held that "although [Mr. Farricielli] transferred parcel C to State Five for no consideration, he did so in 1996, more than three years before the institution of the 1999 action and more than five years prior to the 2001 judgment. . . ." *Id.* Based on this timing, the Court concluded that "it cannot be argued that the transfer was contrary to the plaintiffs' legal rights and proximately caused their inability to collect on their judgment." *Id.*

The Court expounded on its holding in a footnote, observing that the conveyance of land for construction of a cell phone tower that Mr. Farricielli caused to be made for no consideration during the 1999 proceedings also could not have been the proximate cause of the plaintiffs' harm. *Id.* at 737 n.19. That is because a transaction that precedes a judgment cannot be made in violation of a veil-piercing plaintiff's rights, and cannot be the cause of the plaintiff's inability to collect on a judgment

79

not yet entered. The Court held that it would be inequitable to pierce the corporate veil under such circumstances, and indicated that the proper remedy for challenged prejudgment transfers is through a statutory fraudulent transfer action. *Id.*

Here, the timing of the alleged transfer by KMC of its leasing division to KDC is nearly identical to the alleged transfer of parcel C in *State Five*. Mr. Goman made the decision to transfer KMC's leasing division to KDC in 1999—more than six months before Pinnacle made the Diamond Point loan, three years before Plaintiff filed the Maryland Action, and five years before Plaintiff obtained the Maryland Judgment. Similarly, as Judge Droney recognized, any misrepresentation by KMC about its finances or reasonably-expected viability necessarily occurred before the loan was made, and long before Plaintiff obtained its judgment. Consequently, any such misrepresentations could not have caused Plaintiff's inability to collect.

The *State Five* Court also determined that certain transfers made *after* the plaintiffs obtained their judgment could not have been the proximate cause of the plaintiffs' inability to collect. The Court observed that Mr. Farricielli made a number of post-judgment transfers, but "the trial court

did not calculate the value of those transfers, and the evidence presented would not support a finding that their value came ***anywhere near*** to the amount for which the court ultimately held State Five liable." *Id.* at 737 (emphasis added). As a result, the Court held that the plaintiffs had failed to "establish with specificity the necessary connection between [Mr. Farricielli's] improper actions vis-à-vis State Five and the plaintiffs' inability to collect on the 2001 judgment." *Id.*

The Court also expounded on this holding in a detailed footnote, observing that "the total of all transfers of assets during the relevant period [was] approximately $342,000, which [was] less than 10 percent of the judgment for which the trial court ultimately found State Five liable." *Id.* at 737 n.18. The Court held that "[b]ecause transfers to State Five totaling only $342,000 could not be the proximate cause of the plaintiffs' failure to collect a judgment that had grown to exceed $4 million, application of a reverse veil pierce to make *all* of State Five's assets available for collection was not equitable." *Id.*

So too here. With respect to the 2005 Transfers, even after seven years of discovery, Plaintiff failed to quantify the value of those transfers. The only evidence presented was that the assets were sold by KMC for

approximately $600,000—consistent with their fair market value as determined by Mr. Konover's accountant. KMC's outstanding liability at the time of the transfers was $22.8 million. Put simply, these sales by KMC to Ripple, Blackboard, and Mr. Konover, could not have caused Plaintiff's loss.

Judge Thompson refused to acknowledge and apply these controlling principles of Connecticut law in his rulings on the admissibility of evidence or in his jury instructions. Rather, the jury instructions reflected Judge Thompson's view that all veil-piercing cases are "*sui generis*," and can be decided on any basis the jury sees fit. The District Court's "anything goes" approach to the evidence and the law allowed the jury to base its liability finding on transactions that preceded the Diamond Point loan, on the loan default itself, on claims asserted in the Maryland Action, on "Judicially Noticed Facts" drafted by Plaintiff and adopted by the Maryland court, as well as *ad hominem* attacks on Mr. Konover that had nothing to do with collection of the Maryland Judgment. The District Court also erred by refusing to instruct the jury that it was required to find that any transaction on which it based its veil-piercing determination must have been of sufficient magnitude to

82

have caused Plaintiff's inability to collect its judgment.[22]

### C. The District Court Erred by Not Instructing the Jury that Veil-Piercing is Permissible Only if Plaintiff Could Not be Compensated Through Money Damages.

"The concept of piercing the corporate veil is equitable in nature [and o]rdinarily the corporate veil is pierced only under exceptional circumstances." *Naples* v. *Keystone Bldg. & Dev. Corp.*, 990 A.2d 326, 340 (Conn. 2010) (quoting *Tomasso*, 447 A.2d at 406)). "[S]ince equitable remedies will not be imposed where there is an adequate remedy at law, disregard of the corporate entity ***may be refused*** where the court determines that the complaining party can be adequately compensated with money damages." Fletcher Encyclopedia of the Law of Corporations § 41.25 (September 2011) (emphasis added). *See also SCM Corp.* v. *Xerox Corp.*, 507 F.2d 358, 363 (2d Cir. 1974) ("[I]t is basic that equitable relief will not be granted where an adequate remedy at law exists.").

---

[22] To the extent this Court finds that it is unclear under Connecticut law whether the veil-piercing principles applied in *State Five* were meant to have application in subsequent cases or instead were "*sui generis*," Mr. Konover requests that this issue be certified to the Supreme Court of Connecticut pursuant to Local Rule 27.2. Unlike the District Court in this case, however, other courts have not encountered difficulty applying *State Five's* causation principles and giving them precedential effect. *Hyundai-Wia Mach. Am. Corp.* v. *Rouette*, 2013 WL 395474, *8 (D. Conn., Jan. 31, 2013).

Plaintiff initially raised a claim under Connecticut's fraudulent transfer statute, with respect to all of the transactions on which it later presented evidence and argument during the veil-piercing trial. In count three of its second amended complaint, Plaintiff challenged as fraudulent (and incorporated by reference) each transfer that was the subject of its veil-piercing claims. (Doc. 650 at Count 3, ¶ 84).

Plaintiff abandoned these legal claims for fraudulent conveyance on the eve of trial, however, electing instead to challenge these transactions under an "all or nothing" equitable veil-piercing remedy. Plaintiff obviously did not want the jury to be able to consider these self-proclaimed "lesser included offenses," (Doc. 1155 at 33-34), because it recognized that these remedies at law could only lead to compensatory damages that would pale in comparison to a veil-piercing remedy making Mr. Konover jointly liable for the entire amount of the Maryland Judgment, including massive amounts of post-judgment interest.

The Court's refusal to instruct the jury, at Mr. Konover's request, on whether Plaintiff had legal remedies available, converted a last resort, "exceptional" remedy into the only choice. (Doc. 1009 at 46, 78); (5309:9-5311:7). By also refusing to instruct the jury on the meaning of equity, or

84

the need to weigh the amount of the harm alleged from specific transactions versus the magnitude of the underlying Maryland judgment, Plaintiff was permitted to bypass traditional legal remedies in favor of giving the jury the stark choice between a windfall remedy or no remedy at all. (Doc. 1009 at 58, 74); (5302:10-5303:3); (5304:18-5309:8). In sum, the District Court's instructions and rulings on admissibility produced an inequitable veil-piercing verdict.

## III. The District Court Erred by Refusing to Grant Mr. Konover's Motion for Judgment.[23]

As early as 2008, Judge Droney recognized that Plaintiff could not base its veil-piercing claims on facts surrounding the Diamond Point loan negotiation and subsequent default. (Doc. 383 at 7). That is because under the doctrine of res judicata, any claim that Mr. Konover caused KMC's liability for the Maryland Judgment had to have been brought in the Maryland proceedings. For that reason, Judge Droney permitted Plaintiff to attack only two transactions—the Portfolio Sale transactions and the 2005 Transfers.

But under the subsequent *State Five* decision, because the Portfolio

---

[23] The standard of review is *de novo. Izzarelli* v. *R.J. Reynolds Tobacco Co.*, 731 F.3d 164, 167 (2d Cir. 2013).

Sale transactions began 18 months before there was any loan default and were completed by February 2003—before KMC was even sued, before any member of the Konover organization knew that a claim would be made against KMC, and more than two years prior to the Maryland Judgment—they could not possibly have proximately caused Plaintiff's inability to collect a judgment that did not yet exist. And, because the 2005 Transfers involved less than $600,000 in assets— approximately 2.6% of the $22.8 million judgment—they too, cannot be deemed to have proximately caused Plaintiff's loss.

Indeed, the bare fact that all parties to the Diamond Point loan transaction knew with certainty that KMC never was in a position to satisfy a liability of that magnitude forecloses any suggestion that it was supposed wrongful conduct by Mr. Konover that proximately caused Plaintiff's inability to extract $22.8 million from a $4.4 million guarantor. For all of Plaintiff's claims that the lenders were fraudulently induced into making the Diamond Point loan, Plaintiff *never* claimed that KMC held itself out as having anything more than a $4.4 million net worth and cash liquidity that fluctuated between $95,000 and $1.2 million— liquidity that made KMC "tremendously weak." (4385:21-25); (4385:9-

11); (4387:1-4).

As Judge Easterbrook has observed, citing this Court's decision in *Brunswick Corp.* v. *Waxman*, 599 F.2d 34 (2d Cir. 1979), corporate veils should not be readily pierced where "contract creditors have entered into a voluntary arrangement with the corporation, which gave them an opportunity to negotiate terms reflecting any enhanced risk to which doing business with an entity enjoying limited liability exposed them," *Secon Serv. Sys., Inc.* v. *St. Joseph Bank & Trust Co.*, 855 F.2d 406, 413-14 (7th Cir. 1988). The Diamond Point lenders agreed that the KMC Guaranty would not include any minimum net worth covenant or restriction on KMC's ability to take on debt. (2112:10-23). Nor did the Guaranty impose any restrictions on KMC's ability to make distributions to its shareholder, Mr. Konover. (3067:11-13).

Furthermore, the lenders tried, but failed, to obtain a personal guaranty from Mr. Konover. Put simply, this entire litigation represents Plaintiff's improper attempt to obtain Mr. Konover's "warm-body guaranty" for the June 2000 Diamond Point refinancing. *Secon Serv.*, 855 F.2d at 414 ("If they wanted guarantees from the investors, they could have negotiated for them."). The lenders knew what they were getting

when they agreed to allow KMC to serve as a guarantor. Under Connecticut law, parties to a contract cannot pierce the corporate veil of their counterparties when they were "fully aware of the type of business with which they were dealing." *Campisano* v. *Nardi*, 562 A.2d 1, 7 (Conn. 1989). *See also Brunswick Corp.*, 599 F.2d at 36 (refusing to pierce the corporate veil where the plaintiff "knowingly entered into [a sales contract] with a no-asset corporation," and knew that "the sole obligor on the sales contract was to be the corporate dummy created for that purpose").

### A. The Portfolio Sale Transactions Could Not Have Impaired Plaintiff's Nonexistent Judgment Rights.

In *State Five*, the Supreme Court concluded that transfers occurring several years before the plaintiffs obtained their judgment could *not* have been the proximate cause of the plaintiffs' inability to collect. The Court held that where the veil-piercing target made the challenged transfer "more than three years before the institution of the 1999 action and more than five years prior to the 2001 judgment . . . it cannot be argued that the transfer was contrary to the plaintiffs' legal rights and proximately caused their inability to collect on their judgment." *State Five*, 37 A.3d at 737.

Here, Plaintiff argued that it was *Mr. Konover* who made the decision to divert the Portfolio Sale commissions from KMC to KDC and that he did so *prior* to the loan default. But the evidence showed that it was Mr. Goman who made the decision that KDC should receive the sales commissions and it was Mr. Goman and Mr. Anderson who proposed to Mr. Konover that the Portfolio sellers compensate KDC for lost future leasing commissions. But even if Plaintiff was right as to who made these decisions, it was undisputed that the Portfolio Sale transactions all occurred before Plaintiff instituted the Maryland Action, between two and three years before Plaintiff obtained the Maryland Judgment, and that the commissions were paid before KMC had any inkling that it would become liable for the Maryland Judgment. And so under *State Five*, these transactions could not have proximately caused Plaintiff's inability to collect the Maryland Judgment.

**B.    Only the 2005 Transfers Could Have Violated Plaintiff's Judgment Rights, But They Could Not Have Caused Plaintiff's Loss.**

The 2005 Transfers were the only transactions that could possibly have violated Plaintiff's judgment rights. But the *State Five* Court also made clear that post-judgment transfers that are incommensurate with the outstanding judgment could not have been the proximate cause of a plaintiff's inability to collect its judgment. *State Five*, 37 A.3d at 737 n.18. The total value of the post-judgment transfers at issue in *State Five* was $342,000—less than 10 percent of the outstanding judgment. And so the Court determined that these transfers could not have caused the plaintiffs' inability to collect on a $4 million judgment.

Here, the value of the KMC interests that were transferred, according to independent certified accountants, was approximately $600,000—less than 3 percent of the outstanding Maryland Judgment. Plaintiff failed to offer any competing evidence of value. Put simply, the 2005 Transfers could not have been the proximate cause of Plaintiff's inability to collect the Maryland Judgment.

Under Judge Droney's prior rulings, coupled with *State Five's* causation analysis, Judge Thompson should have granted Mr. Konover's

90

motion for judgment.

## IV. Plaintiff's Claims that Mr. Konover Caused KMC to Fraudulently Induce the Diamond Point Loan were Barred by Res Judicata.

On multiple occasions, Plaintiff's counsel told the jury that this was a case about whether Mr. Konover controlled and dominated KMC such that he caused KMC to misrepresent its finances and reasonably-expected viability, which in turn fraudulently induced Pinnacle and Paine Webber to make the Diamond Point loan. (1563:4-7). But the evidence showed that Mr. Konover played no active role in the negotiations with the lenders, and Plaintiff produced no evidence that Mr. Konover caused any representations about KMC to be made. Putting aside this lack of relevant evidence, Plaintiff's theory should have been barred by the preclusive effect of the Maryland judgment.[24] This Court reviews *de novo* a District Court's application of the principles of res judicata. *Duane Reade, Inc.* v. *St. Paul Fire & Marine Ins. Co.*, 600 F.3d 190, 195 (2d Cir. 2010).

While the Connecticut trial was an action against Mr. Konover alone,

---

[24] Mr. Konover objected during the trial that the District Court was allowing Plaintiff to retry the Maryland case—without effect. E.g. (2199:2-2200:14).

91

and so Plaintiff's fraudulent inducement claim was based on misrepresentations Plaintiff alleged Mr. Konover had caused KMC to make, Mr. Konover could not be held liable for fraudulent inducement when Plaintiff failed to prove that same claim against KMC in the Maryland Action. Under Maryland law, res judicata applies "even though the subsequent suit takes a different form or is based on a different cause of action." *Pat Perusse Realty Co.* v. *Lingo*, 238 A.2d 100, 102 (Md. 1968) (citations omitted).[25] *Accord Hall* v. *St. Mary's Seminary & Univ.*, 608 F. Supp. 2d 679, 686 (D. Md. 2009) *aff'd*, 378 F. App'x 326 (4th Cir. 2010) (holding that a plaintiff cannot avoid claim preclusion "merely by asserting variable forms of relief among separate suits that arise from the same transaction"); *Reeves* v. *St. Mary's Cnty. Comm'rs,* 268 F. Supp. 2d 576, 584 (D. Md. 2003) (explaining that res judicata applies to claims that arise from the same transaction "even if they involve different harms or different legal theories.").

Other courts have correctly applied Maryland's rules of claim preclusion under similar circumstances. In *BKJB Partnership* v.

---

[25] Maryland law governs the preclusive effect of a Maryland judgment. *Parsons Steel, Inc.* v. *First Alabama Bank*, 474 U.S. 518, 523 (1986).

*Moseman*, 644 S.E.2d 874, 875 (Ga. App. 2007), the plaintiffs filed suit in Maryland alleging that they had been fraudulently induced to sell their stock in a property-owning entity. The court ruled in favor of the defendant based on a release the plaintiffs had signed in connection with the sale. The plaintiffs then filed a second suit in Georgia, for "inceptive fraud" on the theory that the defendant intended to breach the release when the parties signed it. The court rejected plaintiff's subsequent suit, recognizing that "[u]nder Maryland law, the rules of claim preclusion, also called *res judicata*, are triggered when matters related to earlier litigation are raised in subsequent litigation." *Id.* at 865. Because both lawsuits involved the "same transaction and also sought redress for the same wrongs," the subsequent suit was barred. *Id.* at 866.

Plaintiff did not attempt to hold Mr. Konover liable for fraudulent inducement in the Maryland case, even though Mr. Konover was a defendant in that case. But it pursued substantially identical claims against DPPLP and KMC. Accordingly, Plaintiff's claim in the Connecticut trial that Mr. Konover should be held responsible for fraudulently inducing the Diamond Point loan, even though presented against a different party in Maryland, was barred by res judicata. *See*

93

*Bouchat* v. *Champion Prods., Inc.*, 327 F. Supp. 2d 537, 547 (D. Md. 2003) (observing that res judicata precludes the relitigation of identical issues by "merely switching adversaries") (citations and internal quotation marks omitted); *Advantage Health Plan, Inc.* v. *Knight*, 139 F. Supp. 2d 108, 111 (D.D.C. 2001) ("Having already won a judgment . . . with which it is now dissatisfied because the judgment debtor is in bankruptcy, plaintiff brings essentially the same claims to this Court against others whom it might have—but didn't—seek to hold liable as well. The plaintiff has already had its opportunity to litigate this claim against one and all, and is barred by claim preclusion from bringing it again against potential defendants it elected to ignore.").

## V. The District Court Erred by Taking Judicial Notice of Plaintiff's "Tailored Presentation" of the Maryland Findings.

The District Court rejected Mr. Konover's argument that Plaintiff would circumvent the preclusive effect of the Maryland Judgment if the Court allowed Plaintiff to present the same findings which led to that judgment in support of its claim to pierce KMC's veil. The District Court initially reasoned that Plaintiff was not attempting to "introduc[e] factual findings from [prior] litigation in support of plaintiff's claims in

this action." (Doc. 933 at 4-5). Rather, under the District Court's view, Plaintiff was "relitigating the amount of damages for the acts that form the basis of that claim." *Id.*

To begin with, there was no need for Plaintiff to relitigate any part of its damages claim. As Plaintiff itself argued, *State Five* establishes the general principle that "if the corporate veil is pierced, then the proper remedy is the imposition of joint and several liability for the entire amount of the judgment." (Doc. 920 at 6). The jury's verdict and the judgment of the District Court did not include any damages amount. Rather, Mr. Konover was found jointly and severally liable for the Maryland Judgment. (Doc. 1027); (Doc. 1159).[26]

Furthermore, even if the distinction the District Court adopted before trial was valid, Plaintiff obliterated that distinction during the trial. For example, just before Plaintiff called former KCA employee, Susan Larkin,

---

[26] If Plaintiff had been required to prove the amount of its damages, then Mr. Konover should have been permitted to show that the Maryland Judgment included an erroneous $3.6 million prepayment premium (plus seven years of post-judgment interest on that amount), and other wrongful conduct by Plaintiff that inflated the Maryland Judgment. But the District Court granted Plaintiff's motion in limine precluding Mr. Konover from presenting any evidence in support of these affirmative defenses. (Doc. 927).

to the stand, Plaintiff's counsel asked Mr. Goman whether he was aware that in Maryland finding number 114, Judge Souder determined that during the Maryland trial, Ms. Larkin had "changed her earlier deposition testimony in which she admitted that she had not told anyone at Pinnacle about [the Sam's relocation] information." (2010:18-2011:4). Then when examining Ms. Larkin a short time later, Plaintiff invited Ms. Larkin to dispute this Judicially Noticed Fact solely for purposes of impugning her credibility. (2028:24-2031:22). Plaintiff's counsel asked whether Ms. Larkin "stood by" the deposition testimony she gave in Maryland, because "Judge Souder in Baltimore found that [she] had said one thing in [her] deposition and the opposite thing when [she] testified at trial[.]" (2031). Ms. Larkin explained that she did not know how to answer the question. *Id.* And on "cross," Judge Thompson refused to allow Ms. Larkin to explain the trivial nature of her supposed "change" in testimony, which defense counsel was prepared to convincingly show was immaterial. (2164-2165); (2194:24-2199:1).

Judge Thompson's refusal to allow Ms. Larkin to defend herself, while taking judicial notice of finding 114, was tantamount to instructing the jury that Ms. Larkin was not to be believed. (PX6a at 114). At times, the

96

District Court appeared to recognize the unfairness of permitting Plaintiff to use the Judicially Noticed Facts as a bludgeon to "impeach" the witnesses it called to the stand. (2198). But the District Court stated that "fairness is reflected in the elements of collateral estoppel. So there is no over-arching exception to collateral estoppel just based on fairness." (2227:19-23). This Court, by contrast, has recognized that federal courts have "broad discretion" to reject collateral estoppel on grounds of fairness, as Mr. Konover urged the District Court to do here. *Bear, Stearns & Co.* v. *1109580 Ontario, Inc.*, 409 F.3d 87, 91 (2d Cir. 2005). In fact, this Court has explained that "[d]espite the economies achieved by use of collateral estoppel, it is not to be mechanically applied, for it is capable of producing extraordinarily harsh and unfair results." *Remington Rand Corp.* v. *Amsterdam-Rotterdam Bank, N.V.*, 68 F.3d 1478, 1486 (2d Cir. 1995).

In effect, the District Court treated Maryland's res judicata principles as a discretionary device by allowing Plaintiff to retry aspects of the Maryland Action on slightly different theories and against a different party, but treated collateral estoppel as an inexorable command. It has long been recognized by this Court that the District Court's analysis was

exactly backwards.

> It is altogether right that the judgment shall forever put an end to the first cause of action; but it is not plain that it is always fair that every fact . . . decided in it, shall be conclusively established between the parties in all future suits, just because the decision was necessary to the result.

*Id.* (quoting *Evergreens* v. *Nunan*, 141 F.2d 927, 929 (2d Cir. 1944) (L. Hand, *J.*)).

The District Court's decision to take judicial notice of the specific findings that Plaintiff tailored was "extraordinarily harsh and unfair" for at least three reasons. *First*, Mr. Konover had no warning that the facts found in Maryland could be used in a subsequent case against him personally. Courts have been reluctant to apply estoppel when "the party against whom estoppel is sought had little warning during the first suit that the issues being decided might become binding against it in later litigation." *Remington Rand*, 68 F.3d at 1486. *Second*, Plaintiff could have—but chose not to—bring a veil-piercing claim or fraudulent inducement claim against Mr. Konover in Maryland. A District Court's "discretion should not be exercised to permit the use of offensive collateral estoppel 'where a plaintiff could easily have joined [the party

sought to be estopped] in the earlier action. . . .'" *In re Microsoft Corp. Antitrust Litig.*, 355 F.3d 322, 326 (4th Cir. 2004) (quoting *Parklane Hosiery Co.* v. *Shore*, 439 U.S. 322, 331 (1979)); *see also* Restatement (Second) of Judgments § 29(3). Instead, Plaintiff chose to litigate its fraudulent inducement claims in Maryland against only judgment-proof entities. *Third*, Plaintiff's counsel drafted all of Judge Souder's Maryland findings judicially noticed by Judge Thompson. In federal courts, this practice is disfavored, in part precisely because advocate-drafted findings tend to exaggerate. *See*, *e.g.*, *United States* v. *El Paso Natural Gas Co.*, 376 U.S. 651, 657 n.4 (1964); *Anderson* v. *Bessemer City*, 470 U.S. 564, 572 (1985); *Pompa Constr. Corp.* v. *Saratoga Springs*, 706 F.2d 418, 422 n.5 (2d Cir. 1983). For all these reasons, the District Court erred when it refused to exercise its broad discretion to decline giving collateral estoppel effect to Plaintiff's "tailored presentation" of the Maryland findings.

To make matters worse, after Plaintiff used the Judicially Noticed Facts to suggest that as of late 2002, Mr. Konover received a transfer of $633,000 from DPPLP with an intent to harm Plaintiff's rights as a creditor, Mr. Konover attempted to invoke the rule of completeness to put

those findings in context. (PX6A at 213-218). The true tenor of the Maryland Court's findings with respect to Mr. Konover's frame of mind could only have been revealed by disclosing to the jury Judge Souder's four findings of fact that led her to reject Plaintiff's claim for punitive damages against Mr. Konover. These findings demonstrated that Mr. Konover lacked a "consciousness of . . . wrongdoing," and that he took no action with an intent to harm Wells Fargo. (PX 6 at 243-not admitted-3289:5-8).[27]

This Court has recognized that "Rule 106 allows the introduction of other portions of writings or recordings when they are necessary to explain an earlier-admitted portion, to place the earlier-admitted portion in context, or to avoid misleading the jury," *United States* v. *Demosthene*, 334 F. Supp. 2d 378, 382 (S.D.N.Y. 2004) (citing *United States* v. *Rivera*, 61 F.3d 131, 135-36 (2d Cir. 1995)). But the District Court denied—without explanation—Mr. Konover's motion to supplement Plaintiff's selective sampling of the Maryland findings to place the earlier-admitted findings in context and avoid misleading the jury. (3289:5-8); (Doc. 989).

---

[27] Defense counsel explained to the Court that these findings were among the small handful that Judge Souder did not lift verbatim from Plaintiff's proposed findings of fact. (Doc. 981-1 at 7).

In sum, the District Court erred by permitting Plaintiff to reenact the Maryland trial without opposition. The District Court's rulings granted Plaintiff free rein to repeat the allegations it made in the Maryland case in support of its veil-piercing action, and then placed a gag order on the defense to prevent Mr. Konover or any other witness from responding. With respect to the testimony of several critical witnesses, the result was a form of "show trial," in which Judge Souder's findings—even where clearly erroneous—had to be accepted by the witnesses and by the Connecticut jury.

## VI.  There was No Cause of Action to Support an Award of Punitive Damages.

The District Court's conclusion that under Connecticut law punitive damages are available in connection with a veil-piercing remedy is not supported by a single appellate decision.[28] Nor is there any Connecticut appellate precedent or decisions from the District Court supporting the

---

[28] On February 2, 2013, Mr. Konover asked the District Court to certify to the Connecticut Supreme Court the question whether punitive damages are available in connection with veil-piercing remedies. The District Court denied that motion on September 27, 2013, concluding that it would be "more efficient" for this Court to decide whether to certify the question after first resolving the numerous other issues presented by this case. (Doc. 1117 at 3). The District Court did not enter final judgment until almost a year later on August 19, 2014.

novel proposition that a plaintiff can predicate a claim for punitive damages on a remedy, as opposed to an independent cause of action.

The flaw in the District Court's holding that punitive damages are available as ancillary relief in veil-piercing cases is that punitive damages are a remedy, requiring as support an underlying cause of action. A "punitive damages award cannot stand in the absence of a verdict in the plaintiff's favor *on a cause of action* sounding in tort." *Barry* v. *Posi-Seal Int'l, Inc.*, 672 A.2d 514, 519 (Conn. App. 1996) (emphasis added); *Cole* v. *Aetna Life & Cas.*, 70 F. Supp. 2d 106, 115 (D. Conn. 1999) (holding that "punitive damages are precisely what the name implies—a type of damages which are awarded based on some other underlying cause of action against a defendant").

Veil-piercing is also a remedy, not an independent cause of action. Although plaintiffs who seek to establish alter ego status or pierce the corporate veil often frame their requested remedies as if they were independent causes of action—as Plaintiff in this case did—veil-piercing remains a remedy. Plaintiff itself has recognized the "well-established and undisputable principle that veil-piercing is not an independent cause of action but rather an equitable remedy that imposes liability on an

102

underlying cause of action." (Doc. 919 at 2). Accordingly, a "claim" of piercing the corporate veil cannot provide an independent basis for additional remedies such as punitive damages.

District Judge Underhill applied this concept in *Everspeed Enterprises Ltd.* v. *Skaarup Shipping International*, 754 F. Supp. 2d 395, 403 (D. Conn. 2010). In *Everspeed*, the Court considered whether a plaintiff's request to pierce the corporate veil could serve as an independent cause of action sufficient to provide a basis for a prejudgment attachment remedy. The Court concluded that "[a]lthough the plaintiff has framed its alter ego claim as an independent cause of action, the 'claim' is nothing more than a remedial request to enforce a judgment against a party not primarily liable." *Id.* (citation omitted). Accordingly, the Court denied the plaintiff's request for prejudgment attachment because "Connecticut law does not recognize alter ego as an independent cause of action," and "[t]o the extent the prejudgment remedy application is based on a 'claim' of alter ego alone, there [was] no independent cause of action to support it." *Id.* at 404.

Furthermore, "the doctrine of piercing the corporate veil presupposes that 'the corporation is liable.'" *Morris* v. *N.Y. State Dept. of Taxation &*

*Fin.*, 603 N.Y.S.2d 807, 812 (1993) (quoting 1 Fletcher § 41, at 603). And so it is inconsistent with the nature of the veil-piercing remedy to hold a defendant liable for punitive damages for which the corporation itself was not found liable. Here, the judgment against KMC was for breach of contract only, and all of Plaintiff's claims for punitive damages in the Maryland case were rejected by Judge Souder.

Mr. Konover made these arguments below on multiple occasions. (Docs. 1067-1, 1068-1, 1078). But the District Court never addressed them specifically. Rather, the Court erroneously concluded that punitive damages are available in any case where the jury determines that a defendant's conduct warrants a punitive sanction, without regard to the nature of the supporting cause of action—or even the existence of one. (Doc. 1155 at 4). Judge Thompson also ruled in the alternative that even if he was wrong about the availability of punitive damages for veil-piercing, Plaintiff was entitled to an award of attorneys' fees based on fee-shifting provisions contained in the KMC Guaranty and DPPLP's mortgage agreement. *Id.* That alternative ruling was also erroneous.

## VII.   The Loan Documents Merged Into the Maryland Judgment.

The District Court recognized that the KMC Guaranty and DPPLP

104

mortgage agreement merged into the Maryland Judgment. (Doc. 1117); (Doc. 1155 at 5). But the District Court found that the language of the attorneys' fees provisions contained in those agreements was sufficiently precise to avoid the effects of merger under Maryland law. Putting aside the fact that Judge Droney granted Mr. Konover's motion for summary judgment on Plaintiff's attempt to pierce the veil of DPPLP (the party to the mortgage agreement) the District Court's conclusion that the language of these attorneys' fees provisions was sufficiently specific to avoid the effect of merger—without using any form of the word "merger"—was wrong.

Under Maryland law, "the entry of final judgment on a contract case extinguishes any contract-based right to further attorneys' fees because attorneys' fees recoverable pursuant to a contract are part of the damages claim." *SunTrust Bank* v. *Goldman*, 29 A.3d 724, 731 (Md. App. 2011) (citing *AccuBid Excav., Inc.*, v. *Kennedy Contractors, Inc.*, 981 A.2d 727, 741 (Md. App. 2009) and *Monarc Constr., Inc.* v. *Aris Corp.*, 981 A.2d 822, 834-45 (Md. App. 2009)). In *SunTrust*, the Court explained that

> [a]s part of the damages claim, rather than as a collateral or ancillary matter that may be litigated separately, ***any lingering claims for attorneys' fees have no legal ground upon which to***

105

> ***stand*** after the underlying contract is merged into
> final judgment and ceases to exist as an
> independent cause of action.

*SunTrust*, 29 A.3d at 731 (emphasis added).

There are three potential exceptions to the merger rule. The first two have no application here. The third is where "the parties . . . clearly state their intent in the contract that the fee provision shall not merge into the judgment." *Id.* at 732. As the Court in *SunTrust* noted, apart from an isolated Maryland decision involving a divorce agreement that provided specifically that "this agreement ***shall not be merged*** into the decree," the Court was "not aware of any other circumstance in Maryland in which merger has been avoided, based on the intent of the parties as expressed in the contract." *Id.* at 732-33 (emphasis added) (citation omitted).

The *SunTrust* Court explained that any such provisions are to be strictly construed in favor of merger. And despite the fact that the attorneys' fees provision in *SunTrust* made reference to "a time post judgment" by providing for "collection costs," the Court held that "the language in the agreement [was] not sufficiently clear to exempt it from operation of the merger doctrine." *Id.* at 733. Rather, the provision contained only "general collection language, frequently used, especially

106

in loan documents." *Id.*

The attorneys' fees provisions contained in the Diamond Point loan documents also employed general collection language, frequently used in such documents. The KMC Guaranty merely stated that the "payment of expenses" provision "shall survive . . . payment and performance," while DPPLP's mortgage agreement states that the indemnification provision for fees and expenses "shall survive termination . . . of th[e] Mortgage." (Doc. 1155 at 5-6).[29] Neither provision uses the word "merger" or "judgment." Nor do they contain any reference to avoiding the operation of the merger doctrine.

The only decision ever to hold under Maryland law that the fee-shifting language in a loan document was sufficiently definite to avoid the effects of the merger doctrine—without using the word "merger"—is the District Court's decision below. But nothing in the Diamond Point loan documents comes anywhere close to the specific language required by controlling Maryland decisions to avoid the effects of merger. Simply

---

[29] The District Court did not explain how Plaintiff could hold Mr. Konover liable for attorneys' fees under DPPLP's mortgage agreement, when: Mr. Konover was not a party to that agreement; DPPLP was not a party to this action; and Judge Droney granted Mr. Konover summary judgment on Plaintiff's attempt to pierce DPPLP's veil.

107

stated, Plaintiff was not entitled to a second award of attorneys' fees in Connecticut based on the same loan documents that it used to obtain its judgment for attorneys' fees in Maryland.

## CONCLUSION

For the reasons set forth above, if this Court determines that the District Court had subject matter jurisdiction, the Court should vacate the judgment and direct that judgment be entered in Mr. Konover's favor. In the alternative, this Court should (1) vacate the judgment; (2) remand for a new trial on Plaintiff's veil-piercing claims; and (3) consistent with *State Five*, instruct that the fact finder may only pierce the corporate veil of KMC in connection with the 2005 Transfers, and then only if it finds that those transactions proximately caused Plaintiff's inability to collect the Maryland Judgment, and if Plaintiff otherwise lacked adequate legal remedies. In the event of a new trial, the Court should direct the District Court to deny collateral estoppel effect to the Maryland findings; and direct the District Court to enter judgment in Mr. Konover's favor on Plaintiff's claim for punitive damages and its alternative claim for attorneys' fees under the Maryland loan documents.

Respectfully submitted,


*/s/ William J. Murphy*
William J. Murphy
Conor B. O'Croinin
ZUCKERMAN SPAEDER LLP
100 East Pratt Street, Suite 2440
Baltimore, Maryland 21202
(410) 332-0444
(410) 659-0436 (fax)
wmurphy@zuckerman.com
cocroinin@zuckerman.com

James T. Shearin
PULLMAN & COMLEY, LLC
850 Main Street, P.O. Box 7006
Bridgeport, CT 06601-7006
(203) 330-2000
(203) 576-8888 (fax)
jtshearin@pullcom.com

*Attorneys for Defendant-Appellant*
*Michael Konover*

## CERTIFICATE OF COMPLIANCE

In conformance with Rule 32(a)(7)(C) of the Federal Rules of Appellate Procedure, and this Court's order of October 16, 2014 granting Appellant's motion for an expansion of the allowable word count, the foregoing brief is in 14-point Century Schoolbook proportional font and contains 20,978 words. Accordingly, the brief complies with the type-volume limitation set forth in Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure and this Court's order of October 16, 2014.

Dated:   November 7, 2014   */s/ Conor B. O'Croinin*
Conor B. O'Croinin

*Attorney for Defendant–Appellant*
*Michael Konover*

## CERTIFICATE OF SERVICE

In conformance with Rule 25(d) of the Federal Rules of Appellate Procedure, I certify that on November 7, 2014, I caused the foregoing Brief of Defendant–Appellant to be filed electronically with the Clerk of the Court of the United States Court of Appeals for the Second Circuit by using the Court's Case Management/Electronic Case Filing (CM/ECF) system, which will send notification of this filing to all registered counsel of record.

I further certify that I will submit paper copies of Appellant's Principal Brief in conformance with Local Rules 30.1(b) and 31.1 and Rule 30(a)(3) of the Federal Rules of Appellate Procedure.

*/s/ William J. Murphy*
William J. Murphy

*Attorney for Defendant–Appellant*
*Michael Konover*