# 14-3091-cv

## United States Court of Appeals
## for the Second Circuit

———◖●◗———

WELLS FARGO BANK, N.A., Trustee for the Registered
Holders of Salomon Bro Mortgage Securities VII Inc,
Mortgage Pass-Through Certificates, Series 2000 C-2, by
Orix Capital Markets LLC, its Attorney in Fact,

*Plaintiff-Appellee,*

— v. —

KONOVER DEVELOPMENT CORPORATION, KONOVER
CONSTRUCTION CORPORATION, KONOVER &
ASSOCIATES, INC., BLACKBOARD LLC, RIPPLE LLC,

*Defendants,*

MICHAEL KONOVER,

*Defendant-Appellant.*

———————————————

ON APPEAL FROM THE UNITED STATES DISTRICT
COURT FOR THE DISTRICT OF CONNECTICUT

## FINAL FORM REPLY BRIEF OF
## DEFENDANT-APPELLANT (REDACTED)

WILLIAM J. MURPHY
CONOR B. O'CROININ
ZUCKERMAN SPAEDER LLP
100 East Pratt Street, Ste. 2440
Baltimore, Maryland 21202
(410) 332-0444

JAMES T. SHEARIN
PULLMAN & COMLEY LLC
850 Main Street
Bridgeport, Connecticut 06601
(203) 330-2240

*Attorneys for Defendant-Appellant*

# TABLE OF CONTENTS

TABLE OF CITATIONS ........................................................... iii

INTRODUCTION ..................................................................... 1

REPLY TO PLAINTIFF'S FACTUAL COUNTER-STATEMENT ........... 3

ARGUMENT ............................................................................ 5

I.    Wells Fargo is a Passive, not an Active, Trustee ............................ 5

II.    The District Court Opened the Evidentiary Flood Gates, but then Provided No Guidance to the Jury. ................................ 12

    A.    The District Court Admitted Evidence that was Not Relevant to Plaintiff's Inability to Collect the Maryland Judgment .................................................. 13

    B.    The District Court Erred by Rejecting All Fifteen of Mr. Konover's Veil-Piercing Instructions, and then Telling the Jury that the Rules of Veil-Piercing are: *There Are No Rules*. ............................................... 17

    C.    The District Court Erred by Refusing to Give Sufficient Guidance to the Jury about Proximate Cause. .................................................................. 21

    D.    Mr. Konover was Entitled to an Instruction on the Adequacy of Plaintiff's Legal Remedies. ............................... 23

    E.    Mr. Konover was Entitled to an Instruction about the Meaning of "Equity." ........................................... 26

III.    Mr. Konover is Entitled to Judgment in His Favor ...................... 27

    A.    Mr. Konover did not Cause Plaintiff's Inability to Collect a $22.8 Million Judgment from a $4.4 Million Company. .............................................................. 27

    B.    Despite Plaintiff's Resistance, *State Five* Controls. ............ 29

C.      Under *State Five* Principles, the Result is No
        Different Under the Identity Rule. .......................................32

IV.     Plaintiff's Second Attempt to Pursue its Fraudulent
        Inducement Theory was Barred by Res Judicata..........................36

        A.      Under Res Judicata, Veil-Piercing Theories that a
                Defendant Caused the Plaintiff's Inability to Collect a
                Judgment are Permissible; Theories that a Defendant
                Caused the Judgment are Not...............................................37

        B.      Plaintiff's Maryland and Connecticut Fraudulent
                Inducement Theories are Identical. ....................................38

        C.      Plaintiff Focused on Conduct that Occurred Long
                Before the Maryland Judgment. ..........................................39

        D.      Plaintiff Either Knew all of the Relevant Facts during
                the Maryland Action or Could have Discovered Them. .......40

V.      The District Court Abused its Discretion by Admitting into
        Evidence a Subset of Uncontestable Maryland Findings.............42

        A.      Fairness is Always a Consideration. ...................................42

        B.      Even if Collateral Estoppel Applies, the Findings of
                Fact were Inadmissible.........................................................43

        C.      The District Court Violated the Rule of Completeness........45

VI.     Plaintiff's Award of Punitive Damages Must be Vacated. ............47

        A.      Veil-Piercing is a Remedy, not a Cause of Action.................47

        B.      DPPLP's Mortgage Agreement Does not Provide a
                Basis to Award Fees Against Mr. Konover............................49

CONCLUSION .....................................................................................51

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ii

# TABLE OF CITATIONS

## CASES

*Angelo Tomasso, Inc.* v. *Armor Constr. & Paving, Inc.*,
447 A.2d 406 (Conn. 1982) ................................................................. 32

*Biggins* v. *Hazen Paper Co.*,
111 F.3d 205 (1st Cir. 1997) ............................................................. 43

*Blonder-Tongue Labs., Inc.* v. *Univ. of Ill. Found.*,
402 U.S. 313 (1971) ........................................................................... 42

*Cadle Co.* v. *Zubretsky*,
2008 WL 441935 (Conn. Super. Ct., January 30, 2008) ..................... 48

*Carden* v. *Arkoma Assocs.*,
494 U.S. 185 (1990) ............................................................. 6, 9, 11, 12

*Carvel Corp.* v. *Diversified Mgmt. Grp., Inc.*,
930 F.2d 228 (2d Cir. 1991) ............................................................. 13

*CFM of Connecticut, Inc.* v. *Chowdhury*,
685 A.2d 1108 (Conn. 1996) ............................................................. 48

*Christ* v. *Sears, Roebuck & Co.*,
149 F.3d 1182 (6th Cir. 1998) ........................................................... 13

*Conagra Foods, Inc.* v. *Americold Logistics, LLC*,
2015 WL 328116 (10th Cir., Jan. 27, 2015) ...................................... 12

*CSX Transp., Inc.* v. *Blakeslee*,
2012 WL 3985169 (D. Conn., Sept. 11, 2012) ................................... 34

*DPPLP* v. *Wells Fargo Bank, N.A.*,
929 A.2d 932 (Md. 2007) ................................................................. 16

*Everspeed Enters. Ltd.* v. *Skaarup Shipping Int'l*,
754 F. Supp. 2d 395 (D. Conn. 2010) ........................................... 47, 48

*Guerrero* v. *Katzen*,
774 F.2d 506 (D.C. Cir. 1985) ........................................................... 41

iii

*Henry* v. *Wyeth Pharm., Inc.*,
    616 F.3d 134 (2d Cir. 2010) .................................................................. 18

*Holloway-Johnson* v. *Beall*,
    103 A.3d 720 (Md. App. 2014) ............................................................. 46

*Kent* v. *Smith*,
    404 F.2d 241 (2d Cir. 1968) .................................................................. 18

*KLM Indus., Inc.* v. *Tylutki*,
    815 A.2d 688 (Conn. App. 2003) .......................................................... 36

*Litchfield Asset Mgmt. Corp.* v. *Howell*,
    799 A.2d 298 (Conn. App. 2002) .................................................... 32, 48

*L-Tec Elecs. Corp.* v. *Cougar Elec. Org., Inc.*,
    198 F.3d 85 (2d Cir. 1999) .................................................................... 41

*McCarthy* v. *State Five Indus. Park, Inc.*,
    2009 WL 104287 (Conn. Super. Ct., Jan. 5, 2009) .............................. 31

*N. Tankers (Cyprus) Ltd.* v. *Backstrom*,
    968 F. Supp. 66 (D. Conn. 1997) .......................................................... 48

*Naples* v. *Keystone Bldg. & Dev. Corp.*,
    990 A.2d 326 (Conn. 2010) ........................................................... *passim*

*Navarro Savs. Ass'n* v. *Lee*,
    446 U.S. 458 (1980) ...................................................................... *passim*

*Ningbo Prods. Imp. & Exp. Co.* v. *Eliau*,
    2011 WL 5142756 (S.D.N.Y., Oct. 31, 2011) ...................................... 41

*Norville* v. *Staten Island Univ. Hosp.*,
    196 F.3d 89 (2d Cir. 1999) .................................................................... 26

*Norwood* v. *Vance*,
    591 F.3d 1062 (9th Cir. 2010) .............................................................. 22

*Oliveras* v. *United States Lines Co.*,
    318 F.2d 890 (2d Cir. 1963) .................................................................. 25

*Oscar Gruss & Son, Inc.* v. *Hollander*,
   337 F.3d 186 (2d Cir. 2003) .................................................................. 10

*Parklane Hosiery Co.* v. *Shore*,
   439 U.S. 322 (1979) ............................................................................ 42

*Pat Perusse Realty Co.* v. *Lingo*,
   238 A.2d 100 (Md. 1968) ..................................................................... 38

*Policeman's and Fireman's Ret. Bd.* v. *Sullivan*,
   376 A.2d 399 (Conn. 1977) .................................................................. 24

*RBC Bearings, Inc.* v. *Thin Section Bearings, Inc.*,
   2007 WL 2727160 (D. Conn., Sept. 18, 2007) ...................................... 34

*Remington Rand Corp.* v. *Amsterdam-Rotterdam Bank, N.V.*,
   68 F.3d 1478 (2d Cir. 1995) ................................................................. 42

*Saud* v. *Bank of New York*,
   929 F.2d 916 (2d Cir. 1991) ........................................................... 38, 41

*Schuftan* v. *Bridges*,
   2007 WL 2688856 (D. Conn, Sept. 13, 2007) ...................................... 34

*Secon Servs. Sys., Inc.* v. *St. Joseph Bank & Trust Co.*,
   855 F.2d 406 (7th Cir. 1988) ............................................................... 27

*Shader* v. *Hampton Imp. Ass'n, Inc.*,
   94 A.3d 224 (Md. App. 2014),
   *cert. granted*, 101 A.3d 1063 (Md. 2014) ........................................... 42

*Smith* v. *Texas Co.*,
   219 F.2d 74 (2d Cir. 1955) .................................................................. 20

*Societa Bario E. Derivati* v. *Kaystone Chem., Inc.*,
   1998 WL 182563 (D. Conn., April 5, 1998) .......................................... 49

*SunTrust Bank* v. *Goldman*,
   29 A.3d 724 (2011) ........................................................................ 49, 50

*United States ex rel. Eisenstein* v. *City of New York*,
   556 U.S. 928 (2009) ............................................................................. 9

v

*United States* v. *Morris*,
   957 F.2d 1391 (7th Cir. 1992) ............................................................... 13

*United States* v. *Parker*,
   903 F.2d 91 (2d Cir. 1990) .................................................................... 13

*United States* v. *United States Currency in the Amount of $119,984*,
   304 F.3d 165 (2d Cir. 2002) .................................................................. 42

*Wells Fargo Bank, N.A.* v. *CCC Atl., LLC*,
   905 F. Supp. 2d 604 (D.N.J. 2012) ....................................................... 10

*Yentsch* v. *Texaco, Inc.*,
   630 F.2d 46 (2d Cir. 1980) .................................................................... 20

*Zaist* v. *Olson*,
   227 A.2d 552 (Conn. 1967) ................................................................... 16

**RULES**

Federal Rule of Civil Procedure 17 ........................................................ 10

Federal Rule of Evidence 401 ................................................................ 13

Federal Rule of Evidence 403 ................................................................ 44

**TREATISES**

Wright & Miller, 9C Fed. Prac. & Proc. Civ. § 2556 (3d ed.) .................. 20

**OTHER**

*McCarthy*, Brief for Plaintiff-Appellee,
   2010 WL 7407760 (Conn., March 18, 2010) ......................................... 31

Restatement (Third) of Trusts § 80 ......................................................... 8

## INTRODUCTION

Appellant Michael Konover stands liable to Plaintiff for $32 million, based in large part on Plaintiff's veil-piercing theory that: 1) was unsupported by evidence; 2) even if supported, could not have caused the harm at issue—Plaintiff's inability to collect its $22.8 million Maryland Judgment from Konover Management Corporation ("KMC"); and 3) distorts the principles underlying the exceptional remedy of veil-piercing.

During the trial below, the District Court ignored these infirmities. It permitted Plaintiff to spend weeks pursuing its theory that KMC, as well as entities whose own corporate veils were not at issue at trial, had fraudulently induced a predecessor lender to make the Diamond Point loan in June 2000. The Court did not prevent Plaintiff from attacking any angle, exploring any area, or leveling any accusation, including a claim of fraudulent inducement that should have been barred by the res judicata effect of Plaintiff's failure to prove fraudulent inducement against KMC in the underlying Maryland case. And at the end of six weeks of trial—a proceeding in which Plaintiff called no witnesses representing Plaintiff or any of its predecessor lenders—the District

Court provided virtually no guidance to the jury about how to resolve the complex veil-piercing claims at issue. Indeed, the Court failed to explain to the jury even the most basic aspect of the case below—that the only harm that Plaintiff could permissibly be complaining about was its inability to collect the Maryland Judgment, as opposed to events that led to the judgment itself.

Plaintiff now asks this Court to place its imprimatur on a trial in which the presiding judge ignored the detailed and careful rulings of his predecessor judge without explanation, refused to give precedential weight to the most recent veil-piercing decision by the Supreme Court of Connecticut, and then, after imposing no restraints on the scope of admissible evidence, refused to give the jury any guidance about the law, aside from reciting the formulaic elements of the two veil-piercing tests, and then telling the jury that "[t]here are no hard and fast rules." A-7109.

The judgment below must be vacated.

2

## REPLY TO PLAINTIFF'S FACTUAL COUNTER-STATEMENT

Plaintiff has submitted a "counter-statement" of facts in which it makes assertions unsupported by the record. In short, Plaintiff's string citations to exhibits and transcript pages cannot be trusted to portray the record accurately. For instance, Plaintiff suggests that Mr. Konover's plan to sell the shopping center portfolio included refinancing the Diamond Point loan in June 2000. Plaintiff's Br. 8. Yet none of the cited testimony or exhibits supports this contention. To the contrary, the evidence was overwhelming that Mr. Konover had not even conceived of the Portfolio Sale until the spring of 2001, and there was no evidence that the Diamond Point refinancing a year earlier had anything to do with the Portfolio Sale.

Plaintiff asserts that "Konover controlled the individuals involved in obtaining the [Diamond Point] loan at every step, and specifically instructed them to 'close the loan' despite the fact that material information was never provided to the lender." Plaintiff's Br. 8. Plaintiff's citations do not support this contention. There was no evidence presented at trial that Mr. Konover had any knowledge of, let alone control over, the Larkin Memo or Ms. Larkin's decision to send

3

the lender KMC's unaudited financial statements. Nor was there any evidence presented at trial or in the Maryland Action that Mr. Konover made, or was responsible for making, any representation to the lender. *See, e.g.*, A-7201 at No. 101.

In that same vein, Plaintiff writes that the Larkin Memo "contained numerous material misrepresentations concerning KMC's business." Plaintiff's Br. 9. Yet none of Plaintiff's record citations demonstrates material misrepresentations. Plaintiff next writes that: "Most important, the memorandum represented that KMC was 'a viable, ongoing entity and w[ould] remain as such.'" *Id.* In truth, Ms. Larkin wrote that: "It can be *reasonably expected* that KMC will remain a viable entity." A-7305 (emphasis added). She then explained that KMC's value could "fluctuate" with real estate market conditions, and that "the net worth of KMC...could be minimal while the entity remains viable." *Id.*

Plaintiff's effort to play fast and loose with the record culminates in its contention that "[i]t was up to the jury to decide whom to believe," Plaintiff's Br. 15, concerning whether Mr. Goman or Mr. Konover directed KMC's 2005 asset transfers. Both witnesses testified that Mr.

4

Konover directed those transfers following the Maryland trial. A-2719:22-2720:20; A-4363:5-4365:19. The relevant issue for the jury was whether those transactions caused Plaintiff's inability to collect the Maryland Judgment.[1]

## ARGUMENT

### I.  Wells Fargo is a Passive, not an Active, Trustee.

Plaintiff recognizes that, for purposes of measuring diversity jurisdiction, there is a distinction between traditional trusts and business trusts. Plaintiff's Br. 29-30. Yet, citing *Navarro Savings Association* v. *Lee*, 446 U.S. 458 (1980), Plaintiff contends that the same common law rule—that a trustee can bring a diversity action based on its own citizenship without regard to the citizenship of the trust's beneficiaries—applies to both. Plaintiff's Br. 29. Plaintiff is wrong. In *Navarro*, the Court applied the common law rule to a business trust but

---

[1] In addition, many of Plaintiff's unproved contentions at trial are repeated here. For example, assertions that: KMC had $2.27 million in "loans" outstanding to Mr. Konover; Mr. Konover "took" a $1.1 million distribution from KMC; Mr. Konover recognized that KMC had "contractual rights" to Portfolio Sales commissions; Mr. Konover, rather than Mr. Goman, made the decision that KDC would receive the Portfolio Sale commissions; and Mr. Goman did not actually run Mr. Konover's companies (apart from KMC's appeal of the Maryland Judgment and the 2005 asset transfers), are all inaccurate and unsupported by the record citations. Plaintiff's Br. 10-12.

only after determining that the trustees were "**active trustees** whose control over the assets held in their names is real and substantial." *Navarro*, 446 U.S at 465 (emphasis added).

Plaintiff characterizes *Navarro*'s holding as an "exception" to the rule that governs traditional trusts. Plaintiff's Br. 30. But as to business trusts, the holding in *Navarro* is the rule. As Justice Scalia explained in *Carden* v. *Arkoma Associates*, 494 U.S. 185 (1990), the *Navarro* Court analyzed carefully the business reality of the investment trust at issue "for the purpose of establishing that the respondents were '**active trustees** whose control over the assets...is **real and substantial**,' thereby bringing them under the [traditional trustee] rule...." *Id.* at 191 (emphasis added).

Applied to this case, the inquiry required by *Navarro* and *Carden* demonstrates that Wells Fargo is a passive, not an active, trustee. And the record makes clear that Wells Fargo exercises nominal control over trust assets, not real and substantial control. Wells Fargo's own internal documents reveal the true nature of its trusteeship. ██████ ██████████████████ Konover Br. 68; CA-83 (DX1200-not admitted) A-5895:18-20. As a Wells Fargo designee explained in his March 2009

6

deposition, with respect to the SBMS VII pool, Wells Fargo regards itself as a "nominal trustee." A-954-955. Confirming the accuracy of Wells Fargo's self-assessments are these facts: ███████████ ███████████████████████████████████████████████ ██████████████; Wells Fargo earned only $1,200 per month from the $750 million SBMS VII pool; and Wells Fargo played no role in obtaining the trust asset at issue in this case, the Maryland Judgment. Konover Br. 68.

In response, Plaintiff's attorney-in-fact, ORIX Capital Markets, LLC, says *nothing* in defense of Wells Fargo's admissions that it is ████████ ███████ with nominal responsibility. Rather, Plaintiff points out that Wells Fargo's monthly fee amounts to $14,400 per year, and that "[a]t common law," trustees were not paid at all "for their services." Plaintiff's Br. 36. But Wells Fargo does not charge $14,400 per year for trustee "services." Rather, as Wells Fargo's designee explained, "having a name such as Wells Fargo or a big bank name [helps] market the [CMBS] product." A-957. Plaintiff would be hard-pressed to find a common law example in which the trustee of a traditional trust was chosen for branding purposes and received a fee for helping to market

7

an investment.

With respect to the Maryland Judgment, Plaintiff attempts to liken Wells Fargo to the trustees in *Navarro* by suggesting that "Wells Fargo [is] enforcing a Maryland judgment entered in its own name," which "Wells Fargo secured." Plaintiff's Br. 31. Unlike the trustees in *Navarro*, however, Wells Fargo played no active role in the litigation or underlying transaction. Indeed, Wells Fargo had no knowledge of the Maryland Action when ORIX filed it, and played no substantive role in the Connecticut litigation.

Plaintiff cites Restatement (Third) of Trusts § 80, Comment *e*, for the proposition that a trustee of a business trust need not have knowledge of the "day-to-day details" concerning litigation because delegations of fiduciary authority are proper if "prudently arranged." Plaintiff's Br. 36. Plaintiff's reliance on the Restatement is misplaced for at least four reasons. First, Plaintiff ignores the text of § 80, which explains that a trustee who exercises discretion to delegate authority must thereafter monitor its agents. Wells Fargo undertook no such effort to monitor ORIX. A-296-97. Second, Wells Fargo did not exercise discretion to delegate authority over this litigation to ORIX. It had no discretion.

8

Under § 3.10(c) of the PSA, Wells Fargo was required to either execute and deliver each and every "court pleading" drafted by ORIX, or give ORIX a limited power of attorney "in the form supplied to the Trustee [Wells Fargo] by the Special Servicer [ORIX]." A-211. Wells Fargo here opted for the convenience of a power of attorney, but under either option, ORIX would still be running the show.

Third, whether Wells Fargo's delegation was prudent has no bearing on the question whether Wells Fargo is active or passive under *Navarro* and *Carden*. Rather, what mattered to the Court was that the *Navarro* trustees managed the assets and controlled the litigation, 446 U.S. at 465, not that they could do so in theory. Fourth, while the Restatement applies to traditional common law trusts, it excludes from its scope "the use of trusts as devices for conducting business and investment activities." *Id.* § 1, cmt. b.

The only appellate decision that Plaintiff cites in support of its argument that Wells Fargo satisfies *Navarro's* active trustee requirement is *United States ex rel. Eisenstein* v. *City of New York,* 556 U.S. 928, 934 (2009). But *Eisenstein* was not a diversity case. The issue there was whether the government's 60-day time limit for noting

9

appeals applies to relators in *qui tam* cases in which the United States is only a "real party in interest" under Rule 17. *Eisenstein* has no bearing here. This Court has recognized that "Rule 17 does not...affect jurisdiction and relates only to the determination of proper parties and the capacity to sue." *Oscar Gruss & Son, Inc.* v. *Hollander*, 337 F.3d 186, 193-94 (2d Cir. 2003).

Plaintiff points to other cases in which District Courts have held that despite delegation of authority to a special servicer, Wells Fargo was found to be an active trustee. *E.g., Wells Fargo Bank, N.A.* v. *CCC Atl., LLC*, 905 F. Supp. 2d 604, 612-13 (D.N.J. 2012). But unlike those cases, the factual record here illustrates that Wells Fargo's delegation to ORIX was not a reflection of Wells Fargo's prudent management of the SBMS VII pool. Rather, it reflects how this investment trust was supposed to work from the outset. Wells Fargo never intended to be an active trustee, while ORIX always intended to be "driving the boat." A-5869:8-5871:6.

Instead of explaining why this Court should conclude that Wells Fargo's conception of its own role as ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ is inaccurate, Plaintiff narrows its focus to the language of the PSA and

10

cites District Court cases that base their determinations that trustees of CMBS trusts are "active" when they have been given legal title to trust assets. Plaintiff's Br. 31. The flaw in that analysis is that it runs directly counter to *Carden's* instruction that "business reality is taken into account for purposes of determining whether a trustee is the real party to the controversy." *Carden*, 494 U.S. at 192.

The business reality inquiry takes into account not just legal title, but the level of control exercised by the trustee as compared to the level of control exercised by the beneficiaries. *Navarro*, 446 U.S. at 464-66. In *Navarro*, the trustees filed and controlled the litigation and actively managed the assets, while the beneficiaries effectively "had no voice." Here, Wells Fargo looks to others to manage the trust assets, and the only meaningful voice belongs to the "controlling" beneficiary—ORIX. *See* A-299-300.

Finally, Plaintiff contends that even if ORIX is the real party to the controversy, diversity jurisdiction is not destroyed because ORIX is a citizen of Delaware and Texas. Plaintiff's Br. 37-39. Plaintiff misses the point. The fact that ORIX is, and always has been, "driving the boat," does *not* mean that the citizenship of the trust beneficiaries is

11

disregarded. To the contrary, the fact that ORIX is the active manager of the SBMS VII pool demonstrates that Wells Fargo is *not*. Once Wells Fargo's status as a "passive trustee" is made clear, there is no diversity to destroy—jurisdiction does not exist because of the presence of other non-diverse certificate-holders in the SBMS VII pool.[2]

For these reasons, this Court must dismiss this action for lack of subject matter jurisdiction.

## II. The District Court Opened the Evidentiary Flood Gates, but then Provided No Guidance to the Jury.

Plaintiff contends that the District Court's three-and-a-half pages of veil-piercing instructions provided sufficient guidance to the jury. Plaintiff's Br. 47-50; A-1557-1560.

This Court has made clear that "[i]t is the responsibility of the trial judge to provide the jury with sufficient instruction to enable it to

---

[2] Plaintiff contends that there is a dispute about whether the trust's beneficiaries include Connecticut citizens. Plaintiff's Br. 39 n.20. But it was Plaintiff's burden to establish the citizenship of the trust members below. As the Tenth Circuit recently held, a plaintiff who fails to demonstrate the citizenship of trust beneficiaries has failed to meet its burden to demonstrate diversity. *Conagra Foods, Inc.* v. *Americold Logistics, LLC*, 2015 WL 328116, at *6, (10th Cir., Jan. 27, 2015) (applying *Carden* to determine the citizenship of a business trust and *sua sponte* vacating a final judgment and directing the District Court to remand the matter to state court).

12

assess the evidence within the proper legal framework and to reach a rational verdict." *United States* v. *Parker*, 903 F.2d 91, 101 (2d Cir. 1990). "When jury instructions, taken as a whole, give the jury [an] inadequate understanding of the law, a new trial is warranted." *Carvel Corp.* v. *Diversified Mgmt. Grp., Inc.*, 930 F.2d 228, 232 (2d Cir. 1991) (reversing judgment and remanding for new trial).

### A. The District Court Admitted Evidence that was Not Relevant to Plaintiff's Inability to Collect the Maryland Judgment.

Plaintiff rests its defense of the District Court's evidentiary rulings on the "liberal" standard of Rule 401, and argues that "*State Five* did not even address evidentiary issues," or "the scope of relevant admissible evidence in a veil-piercing case." Plaintiff's Br. 39-42 & n.21.

Plaintiff overlooks that "[w]hether or not a fact is of consequence is determined not by the Rules of Evidence but by substantive law." *United States* v. *Morris*, 957 F.2d 1391, 1400 (7th Cir. 1992). *See also Christ* v. *Sears, Roebuck & Co.*, 149 F.3d 1182 (6th Cir. 1998) (in a diversity case, the court "must look to the substantive law of Michigan to determine what is relevant...."); *United States* v. *Shomo*, 786 F.2d 981, 985 (10th Cir. 1986) (same).

13

As Judge Droney recognized, even before the *State Five* decision, Connecticut cases recognized a distinction between conduct that is alleged to have wrongfully prevented the plaintiff from collecting the underlying judgment, SPA-19, and conduct that led to that judgment, SPA-7. This distinction was at the center of the substantive law that the District Court should have applied when making evidentiary rulings and instructing the jury. It was what led Judge Droney to grant summary judgment to Defendants on Plaintiff's attempt to pierce the corporate veil of the borrower, DPPLP, and what led Judge Droney to opine that "evidence relating to DPPLP and KMC's [alleged] fraudulent misrepresentation of its finances in procuring the Diamond Point loan is *not* relevant...." SPA-31 at n.22. *Compare* Plaintiff's Br. 75-76 ("DPPLP's fraudulent inducement of the loan [was an] important issue[] in this veil-piercing case.").

Plaintiff dismisses Judge Droney's determination as merely a "comment in the margin." Plaintiff's Br. 46 n.23. The likely explanation for why Judge Droney placed that determination in a footnote, however, is that Plaintiff had, before trial, characterized evidence related to DPPLP's (proved) and KMC's (unproved) fraudulent inducement of the

14

Diamond Point loan as mere "background" to its veil-piercing claims. A-145-146; A-747. Even Judge Thompson was surprised to hear Plaintiff state at the charging conference that Plaintiff sought to premise its veil-piercing theories on transactions other than the Portfolio Sale and 2005 Transfers. A-6848:2-9. At the time Judge Droney issued his summary judgment rulings, the idea that four weeks of a six-week trial would focus on evidence that Judge Droney characterized as "not relevant," was unthinkable.

Plaintiff's contention that "[e]vidence tending to show that Konover and his subordinates misrepresented KMC's viability as a guarantor demonstrates that Konover never intended that KMC would fulfill its obligations under the guaranty," Plaintiff's Br. 43, while fanciful in the context of a non-recourse loan secured by a shopping center, is a classic formulation of a theory of liability that might have led to a judgment in Maryland against KMC or Mr. Konover personally. That theory, however, could not explain Plaintiff's inability to collect the Maryland Judgment against KMC. Nor does Plaintiff even offer such an explanation.

15

Instead, Plaintiff suggests that its focus during the Connecticut trial on its allegation that "Konover had orchestrated and directed a fraud at DPPLP," was relevant to show that Mr. Konover anticipated KMC's liability under the guaranty and therefore was probative of his "state of mind." Plaintiff's Br. 42. To begin with, there was no evidence or finding in the Maryland Action that Mr. Konover foresaw KMC's or DPPLP's liability. In fact, the evidence showed that as of October 2002, Mr. Konover perceived no risk of recourse liability for either company. *DPPLP* v. *Wells Fargo Bank, N.A.*, 929 A.2d 932, 947 (Md. 2007). Neither did anyone else who worked for the Konover companies. A-1909:16-1910:4. In addition, Plaintiff's suggestion that Mr. Konover's state of mind was a "key issue" under Connecticut veil-piercing law is not supported by *Zaist* v. *Olson*, 227 A.2d 552, 559 (Conn. 1967), the case Plaintiff cites.

Even if alleged pre-contract conduct was relevant to any veil-piercing issue at trial—and it was not—there was no evidence that Mr. Konover "orchestrated" any fraudulent inducement of the Diamond Point lenders. Despite a string of misleading citations to the record on pages 8 to 10 of its Brief, Plaintiff presented *no evidence* linking Mr. Konover to

16

any representations made to the lender or to its allegations of fraudulent inducement by KMC.

Put succinctly, the District Court should not have admitted evidence relevant only to a theory of KMC's liability, as opposed to a theory about why Plaintiff has been unable to collect its judgment against KMC.

### B. The District Court Erred by Rejecting All Fifteen of Mr. Konover's Veil-Piercing Instructions, and then Telling the Jury that the Rules of Veil-Piercing are: *There Are No Rules.*

Plaintiff argues that the District Court properly guided the jury in this case when, after reciting the formulaic elements of the instrumentality and identity rules, it simply told the jury that in veil-piercing cases: "[t]here are no hard and fast rules," and "each case...should be decided in accordance with its own underlying facts." Plaintiff's Br. 48 (quoting charge). Plaintiff justifies this aspect of the Court's instruction on the grounds that it was "a near-exact quotation of the Connecticut Supreme Court." Plaintiff's Br. 48-49.

This Court has cautioned, however, that "it is generally not helpful to take quotations from the opinions of appellate courts, that were never intended to be used as instructions to juries, and submit these in the

form of requests to charge." *Kent* v. *Smith*, 404 F.2d 241, 244 (2d Cir. 1968). That is because such instructions are "apt to give the jury a wrong impression of the rules of law that govern the resolution of the issues. It is far better for the trial judge to prepare his own instructions ***tailored to the requirements of the case on trial***...." *Id.* (emphasis added). This Court also has observed that "language—developed by appellate courts for use by judges—is 'at best irrelevant, and at worst misleading to a jury.'" *Henry* v. *Wyeth Pharm., Inc.*, 616 F.3d 134, 154 (2d Cir. 2010).

The District Court's *laissez-faire* approach to the admission of Plaintiff's array of evidence and constant innuendo of wrongdoing concerning matters irrelevant to the collection of the Maryland Judgment, coupled with the complete absence of tailored instructions, deprived the jury of any guidance whatsoever. Indeed, the Court's insistence on twice repeating its view that there are "no rules" in veil-piercing cases may have caused more harm than if the Court gave no instructions at all. A-6904:19-22.[3]

---

[3] The District Court even refused to provide the jury with a list of commonly-used factors (requested by both sides) that it could consider when determining whether Mr. Konover had controlled or dominated

18

Contrary to Plaintiff's mischaracterization, Mr. Konover does not argue that Judge Thompson was under an "obligation to read quotations from [Judge Droney's] summary judgment ruling to the jury." Plaintiff's Br. 50. Rather, Mr. Konover argues that at the end of this six-week veil-piercing trial, Judge Thompson was required to instruct the jury in a way that would allow them to evaluate the volumes of evidence that the Court had admitted without restraint— most of which focused on the time *before* Plaintiff even filed the Maryland Action in 2003, and some relating to events that predated a contract between KMC and the lender.

Moreover, Plaintiff glides over the fact that as of the final week of trial, Judge Thompson *was* prepared to instruct the jury—based on language taken directly from Judge Droney's opinion—that "[t]he transactions that the plaintiff attacks pursuant to the instrumentality rule are the transfers [KMC] engaged in during (1) the portfolio sales

---

KMC. *See* SPA-30; *Naples* v. *Keystone Bldg. & Dev. Corp.*, 990 A.2d 326, 339 (Conn. 2010) (listing the familiar factors). This failure prejudiced the defense, which had offered expert testimony explaining those factors, and why they supported KMC's corporate veil remaining intact. *E.g.* A-6520:23-6523:14.

and (2) the asset dispositions in 2005." A-6846:15-6857:22.[4] Yet for reasons Judge Thompson *never* articulated, he removed this language from the draft instructions at Plaintiff's request at the last minute. That left the jury bereft of guidance about the factual issues, and devoid of any instructions relating the law of veil-piercing to the weeks of evidence presented.

This Court has recognized that "the elucidation of the issues and the giving of reasonable guidance to the jury on the facts are among the prime functions of the trial judge." *Smith* v. *Texas Co.*, 219 F.2d 74, 76 (2d Cir. 1955). Indeed, "[i]t is the inescapable duty of the trial judge to instruct the jurors, fully and correctly, on the law applicable to the case, and to guide, direct, and assist them toward an intelligent understanding of the ***legal and factual issues*** involved in their search for a proper resolution of the dispute." Wright & Miller, 9C Fed. Prac. & Proc. Civ. § 2556 (3d ed.) (emphasis added).

This Court's determination in *Yentsch* v. *Texaco, Inc.*, 630 F.2d 46 (2d Cir. 1980) is an example. In *Yentsch*, the trial court gave a barebones

---

[4] Mr. Konover contends that *State Five* (issued after Judge Droney's ruling) should have foreclosed the Portfolio Sales transactions from consideration because they occurred almost three years before the Maryland Judgment. *See* Konover Br. 86-92.

jury charge, which while correctly stating the law, was nevertheless inadequate. "A charge to the jury, especially in as complex an area as antitrust law, should avoid sacrificing clarity for brevity." *Id.* at 59 n. 17. *See also Carvel*, 930 F.2d at 231 ("Without this specific guidance from the court, the jury was left with no legal context in which to assess the significance of the...evidence offered[.]").

In a 66-page summary judgment ruling, Judge Droney had set the stage for a trial to resolve certain factual disputes on complex claims. Judge Thompson regarded that ruling as binding up until the last day of trial. Without reconsidering Judge Droney's opinion, Judge Thompson stripped that ruling of all effect, and then left the jury at sea without judicial guidance.

### C. The District Court Erred by Refusing to Give Sufficient Guidance to the Jury about Proximate Cause.

Plaintiff argues that the District Court correctly refused to give either of the proximate cause instructions that Mr. Konover requested. Plaintiff's Br. 50-54. Plaintiff contends, based on its position that *State Five's* proximate cause determinations are entitled to no precedential value, that the proposed instructions misstated the law. Mr. Konover

21

addresses *State Five* at length in Part III below, but even if the Court were to assume that the Supreme Court did not intend *State Five* to have precedential effect, the District Court still erred by refusing to explain to the jury that the only harm for which Plaintiff could recover was its inability to collect its judgment.

A proposed instruction need not be flawless to identify a material issue on which the Court must instruct the jury. *See Norwood* v. *Vance*, 591 F.3d 1062, 1067 (9th Cir. 2010) (Kozinski, *J.*) ("Perfect or not, the defendants' proposed instruction brought the issue...to the district court's attention."). And here, Mr. Konover's proposed instructions would have alerted the jury to the requirement that it must find that any alleged wrongful transfer was "contrary to the plaintiffs' legal rights" and must have "proximately caused Plaintiff's inability to collect [its] judgment." A-1289. Those instructions also would have informed the jury that:

> It is not enough to pierce the corporate veil for a plaintiff simply to show that a judgment remains unsatisfied. To justify imposing the entire obligation of the Maryland Judgment on Mr. Konover, Plaintiff must show that Mr. Konover exercised his control over KMC to divert or secrete KMC's assets that otherwise would

22

> have been available to satisfy the Maryland
> Judgment....

*Id.* at 58 (citing *State Five*). In the end, the District Court's instructions failed to provide even this most basic guidance to the jury. Because the District Court refused to give the jury sufficient guidance on proximate cause, it is unclear how the jury reached its verdict.

### D. Mr. Konover was Entitled to an Instruction on the Adequacy of Plaintiff's Legal Remedies.

Plaintiff has not argued that it lacked adequate legal remedies. Instead it argues that Judge Thompson correctly refused to give Mr. Konover's requested instruction concerning the adequacy of Plaintiff's legal remedies because it raised an issue of law for the court, and because no Connecticut court has held that the adequacy of legal remedies is a precondition to maintaining "a traditional veil-piercing claim." Plaintiff's Br. 55.

Contrary to Plaintiff's assertion, the adequate legal remedies precondition applies to all forms of veil-piercing. *State Five's* clear admonition that a veil-piercing remedy should be "granted only in the absence of adequate remedies at law," *State Five*, 37 A.3d at 732, was not limited to reverse veil-piercing cases. This was made clear by the

Supreme Court's citation to *Naples*, a traditional veil-piercing case. Indeed, the Supreme Court has long recognized that veil-piercing is "equitable in nature and [o]rdinarily the corporate veil is pierced only under exceptional circumstances." *Naples*, 990 A.2d at 340.[5]

*Policeman's and Fireman's Retirement Board* v. *Sullivan*, 376 A.2d 399 (Conn. 1977), a case involving injunctive relief, is not to the contrary. Since there was no jury trial requested in *Sullivan*, the Court had no occasion to address the question whether an adequate remedies at law charge would be required in a veil-piercing case presented to a jury. In this case, Plaintiff demanded that a jury decide whether it was entitled to the equitable remedy of veil-piercing. It cannot also insist that the jury be kept in the dark about the principles that must inform that decision.

This was a case that Plaintiff claimed was a simple judgment collection action. A-715. Plaintiff's inability to collect its judgment is a function of what assets KMC possessed and whether its disposition of those assets was wrongful—an issue that could have been readily resolved by the legal remedies Plaintiff pursued for years in discovery,

_____

[5] If there is any doubt on this point, the question should be certified to the Connecticut Supreme Court.

but abandoned shortly before trial. Count Three of Plaintiff's Second Amended Complaint challenged as fraudulent every single transfer that was the subject of its veil-piercing claims, including KMC's December 2002 distribution in the amount of $1.1 million, the Portfolio Sale commissions, the common account transactions, and the 2005 Transfers. A-609 at Count 3, ¶ 84.

One of Mr. Konover's defenses at trial was that Plaintiff had less Draconian, adequate legal remedies available to it that would have precisely compensated Plaintiff for its alleged harm. "A litigant is entitled to have the jury instructed as to his...theories of law if supported by the evidence and brought to the attention of the court." *Carvel*, 930 F.2d at 230 (citing *Oliveras* v. *United States Lines Co.*, 318 F.2d 890, 892 (2d Cir. 1963)). Mr. Konover's defense was well-supported by the evidence, and he was therefore entitled to the instruction.

Alternatively, even if Mr. Konover's adequate remedies at law defense was an issue for the Court, the District Court erred by denying Mr. Konover's motion for judgment on this point. A-1215. This Court may review that error *de novo*.

### E.   Mr. Konover was Entitled to an Instruction about the Meaning of "Equity."

Mr. Konover requested that the Court provide some instruction about the meaning of "equity," including that "[e]quity takes into consideration fairness to both the plaintiff and the defendant" and that "[a] hard bargain is not enough to warrant the use of equitable power to pierce the corporate veil." A-1303.

Plaintiff argues that Mr. Konover did not suffer prejudice from Judge Thompson's refusal to adopt any portion of this instruction because "Konover's counsel had no trouble explaining to the jury why, in his view, imposing liability would be unjust and inequitable." Plaintiff's Br. 57. "That a party has the chance to argue its legal theory to the jury during trial does not relieve the trial court of its responsibility to instruct the jury fully and clearly on the applicable law." *Norville* v. *Staten Island Univ. Hosp.*, 196 F.3d 89, 101 (2d Cir. 1999) (Sotomayor, *J.*).

Moreover, here the absence of the requested instruction permitted Plaintiff's counsel to argue incorrectly in summation that equity was a one-way street. A-6903:6-13 ("[T]hat's justice and equity for Wells Fargo. This [veil-piercing instruction] does not speak to justice and

26

equity for Michael Konover."). Mr. Konover was entitled to an instruction that the jury was required to consider fairness to both parties. He also was entitled to an instruction that under equitable principles, the jury could not find that the fact that Plaintiff made a bad bargain with a "weak guarantor" was enough to warrant veil-piercing.

In sum, the Court's barebones instructions failed to provide sufficient guidance to the jury and ensure a fair verdict.

### III.  Mr. Konover is Entitled to Judgment in His Favor.

### A.  Mr. Konover did not Cause Plaintiff's Inability to Collect a $22.8 Million Judgment from a $4.4 Million Company.

Citing Judge Easterbrook's opinion in *Secon Services Systems, Inc.* v. *St. Joseph Bank & Trust Company*, 855 F.2d 406, 413-14 (7th Cir. 1988), we showed in our opening brief that it would be improper to pierce KMC's veil when the lender of the Diamond Point loan "entered into a voluntary arrangement with the corporation, which gave them an opportunity to negotiate terms reflecting any enhanced risk to which doing business with an entity enjoying limited liability exposed them." Konover Br. 88. We explained that the Diamond Point lenders knowingly waived their insistence on a: minimum net worth covenant; restriction on KMC's ability to take on debt or make distributions to Mr.

27

Konover; and personal guaranty by Mr. Konover. *Id.*

Plaintiff has addressed none of these points. Instead, Plaintiff argues that the lenders' knowledge of KMC's $4.4 million net worth is irrelevant, because Mr. Konover (or more accurately employees of Konover Capital Advisors) "expressly represented to the lender that KMC would remain a viable entity, with revenue and income sufficient to satisfy its obligations under the guaranty[.]" Plaintiff's Br. 62. Putting aside the complete lack of evidence that Mr. Konover made any such representations,[6] and the fact that Plaintiff's contorted explanation of the guaranty would have meant that KMC was in default on day one, Plaintiff's argument fails.

Plaintiff contends that Ms. Larkin held KMC out as a "viable" entity that had assets sufficient to satisfy the guaranty. Plaintiff's Br. 62. But Plaintiff ignores the history of the loan negotiation, Konover Br. 15-17, and asks this Court to believe that sophisticated lenders such as PaineWebber rely on vague and qualified statements by potential guarantors that it can be "reasonably expected that KMC will remain a viable entity," A-7305, as opposed to hard figures and express

---

[6] *See* pages 3-5 above.

28

covenants. For all of Plaintiff's contentions below that KMC fraudulently induced the lenders into making the Diamond Point loan, no one testified at trial on behalf of ORIX, Wells Fargo, PaineWebber, or Pinnacle that any lender believed that KMC would ever have a net worth in excess of the $4.4 million shown on the financial statements they were provided. Nor did Plaintiff offer any evidence that the lenders ever believed or were ever told that KMC would in the future quintuple its net worth such that it would be able to satisfy a $20 million judgment.[7] To the contrary, ORIX sized up KMC as a "weak" guarantor when the loan was accepted in the SBMS VII pool. Konover Br. 21, 100.

## B.   Despite Plaintiff's Resistance, *State Five* Controls.

Unless this Court were to find that *State Five's* proximate cause determinations have no effect on this case, the result below cannot stand. Under Plaintiff's theory of causation, any transaction that involves payments by a judgment debtor to a third party constitutes a proximate cause of the judgment creditor's later inability to collect its

---

[7] Plaintiff's argument that the language of the Guaranty itself supports such a contention, Plaintiff's Br. 62, was not evidence of reliance. Moreover, the head of Konover Capital Advisors who oversaw the Diamond Point refinancing rejected Plaintiff's absurd interpretation of the Guaranty. A-4116:13-25. Plaintiff called no lender representative to dispute that testimony.

29

judgment—even if the payment transaction precedes the judgment by several years. Plaintiff's Br. 58-60. Yet if that were right, *State Five* would have come out differently.

As demonstrated in our opening brief, the *State Five* Court concluded that transfers occurring several years before the plaintiffs obtained their judgment could *not* have been the proximate cause of the plaintiffs' inability to collect. The Court held that where the veil-piercing target made challenged transfers prior to the judgment, "it cannot be argued that [any such] transfer was contrary to the plaintiffs' legal rights and proximately caused their inability to collect on their judgment." *State Five*, 37 A.3d at 737.

Plaintiff minimizes these principles by suggesting that "[t]he *State Five* Court held only that the '*sui generis*' transfers and evidence before it were insufficient to establish proximate cause." Plaintiff's Br. 61. But Plaintiff refuses to acknowledge the single relevant characteristic of those transfers—which is that they occurred *before* the judgment. Plaintiff attempts to distinguish *State Five* by pointing to its (unproved and fanciful) allegation that "Konover foresaw the [2002] monetary default on the Diamond Point loan," and then directed the prejudgment

30

transfers under attack. Plaintiff's Br. 61.

To begin with, that explanation does not account for any of the conduct occurring before the Diamond Point refinancing on which Plaintiff also premised its veil-piercing theories at trial. Nor does it distinguish this case from *State Five*, where the same argument was made. There, the plaintiff argued that during the litigation that led to the judgment at issue, Farricielli caused a judgment debtor to transfer a strip of land to State Five for no consideration. The plaintiff argued that Farricielli "then negotiated a cell tower lease for that property, with the result that the lease payments flowed to State Five, as opposed to the defendants on the 2001 Judgment." *McCarthy*, Brief for Plaintiff-Appellee, 2010 WL 7407760, *6 (Conn., March 18, 2010); *McCarthy* v. *State Five Indus. Park, Inc.*, 2009 WL 104287, at *27 (Conn. Super. Ct., Jan. 5, 2009). Despite that contention (and the corresponding finding by the Superior Court), the Supreme Court held that the proper method to challenge a prejudgment transfer was through the legal remedy of a fraudulent transfer action, not a veil-piercing claim. *State Five*, 37 A.3d at 148 n.19.

Finally, Plaintiff makes much of the fact that *State Five* involved

31

reverse veil-piercing. Plaintiff's Br. 60-61. But there is no reason why causation principles should vary between reverse veil-piercing and traditional veil-piercing. Plaintiff offers none. Moreover, if controlling principles involved in reverse veil-piercing cases really were irrelevant or materially different, Plaintiff would not have cited the Superior Court's decision in *State Five* twelve times in support of its jury instructions, A-1230, and would not have cited *Litchfield* right beside it and again in its brief before this Court, Plaintiff's Br. 40, 51. Both are reverse veil-piercing cases. Nor would the *State Five* Court have cited to traditional veil-piercing decisions such as *Naples* and *Angelo Tomasso, Inc.* v. *Armor Constr. & Paving, Inc.*, 447 A.2d 406 (Conn. 1982).

In sum, Plaintiff's sustained effort to explain away the applicability of *State Five* is unpersuasive.

### C.   Under *State Five* Principles, the Result is No Different Under the Identity Rule.

Plaintiff next contends that even if Mr. Konover's conduct did not proximately cause Plaintiff's inability to extract $22.8 million from a $4.4 million company, identity rule liability would still exist. Plaintiff's Br. 63-64. That is because—according to Plaintiff—under the identity test a veil-piercing plaintiff need not show that the defendant's conduct

caused the plaintiff's inability to collect. *Id.*

Plaintiff acknowledges that the District Court has referred to the instrumentality rule and the identity rule as "often interchangeable," but stresses that the two tests have different elements. Plaintiff's Br. 66. But Plaintiff can cite no case in which a court applying Connecticut law has found that a veil-piercing defendant's conduct did *not* proximately cause the plaintiff's inability to collect its judgment, but nevertheless held the defendant liable. No court has approved such an inequitable result.

Indeed, in *State Five*, after the Supreme Court reversed the lower court's proximate cause determinations, it dispensed with the Superior Court's alternative finding of identity rule liability in a single footnote, noting succinctly that "similar to the instrumentality rule, the identity rule is not satisfied." *State Five*, 37 A.3d at 738 n.21. And, in *Naples*, after deciding that the plaintiff failed to prove under the instrumentality test that the veil-piercing target's conduct had proximately caused the injury, the Supreme Court concluded that the plaintiff had failed to prove its claim under the identity test "[f]or the same reasons." *Naples*, 990 A.2d at 342.

33

In short, Plaintiff cannot save its case by resting on the "often interchangeable" identity rule because *State Five* has indicated that this alternative test also requires proof of proximate cause. *See also CSX Transp., Inc.* v. *Blakeslee*, 2012 WL 3985169, \*6 (D. Conn., Sept. 11, 2012); *RBC Bearings, Inc.* v. *Thin Section Bearings, Inc.*, 2007 WL 2727160, \*1 (D. Conn., Sept. 18, 2007); *Schuftan* v. *Bridges*, 2007 WL 2688856, \*1 (D. Conn, Sept. 13, 2007).[8]

Furthermore, the identity test required Plaintiff to show that KMC's existence had ceased or never begun, and that recognition of Mr. Konover's separateness from KMC would permit "the economic entity to escape liability." A-1559; A-7110:22-7111:10. It required Plaintiff to show that KMC was a "mere shell used...primarily as an intermediary to perpetrate fraud or promote injustice." *Naples*, 990 A.2d at 342.

Plaintiff stipulated that KMC was created in 1984 for a proper purpose. Konover Br. 5. There is also no dispute that throughout the time period before the Maryland Judgment, KMC was a general partner of dozens of real estate companies, A-10028; A-9144; managed multiple

---

[8] If there is any doubt concerning the question whether the identity rule contains a causation component, the question should be certified to the Connecticut Supreme Court.

properties along the East Coast, A-5750:9-17; entered into financial transactions, A-5750:9-17; A-5766:14-16; A-5771:21-5772:24; hired and fired employees, A-5770:16-21; A-5791:24-5793:2; observed all corporate formalities, Konover Br. 6; and, existed as an operational entity separate from its owner, Mr. Konover, A-5770:6-5771:16; A-3859:20-3860:5.

Mr. Konover freely acknowledged at trial that following the Maryland court's announcement that it would enter judgment against KMC, he, as opposed to Mr. Goman, directed KMC's litigation with Plaintiff and the sale of KMC's 1% interests to fund a settlement or appeal. Konover Br. 36-39. However, by taking these steps Mr. Konover did not cause KMC to "cease" its existence so that it could "escape liability." At the end of 2004, before the Maryland trial, KMC still acted as a partner in real estate entities, managed other properties, and observed all corporate formalities. A-10137; A-9144; A-10000-10002; A-10024; A-10137. But, because of the Portfolio Sale, it had less than $1 million in net worth, almost all of it illiquid. A-2555:1-2576:6; A-7998. KMC was not in a position to pay even a fraction of the Maryland Judgment.

Some companies face judgments they cannot pay and are forced to wind down and discontinue operations. And when they do, those responsible for the companies, in this case Mr. Konover, have to act on their behalf. But that fact does not give rise to liability for their corporate owners under the identity rule. Rather, it is simply a "reflection of the reality that all corporations act through individuals." *KLM Indus., Inc.* v. *Tylutki*, 815 A.2d 688, 693 (Conn. App. 2003).

Indeed, after 2005, Mr. Konover continued to fund KMC through capital contributions and loans, A-4387:13-4388:2; A-10288, and made sure KMC continued to comply with its corporate formalities, A-10014; A-10020. KMC did not become a shell corporation and never was used to perpetrate a fraud or injustice. There was no basis to pierce KMC's veil under the identity test, even if causation were not an element of the claim.

## IV. Plaintiff's Second Attempt to Pursue its Fraudulent Inducement Theory was Barred by Res Judicata.

In response to Mr. Konover's argument that Plaintiff was precluded by res judicata from attempting a second time to prove that KMC fraudulently induced the Diamond Point loan, Plaintiff argues that: 1) "follow-on veil-piercing suits seeking to enforce judgments" are

36

permissible; 2) Plaintiff's fraudulent inducement theory was focused on "the relationship between Konover and KMC"; 3) many of the operative facts of this case arose *after* the Maryland Judgment; and 4) the operative facts that arose before the Maryland Judgment were unknown to Plaintiff during the Maryland Action. Plaintiff's Br. 68-72. Each contention is flawed.

### A. Under Res Judicata, Veil-Piercing Theories that a Defendant Caused the Plaintiff's Inability to Collect a Judgment are Permissible; Theories that a Defendant Caused the Judgment are Not.

Plaintiff begins by pointing out the obvious: that claim preclusion does not prevent "follow-on veil-piercing suits seeking to enforce judgments against...debtors." Plaintiff's Br. 68. Indeed, *State Five* was such a case. But as *State Five* makes clear, in "follow-on" cases, the plaintiff must "establish with specificity the necessary connection between [the veil-piercing defendant's] improper actions...and the plaintiffs' inability to collect on the judgment." *State Five*, 37 A.3d at 737. As noted, Judge Droney recognized this principle repeatedly below—even before *State Five* was handed down. SPA-19.

The problem for Plaintiff is not that "follow-on" suits are impermissible. The problem for Plaintiff is that res judicata barred its

37

effort to turn the trial in this case from a "follow-on" suit into a retrial of its failed attempt to show that KMC fraudulently induced the Diamond Point loan. As we showed in our opening brief, Maryland law precludes subsequent suits that merely take on a "different form." *Pat Perusse Realty Co.* v. *Lingo*, 238 A.2d 100, 102 (Md. 1968).

## B. Plaintiff's Maryland and Connecticut Fraudulent Inducement Theories are Identical.

Plaintiff concedes, as it must, that its strategy below was "to show how Konover and his subordinates misrepresented KMC's financial condition and suitability to be the guarantor of the Diamond Point loan." Plaintiff's Br. 72-73. It then strains to distinguish its fraudulent inducement theory in this case from the identical theory it pursued in Maryland. Plaintiff characterizes its theory in this case as focusing on KMC's fraud and Mr. Konover's "relationship with KMC." Plaintiff's Br. 73. Plaintiff then contrasts its fraudulent inducement theory in Maryland as having been "focused on...DPPLP's frauds." Plaintiff's Br. 73.

Plaintiff's "attempt to draw fine distinctions between the types of fraud in the two actions is unavailing." *Saud* v. *Bank of New York*, 929 F.2d 916, 920 (2d Cir. 1991) (holding that res judicata applies to "broad

allegations of fraud in connection with the same loan transaction"). Indeed, to support its distinction, Plaintiff ignores the fact that it alleged in the Maryland Action that KMC had "actively participated in the acts of deceit, fraud[,] and misrepresentation perpetrated by [DPPLP]." A-9609 at Count IV; Konover Br. 32. Plaintiff also disowns its failure to prove that theory in Maryland. But whether Plaintiff prevailed on these claims in Maryland or not, the identical nature of the theories means that res judicata applies.

Yet the District Court awarded Plaintiff a fresh opportunity to pursue the same theory in Connecticut, and allowed Plaintiff to argue—despite a complete absence of evidence—that Michael Konover caused KMC to fraudulently induce the lenders to make the Diamond Point loan. Res judicata barred that claim and should have precluded weeks of testimony which Plaintiff sought to support it.

### C. Plaintiff Focused on Conduct that Occurred Long Before the Maryland Judgment.

Plaintiff next argues that "many of the operative facts in this case...occurred after the Maryland judgment entered[.]" Plaintiff's Br. 71. Plaintiff's statement is contradicted both by the record and Plaintiff's own characterizations of the record. A-4552:1-2 ("the time

39

frame from 2000 through 2002...really is the focus for this case"). *All* of the operative facts relating to Plaintiff's theory that KMC misrepresented its $4.4 million net worth and "reasonably expected viability" occurred long before Plaintiff filed the Maryland Action in 2003. *None* of those operative facts occurred after the Maryland Judgment was entered in 2005.

### D. Plaintiff Either Knew all of the Relevant Facts during the Maryland Action or Could have Discovered Them.

Finally, Plaintiff contends that as to those operative facts that it concedes occurred before the Maryland Judgment, res judicata does not apply because they "were unknown to Wells Fargo at the time." Plaintiff's Br. 71.

Plaintiff again denies the record. The very document on which Plaintiff based its fraudulent inducement theory below—the Larkin Memo—was produced in discovery in the Maryland Action. In fact, it was a Maryland trial exhibit. Konover Br. 34. And multiple witnesses that Plaintiff's counsel deposed in the Maryland Action described the Portfolio Sale, which was public knowledge. *Id.*

But even if some isolated fact was unknown to Plaintiff at the time, that does not overcome the effect of res judicata. "Generally, the

doctrine of res judicata applies even where the subsequent action is premised upon 'newly discovered evidence' unless that evidence 'was fraudulently concealed' or 'could not have been discovered with reasonable diligence.'" *Ningbo Prods. Imp. & Exp. Co.* v. *Eliau*, 2011 WL 5142756, at *9 (S.D.N.Y., Oct. 31, 2011). *See also Saud*, 929 F.2d at 920; *Guerrero* v. *Katzen*, 774 F.2d 506, 508 (D.C. Cir. 1985).

Plaintiff makes no claim that KMC or DPPLP concealed any of the operative facts during the Maryland Action. Nor does Plaintiff suggest that it could not have uncovered the allegedly concealed evidence "with minimal diligence." Accordingly, res judicata applies because Plaintiff's fraudulent inducement theory arose out of the same factual predicate as its claims in Maryland: the lenders' decision to make the Diamond Point loan. "The new claims are based on different legal theories rather than different facts and, accordingly, could have been raised in the original complaint." *L-Tec Elecs. Corp.* v. *Cougar Elec. Org., Inc.*, 198 F.3d 85, 88 (2d Cir. 1999).

41

**V.   The District Court Abused its Discretion by Admitting into Evidence a Subset of Uncontestable Maryland Findings.**

**A.   Fairness is Always a Consideration.**

Plaintiff contends that "fairness" is relevant to collateral estoppel only in its "offensive nonmutual" form, which (according to Plaintiff) Maryland does not recognize.[9] In fact, given the constraints of due process, fairness is always a consideration when applying collateral estoppel. *See*, *e.g.*, *Blonder-Tongue Labs.*, *Inc.* v. *Univ. of Ill. Found.*, 402 U.S. 313, 332-33 (1971); *Parklane Hosiery Co.* v. *Shore*, 439 U.S. 322, 331 (1979); *United States* v. *United States Currency in the Amount of $119,984*, 304 F.3d 165, 172 (2d Cir. 2002); *Remington Rand Corp.* v. *Amsterdam-Rotterdam Bank, N.V.*, 68 F.3d 1478, 1486 (2d Cir. 1995).

Here, DPPLP had little incentive to defend against the fraud claims in Maryland because it was a single-purpose entity with no assets other than the Diamond Point shopping center, which was in the process of foreclosure. And the application of collateral estoppel in a future veil-piercing action was not foreseeable to Mr. Konover, which is precisely what Plaintiff wanted. Plaintiff easily could have served notice in the

---

[9] *But see Shader* v. *Hampton Improvement Ass'n, Inc.*, 94 A.3d 224, 239 (Md. App. 2014), *cert. granted*, 101 A.3d 1063 (Md. 2014) ("[W]e hold that...a plaintiff who invokes nonmutual collateral estoppel...may proceed so long as [it] does not offend the *Parklane* factors").

Maryland litigation that it would seek to hold Mr. Konover liable for the enormous damages sought against other defendants. Instead, Plaintiff sued Mr. Konover as an individual defendant on a far smaller claim, while concealing any intention to file subsequent veil-piercing claims for the massive damages it sought from judgment-proof entities.

The District Court's application of collateral estoppel in this case was fundamentally unfair to Mr. Konover, and therefore an abuse of the Court's discretion.

### B.   Even if Collateral Estoppel Applies, the Findings of Fact were Inadmissible.

Even where a plaintiff meets the elements of collateral estoppel, a federal trial court may nevertheless refuse to instruct a jury in a way that will badly distort the issues being tried. *Biggins* v. *Hazen Paper Co.*, 111 F.3d 205, 207 (1st Cir. 1997).

In *Biggins*, a plaintiff won several claims against his former employers. They included an ADEA claim, an ERISA claim, and claims for fraud and breach of contract. The First Circuit remanded the case for a second jury trial on the ADEA claim. Before the start of the second trial, the plaintiff invoked collateral estoppel with respect to four factual findings concerning his firing that the first jury had made

43

through a special verdict form. The District Court refused to so instruct the jury.

On appeal, the First Circuit rejected the defendants' arguments that collateral estoppel did not apply. But the Court affirmed the trial court's refusal to instruct the jury. The Court held that even if collateral estoppel applied, the findings were excluded properly under the rules of evidence. Citing Rule 403, the Court held that "[w]e think that it would badly distort matters to tell the jury that in carrying out [its] task, it must accept that the [defendants'] motivation in firing [plaintiff] was wrongful or fraudulent. The glare from such an instruction would distort any effort to distinguish shadows or shades in the [defendants'] actual motivation." *Id.* at 210.

Plaintiff's use of the Maryland findings went far beyond that standard. Plaintiff's retrial of the Maryland Judgment badly distorted the issues to be decided by the Connecticut jury. Plaintiff's "impeachment" of Susan Larkin is but one example. Plaintiff impugned Ms. Larkin's credibility by citing a discrepancy the Maryland court found between her deposition and trial testimony concerning Plaintiff's successful fraud claim against DPPLP. But the evidence that led to the

44

Maryland Judgment had little if any relevance to the veil-piercing trial in Connecticut.

### C. The District Court Violated the Rule of Completeness.

Plaintiff contends that the District Court did not err by refusing Mr. Konover's invocation of the rule of completeness. Plaintiff argues that the additional findings of fact made by the Maryland court concerning Plaintiff's $633,000 fraudulent transfer claim were irrelevant because they involved the court's refusal to impose punitive damages. Plaintiff's Br. 83. Plaintiff claims that these additional findings were "in no way necessary to 'explain' the factual findings underlying the fraudulent-transfer judgment[.]" *Id.*

To put that argument in context, Plaintiff contends that the $633,000 transfer findings were relevant because they went to Mr. Konover's "intent" and "state of mind." Plaintiff's Br. 42-43. But at its core, the $633,000 issue in Maryland involved a dispute about whether funds DPPLP held in its bank account constituted "rents" within the meaning of DPPLP's assignment of rents to the lender. *See* A-7205 at No. 172; A-7206 at No. 176; A-7207 at Nos. 184-87. The Maryland court found that the funds constituted rents, and that DPPLP had improperly removed

the funds from its bank account. That conclusion led the Circuit Court to adopt no less than 74 findings (almost all of which proposed by Plaintiff) aimed ostensibly at ensuring that the "rents" would be handed over to Plaintiff. A-7163-7173 at Nos. 170-244. Among those findings, the Court determined that the transfer of rents benefitted Mr. Konover through a series of ledger transactions. *See* A-7169 at No. 207.

Even assuming that a judicial finding that Mr. Konover *received* a transfer of "rents" was probative of his state of mind, when Mr. Konover attempted to point out that the Circuit Court had made additional findings about his state of mind, the District Court shut him down. Findings 243 and 378—which showed that Mr. Konover did not act with malice, meaning he had no "consciousness of wrongdoing"—also shed light on his state of mind. A-7173 at No. 243; A-7193 at No. 378. After all "malice" is all about "states of mind." *Holloway-Johnson* v. *Beall*, 103 A.3d 720, 741 (Md. App. 2014). Plaintiff trips over its own argument when it claims that the factual findings concerning the $633,000 transfer were relevant to Mr. Konover's state of mind, but then contends that findings 243 and 378 were "in no way necessary" to explain Mr. Konover's state of mind. Plaintiff's Br. 83.

46

Finally, Plaintiff warns that admission of findings 243 and 378 may have led some jurors to conclude that "the Maryland court's findings were internally inconsistent." Plaintiff's Br. 83. But that would be a reason to exclude all of the $633,000 transfer findings, not just the findings that Plaintiff wanted to conceal from the jury. Put another way, Mr. Konover's complaint that the District Court admitted only that "state of mind" evidence that benefitted Plaintiff is not an invitation for this Court to apply "freewheeling fairness." It is instead a request for fundamental fairness, to which every litigant is entitled.

## VI.  Plaintiff's Award of Punitive Damages Must be Vacated.

### A.  Veil-Piercing is a Remedy, not a Cause of Action.

Plaintiff does not dispute that under Connecticut law, a punitive damages remedy requires a supporting cause of action. Plaintiff's Br. 85-86. Plaintiff now argues that veil-piercing remedies *are* causes of action. Yet Plaintiff's position is flatly contrary to arguments it made below. In fact, Plaintiff convinced the District Court that *Everspeed Enterprises Ltd.* v. *Skaarup Shipping International*, 754 F. Supp. 2d 395, 403 (D. Conn. 2010) stood for the opposite proposition. A-1049 (arguing that the principle that "[a]n attempt to pierce the corporate veil is not itself a cause of action" is "well-established" and

47

"undisputable"). In any event, *Everspeed* is clear. Piercing the corporate veil is a remedy, not a cause of action.

Plaintiff's next step is to cite to *Cadle Company* v. *Zubretsky*, 2008 WL 441935, at *8 (Conn. Super. Ct., January 30, 2008) as support for its novel claim that a plaintiff can permissibly tack on a punitive damages remedy to a veil-piercing remedy. Yet even the District Court recognized that the holding in *Cadle* was unclear. That is because the sole case cited by the Superior Court in *Cadle* was *CFM of Connecticut, Inc.* v. *Chowdhury*, 685 A.2d 1108, 1118 (Conn. 1996)—a sanctions opinion having nothing to do with punitive damages.

Plaintiff's position also is inconsistent with Connecticut cases in which a plaintiff made a remedial request to pierce the corporate veil and also sought punitive damages in connection with other causes of action. In those cases, the courts never even hinted that a veil-piercing remedy could supply the necessary cause of action sufficient to support an award of punitive damages. *See, e.g., Litchfield Asset Mgmt. Corp.* v. *Howell*, 799 A.2d 298, 309 (Conn. App. 2002) (reversing punitive damages award based on an alleged conspiracy to defraud); *N. Tankers (Cyprus) Ltd.* v. *Backstrom*, 968 F. Supp. 66 (D. Conn. 1997) (denying

punitive damages despite finding that defendants had committed "wanton and wilful malicious misconduct" with respect to fraudulent transfers of assets); *Societa Bario E. Derivati* v. *Kaystone Chem., Inc.*, 1998 WL 182563, at *1 (D. Conn., April 5, 1998) (relying on CUTPA as sole basis for an award of punitive damages).

In sum, Plaintiff's position that veil-piercing is a cause of action capable of supporting a punitive damages remedy is unsupported by Connecticut law and contradicted by its prior litigation positions.

## B. DPPLP's Mortgage Agreement Does not Provide a Basis to Award Fees Against Mr. Konover.

Plaintiff argues that language in DPPLP's mortgage agreement is sufficiently clear to avoid the effect of merger under Maryland law and allowed the District Court to award attorneys' fees against Mr. Konover, who was not a party to DPPLP's mortgage agreement. Plaintiff's analysis of *SunTrust Bank* v. *Goldman*, 29 A.3d 724 (Md. App. 2011) is wrong. The language in the mortgage agreement, which says nothing about merger, claim preclusion, claim splitting, or post-judgment proceedings, is insufficient to provide a mortgagee with the

right to seek post-judgment attorneys' fees under Maryland law.[10]

Yet even if Plaintiff's view of *SunTrust* was correct, Plaintiff nowhere contends that the District Court could award attorneys' fees against DPPLP under the mortgage agreement. Nor could it. That is because Judge Droney granted Mr. Konover summary judgment with respect to Plaintiff's attempt to pierce DPPLP's veil. How then can Mr. Konover be held liable for an award of attorneys' fees that was not—and could not have been—imposed on DPPLP itself? Plaintiff has no answer. Neither did the District Court.

This Court should reject the District Court's alternative ruling that Mr. Konover could be held liable for attorneys' fees under DPPLP's mortgage agreement.

---

[10] Plaintiff does not (indeed could not) seriously argue that anything in the KMC Guaranty meets the *SunTrust* standard. *See* Plaintiff's Br. 90 n.35.

## CONCLUSION

For these reasons, this Court should vacate the District Court's judgment and render judgment in favor of Mr. Konover. At minimum, the Court should order a new trial.

Respectfully submitted,

*/s/ William J. Murphy*
William J. Murphy
Conor B. O'Croinin
ZUCKERMAN SPAEDER LLP
100 East Pratt Street, Suite 2440
Baltimore, Maryland 21202–1031
(410) 332–0444; (410) 659–0436 (fax)
wmurphy@zuckerman.com
cocroinin@zuckerman.com

James T. Shearin
PULLMAN & COMLEY, LLC
850 Main Street, P.O. Box 7006
Bridgeport, CT 06601–7006
(203) 330–2000; (203) 576–8888 (fax)
jtshearin@pullcom.com

*Attorneys for Defendant–Appellant*
*Michael Konover*

51

## CERTIFICATE OF COMPLIANCE

In conformance with Rule 32(a)(7)(C) of the Federal Rules of Appellate Procedure, and this Court's order of November 26, 2014 granting Appellant's motion for an expansion of the allowable word count, the foregoing brief is in 14-point Century Schoolbook proportional font and contains 9,928 words. Accordingly, the brief complies with the type-volume limitation set forth in Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure and this Court's order of November 26, 2014.

Dated:    March 13, 2015                    */s/ Conor B. O'Croinin*
                                            Conor B. O'Croinin

                                            *Attorney for Defendant–Appellant*
                                            *Michael Konover*

**CERTIFICATE OF SERVICE**

In conformance with Rule 25(d) of the Federal Rules of Appellate Procedure, I certify that on March 13, 2015, I caused the foregoing Reply Brief of Defendant–Appellant to be filed electronically with the Clerk of the Court of the United States Court of Appeals for the Second Circuit by using the Court's Case Management/Electronic Case Filing (CM/ECF) system, which will send notification of this filing to all registered counsel of record.

I further certify that I will submit paper copies of Appellant's Principal Brief in conformance with Local Rules 30.1(b) and 31.1 and Rule 30(a)(3) of the Federal Rules of Appellate Procedure.

*/s/ William J. Murphy*
William J. Murphy

*Attorney for Defendant–Appellant Michael Konover*